KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS - #158708
epeters@keker.com
LAURIE CARR MIMS - #241584
lmims@keker.com
STEVEN P. RAGLAND - #221076
sragland@keker.com
CODY S. HARRIS - #255302
charris@keker.com
ELIZABETH K. McCLOSKEY - #268184
emccloskey@keker.com
SEAN M. ARENSON - # 310633
sarenson@keker.com
MAYA PERELMAN - # 318554
mperelman@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Plaintiff
GENENTECH, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GENENTECH, INC., | Case No. 3:18-cv-06582-WHA |
| Plaintiff, | **PLAINTIFF GENENTECH, INC.'S AMENDED NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| JHL BIOTECH, INC., XANTHE LAM, an individual, ALLEN LAM, an individual, JAMES QUACH, an individual, RACHO JORDANOV, an individual, ROSE LIN, an individual, JOHN CHAN, an individual, and DOES 1-50, | Date:       December 13, 2018<br>Time:       9:30 a.m.<br>Dept:       Courtroom 12 - 19th Floor<br>Judge:      Hon. William Alsup |
| Defendants. | Date Filed: October 29, 2018<br>Trial Date: Not Set |

1309589

## AMENDED NOTICE OF MOTION

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 13, 2018 at 9:30 a.m., or as soon thereafter as this matter may be heard by the above-captioned Court, at 450 Golden Gate Ave., Courtroom 12 – 19th Floor, San Francisco, CA 94102, before the Honorable William Alsup, Plaintiff Genentech, Inc. will and hereby does move this Court, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Rule 65-1, for a preliminary injunction against all Defendants.

As set forth in detail in the accompanying [Proposed] Order Granting Plaintiff's Motion for Preliminary Injunction, Genentech specifically requests a preliminary injunction:

1. restraining and enjoining JHL Biotech, Inc., Xanthe Lam, Allen Lam, Racho Jordanov, Rose Lin, John Chan, and James Quach (collectively "Defendants") from disclosing or using, directly or indirectly, Genentech's trade secret information;

2. restraining and enjoining Defendants from making, testing, using, promoting, offering to sell, marketing, commercializing, or selling biologics, therapeutics, drugs, and/or products of any kind that utilize, embody, or were developed, in whole or in part, with the benefit or use of any of Genentech's trade secret information;

3. restraining and enjoining Defendants from utilizing any processes or methods that are derived from, contain, or embody, in whole or in part, any of Genentech's trade secret information;

4. restraining and enjoining Defendants from submitting to or filing with any regulatory body any documents or other materials (in paper, electronic, or any other form, including, for example, cell lines, assays, test results, drug substances, or drug products) that are derived from, contain, or embody, in whole or in part, any of Genentech's trade secret information;

5. requiring Defendants to preserve and to return to Genentech within fourteen (14) calendar days of the date of the Court's Order on this Motion (i) all copies of all

i

Genentech documents and information, including without limitation any trade secret and other confidential or proprietary information acquired from Genentech; and (ii) all copies of all materials (in paper, electronic, or any other form, including, for example, cell lines, assays, test results, drug substances, or drug products) containing any, or derived from any, Genentech information, trade secrets, or other confidential or proprietary information;

6. requiring JHL Biotech, Inc., Racho Jordanov, and Rose Lin (collectively "JHL Defendants") to conduct, within thirty (30) calendar days of the date of the Court's Order on this Motion, a thorough investigation and provide a detailed accounting under oath, setting forth each individual and entity to whom or to which Defendants and any of them, and their employees or representatives, and all persons acting in concert or participating with them, disclosed (i) any Genentech documents or other materials (in paper, electronic, or any other form, including, for example, cell lines, assays, test results, drug substances, or drug products) or (ii) any of Genentech's confidential, proprietary, and/or trade secret information; and

7. requiring Defendants to provide to Genentech's counsel and the Court, within thirty (30) calendar days of the date of the Court's Order on this Motion, a complete and chronologically organized log of all oral and written communications—including, without limitation, conferences, meetings, phone calls, Skype or video-chat sessions, one-on-one conversations, texts, emails, letters, memos, and voicemails—wherein Xanthe Lam, Allen Lam, John Chan, or James Quach may have mentioned any Genentech confidential, proprietary or trade secret information to any officer, director, employee, agent, supplier, vendor, customer, client, partner, or consultant of the JHL Defendants.

As set forth in the accompanying Memorandum of Points and Authorities, this Motion is made on the grounds that Plaintiff is likely to succeed on the merits of its claims, Plaintiff will suffer irreparable injury and key evidence may be lost unless all Defendants are enjoined as

1309589

1  requested; the balance of equities is decidedly in Plaintiff's favor; and injunctive relief is in the

2  public interest.

3       This Motion is based on this Notice of Motion and Motion, the Complaint in this action,

4  the Memorandum of Points and Authorities filed concurrently herewith, the accompanying

5  Declarations of Daniel J. Kirshman; Jamie Moore; Paul Bezy; Doug Balogh; Paul T. French;

6  Elliot R. Peters; and Elizabeth K. McCloskey, along with supporting exhibits; the Proposed Order

7  submitted herewith, further papers and argument as may be submitted to the Court in connection

8  with the Motion, and such evidence and argument as may be presented at the hearing before this

9  Court.

10

11  Dated:  November 6, 2018          KEKER, VAN NEST & PETERS LLP

12

13  By:   */s/ Elliot R. Peters*
                 ELLIOT R. PETERS

14

15                   Attorney for Plaintiff
                 GENENTECH, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

1309589

## TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND ...............................................................................3

    A.   Genentech is a global leader in developing cutting-edge biotherapies. ..................3

    B.   Access to proven analytical data, methods, and manufacturing protocols would prove highly valuable to a biosimilar manufacturer. ......................3

    C.   The Trade Secrets at Issue .................................................................................5

    D.   Genentech takes reasonable efforts to protect its trade secrets. ...........................5

    E.   Defendants misappropriated Genentech's trade secret information. .....................6

        1.   Acting as JHL agents, Xanthe and Allen Lam funneled Genentech trade secrets to JHL in person and via email. ................................6

        2.   Xanthe recruited John Chan to JHL to serve as another conduit for Genentech trade secret information. .........................................12

        3.   With Xanthe's help, Defendant James Quach unlawfully accessed Genentech's computer system and downloaded hundreds of confidential documents before leaving for JHL. ..................13

    F.   JHL used Genentech's trade secret information to fuel its meteoric rise as a biotech startup. ................................................14

    G.   Following an anonymous tip, Genentech promptly launched an investigation, alerted law enforcement, and sought relief as soon as possible. ................................16

III.  LEGAL STANDARD ........................................................................................17

IV.   ARGUMENT ....................................................................................................18

    A.   Genentech is likely to succeed on the merits of its DTSA and CUTSA claims. ................................18

    B.   Genentech is suffering irreparable harm. ..........................................................22

    C.   The balance of equities and public interest favor Genentech. .............................25

V.    CONCLUSION .................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*,
   2015 WL 7575925 (M.D.N.C. Nov. 25, 2015)................................................23

*Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*,
   819 F. Supp. 2d 1001 (E.D. Cal. 2011)......................................................23

*Arc of Cal. v. Douglas*,
   757 F.3d 975 (9th Cir. 2014) ......................................................................18

*Beckman Instruments, Inc. v. Cincom Sys., Inc.*,
   165 F.3d 914 (9th Cir. 1998) ...................................................................2, 3

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
   2013 WL 890126 (N.D. Cal. Jan. 23, 2013) ..........................................23

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009).......................................................................25

*Gallagher Benefits Servs., Inc. v. De La Torre*,
   2007 WL 4106821 (N.D. Cal. Nov. 16, 2007) .......................................23

*Henry Schein, Inc. v. Cook*,
   191 F. Supp. 3d 1072 (N.D. Cal. 2016) ............................................22, 25

*Henry Schein Inc. v. Cook*,
   2016 WL 3418537 (N.D. Cal. June 22, 2016)..................................20, 22

*MAI Sys. Corp. v. Peak Computer, Inc.*,
   991 F.2d 511 (9th Cir. 1993) .....................................................................19

*Oculus Innovative Scis., Inc. v. Nofil Corp.*,
   2007 WL 4044867 (N.D. Cal. Nov. 15, 2007) .......................................22

*OTR Wheel Eng'g, Inc. v. W. Worldwide Svcs., Inc.*,
   602 F. App'x 669 (9th Cir. 2015) .............................................................19

*Pixon Imaging, Inc. v. Empower Techs. Corp.*,
   2011 WL 3739529 (S.D. Cal. Aug. 24, 2011).......................................23

*Pyro Spectaculars N., Inc. v. Souza*,
   861 F. Supp. 2d 1079 (E.D. Cal. 2012)...................................................20

*TMX Funding, Inc. v. Impero Techs., Inc.*,
   2010 WL 1028254 (N.D. Cal. Mar. 18, 2010)........................................25

v

1309589

*United States v. Lam, et al.*,
No. CR-18-527-WHA (N.D. Cal.)................................................................................iv

*Vinyl Interactive, LLC v. Guarino*,
2009 WL 1228695 (N.D. Cal. May 1, 2009) ...........................................................23

*W. Directories, Inc. v. Golden Guide Directories, Inc.*,
2009 WL 1625945 (N.D. Cal. June 8, 2009) ...........................................................23

*Waymo LLC v. Uber Techs., Inc.*,
2017 WL 2123560 (N.D. Cal. May 15, 2017) ..................................................*passim*

**Statutes**

18 U.S.C. § 1030 ......................................................................................................17, 22

18 U.S.C. § 1836(b)(1) ...............................................................................................18, 19

18 U.S.C. § 1839 .............................................................................................18, 19, 20, 21

Cal. Civ. Code §§ 3426.1 .................................................................................18, 19, 20, 21

N.D. Cal. Civ. L.R. 3-12 .....................................................................................................iv

Cal. Code Civ. Proc. § 2019.210 ....................................................................................5, 6

Cal. Pen. Code § 502(c)(1) .............................................................................................22

**Other Authorities**

*Biosimilar and Interchangeable Products*, U.S. Food & Drug Administration,
https://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevel
opedandApproved/ApprovalApplications/TherapeuticBiologicApplications/Bi
osimilars/ucm580419.htm#nodiff (last updated Oct. 23, 2017) ................................4

*Biosimilar Medicines*, European Medicines Agency,
https://www.ema.europa.eu/human-regulatory/overview/biosimilar-medicines........................4

H.R. Rep. No. 114-529 (2016).........................................................................................19

1309589

## MEMORANDUM OF POINTS AND AUTHORITIES

I.     **INTRODUCTION**

From 2013 to 2017, Defendant JHL Biotech, Inc. ("JHL") engineered an audacious theft of Genentech's trade secrets and used them to build a biopharmaceutical business overseas that develops and seeks to market copycat "biosimilar" versions of Genentech's groundbreaking medicines.  JHL and its top executives relied primarily on an inside source at Genentech—senior scientist Xanthe Lam—to steal Genentech's valuable trade secrets to help them develop, test, manufacture, and commercialize their own versions of Genentech's Pulmozyme®, Rituxan®, Avastin®, and Herceptin® therapies, and to enhance the chances that JHL's versions of those medicines would win regulatory approval.  Xanthe,[1] along with three of her co-conspirators—Allen Lam, James Quach, and John Chan—have now been indicted by a federal grand jury.  *See United States v. Lam, et al.*, No. CR-18-527-WHA, Dkt. 1, (N.D. Cal. Oct. 29, 2018).  Criminal sanctions, however warranted, will not redress Genentech's imminent and ongoing injuries.  Only injunctive relief will accomplish that.

Genentech has no objection to the development and sale of biosimilars.  It objects strenuously, however, to other companies stealing its confidential, proprietary, and trade secret information to develop those biosimilars.  The evidence of theft in this case is overwhelming.  Emails, text messages, Skype logs, download reports, and other documents, as well as admissions by Xanthe and Quach, reveal a multi-year effort by JHL to improperly obtain and use Genentech's trade secrets relating to its formulation data, analytical methods, and manufacturing processes.  Genentech discovered much of this evidence while conducting its own internal investigation into Xanthe's activities following an anonymous tip, and the United States government obtained additional incriminating evidence during its own investigation.  A small sample of the evidence obtained to date is attached to this motion in support of Genentech's urgent request for preliminary injunctive relief.

JHL's scheme dates to at least mid-2013—just six months after former Genentech

---

[1] Because Defendants Xanthe Lam and Allen Lam are a married couple, this brief will refer to them by their first names rather than as "Mr. Lam" and "Ms. Lam" to avoid confusion.

1

1309589

1   employees Racho Jordanov and Rose Lin (a longtime friend of Xanthe's) co-founded JHL.  At

2   that time, Xanthe was working for Genentech as a trusted senior scientist with broad access to a

3   wealth of Genentech trade secret and confidential information.  Breaching her fiduciary and

4   contractual obligations to Genentech, Xanthe began helping JHL develop analytical methods and

5   formulations for its drugs, which were designed to compete directly with Genentech's medicines.

6   At Lin's and Jordanov's request, Xanthe surreptitiously traveled to JHL's headquarters in Taiwan

7   in December 2013 to work in its laboratory and direct its employees.  In her work for JHL,

8   Xanthe relied not only on the trade secret information she knew and had access to by virtue of her

9   role as a Genentech senior scientist, but also on hundreds of confidential documents containing

10   and reflecting Genentech trade secrets, which she had downloaded from Genentech's password-

11   secured document repository and carefully organized on her Genentech laptop computer.

12         Xanthe's covert work continued long after her stint in Taiwan.  While still employed by

13   Genentech, she secretly continued to oversee JHL's analytical method and formulation

14   development through weekly Skype calls with JHL scientist John Chan, a family friend whom

15   JHL hired at her insistence, and who acted as her "direct report."  She also continued to funnel

16   Genentech trade secret information through her husband, JHL consultant Allen Lam, to JHL's top

17   executives, including Jordanov and Lin.  Jordanov and Lin knowingly and eagerly received these

18   trade secrets, and used them to test, stabilize, manufacture, and obtain regulatory approval for

19   clinical trials of its biosimilars of Genentech's medicines.  Then, in 2017, JHL hired former

20   Genentech employee James Quach to help establish its manufacturing facility in Wuhan, China.

21   Before Quach left the United States to begin work at JHL, Xanthe allowed him to access

22   Genentech's secure document repository using her own personal log-in credentials.  With

23   Xanthe's knowledge, Quach used her credentials to download hundreds of confidential

24   Genentech manufacturing protocols and processes onto an external flash drive.

25         Based on the substantial documentary evidence already uncovered, as well as direct

26   admissions by Xanthe and Quach, Genentech is likely to succeed on the merits of its claims.  The

27   irreparable harm to Genentech is likewise clear: "Once [a trade secret is] lost, it is lost forever.

28   The harm is irreparable." *Beckman Instruments, Inc. v. Cincom Sys., Inc.*, 165 F.3d 914, at *2

2

1309589

1    (9th Cir. 1998).  What's more, JHL's highly-touted business trajectory is rooted in the criminal

2    theft of Genentech's trade secrets, and JHL is using that information to develop products designed

3    to compete directly with Genentech's medicines.  To avoid further irreparable harm and preserve

4    the status quo, JHL and those acting in concert with it must be enjoined from any further use and

5    exploitation of the stolen Genentech trade secrets.

6    **II.      FACTUAL BACKGROUND**

7         **A.      Genentech is a global leader in developing cutting-edge biotherapies.**

8         For more than 40 years, Genentech has been discovering, developing, manufacturing, and

9    commercializing cutting-edge biopharmaceuticals, or "biologics," to address patients' significant

10   unmet medical needs.  Decl. of Elizabeth K. McCloskey in Supp. of Mot. for Prelim. Inj.

11   ("McCloskey Decl.") ¶¶ 3–9.  Over the past several decades, Genentech has successfully

12   developed and brought to market a string of advanced biologic therapies.  *Id*.  These include

13   Pulmozyme®, an inhaler treatment for cystic fibrosis, as well as the cancer treatments Rituxan®,

14   Avastin®, and Herceptin®.  *Id*.  Genentech has invested hundreds of millions of dollars

15   researching, developing, and bringing these drugs to doctors and patients around the world.  *Id*.

16        **B.      Access to proven analytical data, methods, and manufacturing protocols**
          **would prove highly valuable to a biosimilar manufacturer.**
17

18        Biologics are notoriously difficult to develop and manufacture safely at scale.  Unlike

19   small molecule drugs that are created solely using chemistry, biologics are complex proteins, such

20   as antibodies created using genetically-modified living cells.  Such medicines are strictly

21   regulated by the Food and Drug Administration ("FDA") and other regulatory authorities abroad.

22   In recent years, regulators have crafted shorter, less expensive regulatory pathways for drugs that

23   are "highly similar" to innovator-branded biologics whose patents have expired.  These products

24   are called "biosimilars."  For example, to pass regulatory muster in Europe (one of JHL's primary

25   markets), the biosimilar manufacturer must show through a complex series of tests and analyses

26   that there are "no clinically meaningful differences" between the proposed biosimilar and the

27

28

1309589

1   innovator's branded drug "in terms of the safety, purity, and potency" of the product.[2]  Thus, to

2   shorten the pathway to commercialization, the manufacturer must provide robust analytical data

3   showing biosimilarity.

4         Compiling this data is no easy feat.  A biosimilar manufacturer must develop and run

5   numerous comparative tests on both the innovator's "reference product" (here, the approved

6   Genentech medicine) and the biosimilar product, producing results showing the two products are

7   "highly similar" in identity, purity, and potency.  Decl. of Doug Balogh in Supp. of Mot. for

8   Prelim. Inj. ("Balogh Decl.") ¶ 12.  While some analytical methods are standardized, many others

9   are unique and proprietary to the innovator.

10         Having access to the innovator company's test procedures and results would aid a

11   biosimilar manufacturer immensely.  Most importantly, the competitor would know exactly how

12   to run the various tests and the unpublished acceptance criteria that supported the reference

13   product's regulatory approval.  Access to such information would save the competitor precious

14   time and expense in an industry in which time to market is crucial.  *Id.* ¶¶ 13–15.

15         The same holds true for proprietary manufacturing processes, protocols, and procedures

16   designed to ensure compliance with Good Manufacturing Practices ("GMP").  Access to a

17   comprehensive set of Genentech's key manufacturing operations procedures would provide a

18   lucrative shortcut for a biopharmaceutical manufacturer like JHL opening and developing a new

19   biologics manufacturing facility.  Decl. of Paul Bezy in Supp. of Mot. for Prelim. Inj. ("Bezy

20   Decl.") ¶¶ 5–8.  The information would allow a manufacturer to mimic the procedures and

21   processes described, and thereby significantly reduce the time and expense necessary to develop

22   procedures for complying with GMP standards.  It would also allow a manufacturer to

23   demonstrate to a regulatory agency, such as the FDA or the European Medicines Agency

24   ("EMA"), that its products are consistently produced and controlled according to required quality

25

26   [2] *Biosimilar Medicines*, European Medicines Agency, https://www.ema.europa.eu/human-regulatory/overview/biosimilar-medicines.  The FDA's requirements for biosimilar approval are similar. *See Biosimilar and Interchangeable Products*, U.S. Food & Drug Administration, https://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/TherapeuticBiologicApplications/Biosimilars/ucm580419.htm#nodiff (last updated Oct. 23, 2017).

standards.  *Id.* ¶¶ 8–9.  If a competitor had access to this confidential information when opening a new manufacturing facility, it could avoid the years of testing required to develop its own procedures for GMP compliance, and likely would gain regulatory approval months, if not years, earlier than otherwise would be possible.  *Id.* ¶¶ 8–11.  Indeed, biopharmaceutical companies have faced costly delays and intense regulatory scrutiny when a regulatory agency deems their manufacturing processes suspect or inadequate.  *See* Balogh Decl. ¶ 27.  Having access to time-tested, already-validated procedures for compliance with GMPs from the same company that developed the reference products, especially an established, successful manufacturer like Genentech, would greatly reduce such risks.

### C.     The Trade Secrets at Issue

Because Genentech is asserting a claim under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq.*, Genentech is filing under seal a statement pursuant to California Code of Civil Procedure Section 2019.210, which describes with reasonable particularity the trade secrets currently at issue in this action.  In general terms, the trade secrets concern the following: (a) proprietary, validated analytical methods to test and ensure the stability, potency, purity, identity, and quality of its Pulmozyme®, Rituxan®, Avastin®, and Herceptin® medicines; (b) proprietary information regarding the development and selection of a formulation for each of those four medicines, as well as for Genentech's Tecentriq® medicine; (c) proprietary manufacturing and operations protocols, including procedures for complying with GMP standards; and (d) the compilations of confidential Genentech documents that Xanthe, Allen, and Quach downloaded and compiled specifically for JHL's benefit.

Each stolen trade secret, standing alone, represents Genentech's hard work and investment and would aid a competitor looking for a shortcut to develop and market its own rival drug.  Taken together as a compilation, the stolen information provides a roadmap for a competitor to try to achieve through theft what Genentech accomplished through diligence, trial-and-error, hard-won know-how, and significant investment of time and money.

### D.     Genentech takes reasonable efforts to protect its trade secrets.

Because Genentech's confidential, proprietary, and trade secret information is the

5

1309589

company's lifeblood, Genentech takes protecting that information seriously.  The company has implemented several controls to prevent its unauthorized disclosure or misappropriation.  *See* Decl. of Daniel J. Kirshman in Supp. of Mot. for Prelim. Inj. ("Kirshman Decl.") ¶¶ 26–28.  **First**, Genentech has implemented robust security and document-control systems.  **Second**, as a condition of employment, Genentech requires employees to sign a written agreement concerning non-disclosure of Genentech's proprietary information.  **Third**, Genentech has distributed to all employees written policies regarding use, handling and non-disclosure of confidential information, as well as how to avoid conflicts of interest that may compromise Genentech's proprietary information.  **Fourth**, Genentech ensures that employees are aware of these policies by requiring employees annually to certify their compliance with these obligations.  **Fifth**, Genentech makes adherence with its policies—including the policies concerning nondisclosure of confidential information—a condition of employment, provides procedures for employees to report suspected noncompliance, and disciplines employees for violating such policies.  *Id.*

### E.   Defendants misappropriated Genentech's trade secret information.

#### 1.   Acting as JHL agents, Xanthe and Allen Lam funneled Genentech trade secrets to JHL in person and via email.

Defendant Xanthe Lam (a/k/a Mei Ling Sheung) began working at Genentech in 1986. Kirshman Decl. ¶ 3.  For more than 30 years, Xanthe worked in various capacities as a Genentech scientist, and was entrusted with some of Genentech's most sensitive confidential, proprietary, and trade secret information.  *See id.* ¶¶ 3–4; Decl. of Jamie Moore in Supp. of Mot. for Prelim. Inj. ("Moore Decl.") ¶¶ 2–3.  Xanthe's husband, Allen Lam worked for Genentech until 1998, when he resigned amid revelations that he had started working for another biopharmaceutical company while still employed at Genentech.  *See* Kirshman Decl. ¶¶ 21–22.

Just months after JHL's founding in December 2012, its co-founders Lin and Jordanov recruited Xanthe and Allen to assist JHL with developing biosimilar versions of Genentech's medicines by having them covertly funnel Genentech trade secrets to their fledging start-up.  The scheme commenced in mid-2013 when Allen signed on as a JHL consultant (in return for a substantial salary and founder stock options) and Xanthe began downloading hundreds of

6

1309589

confidential and proprietary Genentech documents from Genentech's password-protected document repositories and carefully organizing them in folders on her Genentech-issued laptop. Kirshman Decl. ¶¶ 5–9.  Xanthe specifically selected documents containing Genentech trade secret information concerning the four Genentech medicines that JHL was attempting to mimic: Pulmozyme®, Rituxan®, Avastin®, and Herceptin®.  Id. ¶ 7.  Her files included confidential "Pharmaceutical R & D Technical Reports," stability studies, mixing studies, degradation studies, validation reports, testing protocols, and other confidential reports, procedures, and analyses.  Id.

Xanthe had no legitimate work-related reason to compile this trove of information on her laptop.  Moore Decl. ¶ 4.  And in fact, the manner in which Xanthe stored the documents on her computer reveals that she was using them to aid JHL's biosimilar analytical development and formulation efforts.  Xanthe created folders on her laptop's hard-drive, using nomenclature connecting Genentech's medicines with JHL, and competing efforts: "Pulmozyme_JHL," "Rituxan_JHL," "Avastin_JHL," and "Herceptin_JHL." Kirshman Decl. ¶ 8, Ex. 1.  Each of these folders contained a mixture of confidential Genentech documents and internal JHL documents. In the "Rituxan_JHL" folder, for example, Xanthe had saved confidential Genentech quality control documents such as Genentech's "Validation Master Plan Report" for Rituxan®, and Genentech's "Stability Protocol for Rituxan Drug Product," alongside JHL Formulation Development Presentations that track JHL's efforts to create a Rituxan® biosimilar.  Id.

After Xanthe had downloaded these Genentech trade secret materials to her "JHL" folder, Allen spent six weeks at JHL during September and October of 2013, working "on analytical assay development and evaluation for biosimilars."  Kirshman Decl. ¶ 9, Ex. 2.  Allen was deeply involved in JHL's efforts to develop biosimilars of Genentech's medicines, and did so with direct access to the Genentech documents Xanthe had compiled in her "JHL" folders.  Documentary evidence reveals that before Allen traveled to Taiwan, Xanthe gave him copies of many, if not all, of the Genentech documents she had downloaded.  The evidence further shows that once in Taiwan, Allen relied on those documents to develop analytical methods and validation protocols for JHL's drugs, with assistance from Xanthe through email, and Skype video and audio chats.

For example, on September 2, 2013, Allen emailed Xanthe to ask her about the ion-

7

1309589

exchange chromatography ("IEC") specification limit for Rituxan®.  He needed the information for a validation protocol that he and David Kapitula (another former Genentech employee who was JHL's VP of Quality/Regulatory) were developing for JHL's Rituxan® biosimilar, dubbed "JHL1101."  McCloskey Decl. ¶ 11, Ex. 1.  Xanthe responded, "Skype me to explain it to you.  It is difficult to explain by writing." *Id.*  Later that evening, Allen and Xanthe exchanged messages concerning the IEC specification limit.  Allen referenced Genentech trade secret documents that Xanthe had given him, and even attached one for Xanthe to review because, she said, "I don't have those files with me at home." *Id.* At the end of this email discussion, Allen confirmed that he understood he should use the "limits ***from the GNE production spec***" contained in the Genentech trade secret materials Xanthe had provided. *Id.* ¶ 12, Ex. 2 (emphasis added).[3]

In late September 2013, JHL's co-founders Jordanov and Lin asked Xanthe to come to Taiwan to help with JHL's development efforts in person.  Making it clear that she was still employed by Genentech, Xanthe agreed to fly to JHL for four weeks in December 2013 if she could "find someone willing to cover [her] during my absence/sabbatical in this month." *Id.* ¶ 13, Ex. 3.  Xanthe emailed her friend Kim Chan, a professor at the University of Sydney, telling him that she would "spend 4 weeks at JHL Biotech o[n] my sabbatical until Dec. 30."  Kirshman Decl. ¶ 11, Ex. 2.  Xanthe repeated her plans to join JHL in an October 27, 2013 email to her niece, stating that she would be "joining a biotechnology company in Taiwan as a Visiting Scientist for one month." *Id.* ¶ 11, Ex. 4.

Xanthe's stint at JHL was a clear and egregious breach of her contractual obligations to Genentech.  Like all Genentech employees, Xanthe was subject to the company's Code of Conduct and a Proprietary Information Agreement, both of which expressly prohibited her from disclosing any confidential, proprietary or trade secret information to any third party.  The Proprietary Information Agreement further prevented her from "engag[ing] in any employment or activity other than for the Company in any business in which the Company is now or may hereafter become engaged." *Id.* ¶¶ 29–31, Exs. 20, 25. Recognizing that her moonlighting with a

---

[3] "GNE" is a commonly-used abbreviation for Genentech.

1309589

competitor represented a grave breach of her contractual obligations, Xanthe lied about it.  Rather than seeking permission to work at JHL as a "Visiting Scientist," she repeatedly described her trip internally as a "vacation," during which she would be "traveling in Asia."  *Id.* ¶ 11, Exs. 5–6.

In the months leading up to her December 2013 trip to JHL, Xanthe worked to develop the analytical methods and formulations for JHL's drugs, consistently relying upon confidential trade secret information she had access to as a senior Genentech scientist.  On October 29, 2013, Xanthe sent to JHL personnel, including Lin and Jordanov, a "formulation development plan for JHL 1101," JHL's biosimilar of Genentech's Rituxan®.  McCloskey Decl. ¶ 14, Ex. 4.

In December, Xanthe traveled to Taiwan as planned to work at JHL.  She was present at JHL's grand opening on December 5, 2013, and she and Allen were photographed at JHL alongside Jordanov and Lin.  Decl. of Paul French in Supp. of Prelim. Inj. ("French Decl.") ¶ 13, Exs. 4–5.  Forensic data confirms that Xanthe connected her Genentech-issued laptop to JHL's Wi-Fi network on or about December 26, 2013.  *Id.* ¶ 12. While in Taiwan, Xanthe went about her work as a JHL agent, assisting JHL's formulation and analytical development efforts.  Jordanov and Lin worked closely with Xanthe during that time, attending meetings together on formulation strategy for JHL's biosimilars of Genentech's Pulmozyme®, Rituxan®, and Herceptin® medicines.  McCloskey Decl. ¶¶ 15–20, Exs. 5–10. Throughout December 2013, they also exchanged email messages with Xanthe (through her personal email account) concerning the formulation strategy for these products.  *Id.*  In a December 2013 email to Defendant John Chan—whom she would later recruit to JHL as a formulation scientist—Xanthe stated that part of her role at JHL was "to go the lab to coach and help," and to be "in charge of the company" while Jordanov and Lin flew home to the United States for the holidays.  Kirshman Decl. ¶ 12, Ex. 7.

While in Taiwan, Xanthe aided JHL's development efforts through direct access to the Genentech trade secret materials she had downloaded prior to her trip.  For example, on December 23, 2013, Xanthe emailed her husband two confidential Genentech Standard Operating Procedures ("SOPs") for testing the potency and identity of Pulmozyme® using methyl green assays.  *See* McCloskey Decl. ¶ 21, Ex. 11.  Xanthe had downloaded these confidential assays from Genentech's password-secured document repository DocLink in July 2013.  Kirshman Decl.

9

1309589

¶¶ 46–50, Ex. 27.  Putting to rest any doubt that Xanthe was using the materials she had compiled in her "JHL folder" while in Taiwan, or that she had previously given Allen those documents, she wrote: "Do you have the SOP for methyl green extraction from GNE?  Have I given you that? I don't see it in my Pulmozyme JHL folder."  *See* McCloskey Decl. ¶ 22, Ex. 12.

Xanthe continued to raid Genentech's secure document repository for JHL's benefit after she returned from Taiwan.  For example, on January 9, 2014, Genentech's password-protected document repository logs ("DocLink logs") reveal that Xanthe downloaded a confidential Genentech Test Procedure for Pulmozyme® entitled "Total Neutral Sugars Determination." Kirshman Decl. ¶ 50, Ex. 27.  That same day, Xanthe saved the file to her "Pulmozyme_JHL" folder.  Later that day, Xanthe used her personal email account to send her husband an email at his JHL account entitled "Total Neutral Sugars for JHL1921"[4], attaching that same document. McCloskey Decl. ¶ 23, Ex. 13.  About a month later, on February 12, 2014, Allen emailed Xanthe to request additional Genentech trade secret information: "I am assigned to take care of the raw material management policies . . . . Having doc[s] in these topics are [sic] very helpful to me." *Id.* ¶ 24, Ex. 14.  Xanthe quickly obliged.  DocLink logs show that on February 13, 2014—the day after Allen's request—Xanthe downloaded eleven confidential Genentech documents, all relating to raw material management.  Kirshman Decl. ¶ 50, Ex. 27.  The same day, she used her personal email account to send all eleven confidential Genentech documents to her husband, noting: "Attached are the docs related to raw material management policies that I found.  Hope they are useful." McCloskey Decl. ¶ 24, Ex. 14.

The Lams' illicit transfer of Genentech trade secret materials to JHL continued unabated. In May 2015, Xanthe sent Allen an email attaching two documents with the subject line "1922"— no doubt referring to JHL 1922, JHL's second attempt at a Pulmozyme® biosimilar.  McCloskey Decl. ¶ 25, Ex. 15.  The documents contained detailed Genentech trade secret information concerning the preparation of Pulmozyme® samples for evaluating potential drug degradation during shipping, handling, and long-term storage.  *Id.*

---

[4] JHL1921 was JHL's first attempted Pulmozyme® biosimilar.  In 2014, JHL discontinued development of JHL1921 and began work on JHL1922, another Pulmozyme® biosimilar.

1309589

Defendants Jordanov and Lin unquestionably knew that the information Xanthe and Allen were funneling to them originated at Genentech.  For example, Allen converted the Genentech methyl green SOP Xanthe sent him in December 2013 (as described above) into a JHL SOP. Balogh Decl. ¶ 21, Ex. 5.  Comparing the Genentech SOP to the JHL SOP reveals that JHL copied Genentech's trade secrets into the JHL document: both SOPs reference the same equipment, concentrations of reagents, and order of steps to be taken. *Id*.  On January 7, 2014, Allen sent the SOP on JHL letterhead to Jordanov and Lin, among other JHL employees. Leaving no doubt regarding the provenance and value of the information he was providing, Allen wrote, "Attached is the methyl green activity assay ***used by the innovator***.  The assay is rather lengthy, but is doable.  ***At least the assay is familiar to the FDA/EMEA, and acceptable to them***."  McCloskey Decl. ¶ 26, Ex. 16 (emphasis added).  Allen's email demonstrates the value of the trade secrets JHL stole from Genentech: because regulators had already reviewed and approved the stolen Genentech protocols and processes, JHL hoped and believed that regulators would be more likely to approve those same processes for JHL.  Allen's email also makes clear that JHL was already using the pilfered information, noting that a JHL employee had ordered the "materials and chemicals required in this assay," such that "they will be in-house at JHL soon, so she can try out the method."  *Id.*

Logs from Xanthe's Genentech-issued iPhone likewise confirm that she was discussing JHL matters with Rose Lin throughout the conspiracy.  A text messaging log reveals several communications between Xanthe and Lin on April 23, 2015, during which Xanthe suggested using FaceTime to call Lin in Taiwan.  Before the video-call, she asked Lin to "read the email that Allen sent first."  Kirshman Decl. ¶ 17, Ex. 17.  Email correspondence between Xanthe and Allen on Xanthe's personal email reveals that Xanthe was referring to an email Allen sent Lin on or about April 23, 2015 regarding Genentech's confidential analytical methods for Rituxan® and their applicability to the stability testing and assay validation for JHL's Rituxan® biosimilar. McCloskey Decl. ¶ 27, Ex. 17.   Xanthe's call log shows that she spoke with Lin via FaceTime for 27 minutes later that same day, April 23, 2015.  Kirshman Decl. ¶ 17, Ex. 17.

1309589

### 2.   Xanthe recruited John Chan to JHL to serve as another conduit for Genentech trade secret information.

Shortly after returning to Genentech after her unsanctioned stint in JHL's laboratory, Xanthe set out to install a scientist at JHL who could function as another conduit for Genentech's trade secret information.  On February 13, 2014, Xanthe emailed Defendant John Chan to let him know that she had asked JHL to create a position of "formulation scientist" for him.  Kirshman Decl. ¶ 15, Ex. 9.  This would be Chan's first job after finishing his Ph.D.  Chan interviewed with JHL co-founder Rose Lin on February 20, 2014.  When reporting back to Xanthe about the interview, Chan wrote that his "[w]orking arrangement and role[]" would be "Formulation under you and Allen's guidance (***presumably I will be your direct report***)."  *Id.* ¶ 15, Ex. 10 (emphasis added).  Again, at this time, Xanthe was employed as a Principal Scientist at Genentech, not in any sanctioned capacity at JHL.

JHL offered Chan the position on March 5, 2014.  After consulting with Xanthe about the offer, Chan accepted it.  Despite having no previous work experience in the field, Chan became the "head of the Pulmozyme® biosimilar project" and "Group Leader, Formulation" at JHL.  *Id.* ¶ 15, Ex. 11–13; McCloskey Decl., Ex. 20 at 5.  Shortly after Chan took the position at JHL, Xanthe began holding frequent conversations with him via Skype.  Skype logs found on Xanthe's laptop reveal that she spoke to Chan via Skype nearly every week between May 15, 2014 and November 12, 2016.  Kirshman Decl. ¶ 16, Ex. 14; French Decl. ¶ 17, Ex. 7.

In September 2014, Xanthe and Chan communicated via Skype weekly. Then, on September 29, 2014, Xanthe sent an email to her husband at his personal account with the subject line "Tech report for John."  Kirshman Decl. ¶ 16, Ex. 15.  Xanthe instructed her husband to "**[m]ake a hard copy of the report attached for John.  Don't give him e-copy and tell him don't show it to others**." *Id.* (emphasis added).  The attachment was a confidential Genentech Technical Report containing detailed procedures and test results concerning the stability and compatibility of Pulmozyme® with Stedim bags for storage, shipping, and handling.  Moore Decl. ¶ 9, Ex. 2.  Allen replied, "Great!! I have printed that out and will give it to John when he comes back tonight."  Kirshman Decl. ¶ 16, Ex. 16.

12

1309589

### 3. With Xanthe's help, Defendant James Quach unlawfully accessed Genentech's computer system and downloaded hundreds of confidential documents before leaving for JHL.

In 2017, Defendants' conspiracy extended to include Defendant James Quach (a/k/a Phat Trang Quach). Quach worked at Genentech for 17 years, from 2000 until Genentech terminated him in April 2017 for unacceptable performance. Kirshman Decl. ¶ 25. Following his termination from Genentech, Xanthe helped Quach secure employment at JHL. *Id.*, Ex. 18. Quach applied for a position at JHL in May 2017 and by July 2017 had accepted an offer to work at JHL's manufacturing facility in Wuhan, China. *Id.*, Ex. 19.

As both Quach and Xanthe have admitted, Quach went to Xanthe's South San Francisco home on three separate occasions in July 2017 and, with Xanthe's knowledge and consent, used Xanthe's log-in credentials to access Genentech's document control system and download files onto a personal USB drive. Kirshman Decl. ¶¶ 18–19; McCloskey Decl. ¶ 30. The files Quach downloaded comprise Genentech's procedures for complying with regulatory GMP standards. Bezy Decl. ¶ 5. Genentech developed these detailed protocols and procedures through years of analysis, testing and by incorporating feedback from the FDA and other regulatory authorities, and kept these materials strictly confidential. *Id.* These documents would provide a lucrative shortcut for a competing biopharmaceutical manufacturer such as JHL to gain regulatory approval for their manufacturing and quality assurance processes. Not coincidentally, Quach's role at JHL involved managing engineering and validation activities during the start-up phase of JHL's Wuhan manufacturing facility. McCloskey Decl. ¶ 31, Ex. 19. A component of this role would include developing procedures for the Wuhan facility to comply with GMP standards. *Id.*

Genentech has reason to believe that Quach took Genentech's trade secret information with him to Wuhan for JHL's benefit. And indeed, upon arriving at JHL's facility in China, Quach determined that he needed additional Genentech documents. He emailed Xanthe and asked her to download and send him certain additional documents from Genentech's computer system. *Id.* ¶ 30. Analysis of Xanthe's downloads during August 2017 reveal that she downloaded additional manufacturing facility procedures. Kirshman Decl. ¶ 18. And Quach admitted Xanthe emailed those documents to him while he was at JHL. McCloskey Decl. ¶ 30.

13

1309589

1

2

**F.     JHL used Genentech's trade secret information to fuel its meteoric rise as a biotech startup.**

3
4
5
6
7

JHL has already used and benefited from Genentech's trade secret information.  In addition to the wholesale conversion of Genentech's Pulmozyme® methyl green assay into a JHL SOP as described above, Genentech's investigation uncovered several JHL documents on Xanthe's computer revealing that Defendants altered JHL's internal development methods and specifications so they would *exactly match* Genentech's.[5]  Balogh Decl. ¶ 21.  For example, in April 2015, Xanthe edited JHL's draft stability protocols for "JHL 1922"—JHL's latest

8
9
10
11
12
13
14
15
16
17
18

Pulmozyme® biosimilar—so that JHL's specifications would match those listed in Genentech's confidential stability protocol for Pulmozyme® in key ways.  *Id.*  Specifically, Xanthe's revisions (revealed as "tracked changes") to JHL's draft protocol changed the pH specifications, potency criteria, and temperature for conducting stability tests so that those metrics would precisely match Genentech's own acceptance criteria.  *Id.*  Likewise, other emails uncovered during the government's investigation reveal the extent to which Xanthe shaped JHL's development methods to match Genentech's.  For example, in a September 2013 email to Allen, Xanthe instructed Allen to share with JHL executives her critique on five assays that JHL used to assess its Rituxan® biosimilar.  *Id.*  In that email, she revealed details of Genentech's confidential methods for testing Rituxan® and explained why Genentech's methods were more powerful and should be used instead of JHL's.  *Id.*

19
20
21
22
23
24
25
26

The confidential, proprietary, and trade secret information that JHL obtained gave that embryonic company an unfair and illegal advantage, catapulting it to rapid success.  On February 14, 2016—a little over three years after the company's founding in December 2012—JHL issued a press release touting that European regulatory authorities had approved a clinical trial for its Rituxan® biosimilar.  *See* PR Newswire, *JHL Biotech Receives Approval From European Authorities to Begin Biosimilar Clinical Trial*, Feb. 14, 2016.  In the release, Jordanov explained how difficult it is to replicate Rituxan®: "Countless international pharmaceutical companies have

27
28

---

[5] In fact, forensic evidence from Xanthe's Genentech-issued laptop suggests that Xanthe had access to a "JHLBiotech Mail" account from that laptop, and that she printed JHL analytical test results from that account on her home printer on Sunday, May 11, 2014. French Decl. ¶ 15.

14

1309589

attempted to develop a rituximab biosimilar.  Rituximab has a complex structure, and JHL had to develop a product identical in quality, safety, and efficacy to its Roche reference." *Id.*  Jordanov hailed the trial as "the beginning of an exciting new stage in JHL's growth." *Id.*

On or about December 5, 2016, JHL entered into a partnership with the French multinational pharmaceutical company Sanofi to produce and market a Rituxan® biosimilar.  As industry news sources reported, the deal "put Sanofi's commercial prowess behind JHL's in-development Rituxan copycat and, potentially, other drug candidates from the company."[6]  The JHL/Sanofi deal is reportedly worth up to $236 million in upfront and milestone payments, with $21 million paid up front alongside an $80 million investment in JHL stock.[7]  The Sanofi pact was incredibly important to JHL, with Jordanov calling it "a turning point in JHL's history."[8]

JHL's speedy path from nascent start-up to multinational biosimilar player depended on the Genentech trade secret information that JHL misappropriated over the past several years.  Indeed, the rate of JHL's development is markedly unusual: despite having been established only in 2012, JHL won regulatory approval to launch clinical trials of ***not one, but all four of its biosimilars of Genentech medicines***.  In March 2018, it received approval to conduct clinical trials of its Pulmozyme® biosimilar; in April 2018, it received approval to conduct Phase I trials of its Avastin® biosimilar in China (and already had approval in Bulgaria); in July 2018, it announced that it had received approval to commence Phase III trials of its Rituxan® biosimilar in China; in August 2018, it announced that European regulators had provided positive scientific advice regarding its planned Phase III clinical trials of its Avastin® and Herceptin® biosimilars; and in October 2018, it announced that it had received approval to conduct a Phase III trial of its Avastin® biosimilar in China.  McCloskey Decl. ¶ 36.  This abbreviated timeline is particularly unusual for a six-year-old start-up that had relatively few employees during this time period.  Even as of June 2015, JHL only had a "[t]otal headcount [of] ~90 (18 PhD's)." *Id.* ¶ 32, Ex. 20.

[6] Eric Palmer, *Sanofi, JHL Biotech Strike Rituxan Biosimilar Pact Worth Up To $236M*, FiercePharma, Dec. 5, 2016.

[7] Biomark Capital, *Sanofi & JHL Announce Strategic Biologics Alliance in China*, Dec. 5, 2016.

[8] *Id.*

The evidence confirms JHL's speedy development was fueled by access to Genentech's trade secrets.  For example, in draft slide deck for a JHL meeting with a potential partner in May 2014, a copy of which was found on Xanthe's Genentech-issued laptop, JHL touted a timeline for developing analytical methods for its Pulmozyme® biosimilar that was six to twelve months faster than expected in the industry.  Balogh Decl. ¶ 22.  Xanthe confirmed the basis for this accelerated schedule in an email to Allen sent days prior to the meeting, noting JHL already "***should have most of the Pulmozyme assays (GNE Q methods) listed for characterization***" such that there would be no need for JHL to spend time developing its own.  McCloskey Decl. ¶ 28, Ex. 18 (emphasis added).  JHL is now attempting to parlay its theft into additional economic benefits: JHL recently announced that it raised $106 million in pre-IPO funding, which it intends to use "to support clinical trials and further development of its biosimilar portfolio" and as a prelude to an expected "$250 million IPO in Hong Kong later this year."[9]

### G.    Following an anonymous tip, Genentech promptly launched an investigation, alerted law enforcement, and sought relief as soon as possible.

Although Defendants' unlawful conduct has been going on for years, Genentech discovered the scheme only in October 2016 thanks to an anonymous tip.  Kirshman Decl. ¶ 5. Genentech promptly launched an internal investigation, which helped uncover the scheme described in this motion.  *Id.* ¶ 6.  Genentech also contacted law enforcement authorities, and cooperated fully with the U.S. Attorney's Office as it launched a criminal investigation.  *See* Decl. of Elliot R. Peters in Supp. of Mot. for Prelim. Inj. ("Peters Decl.") ¶ 2.

The FBI executed a search warrant on Xanthe's home early in the morning on September 11, 2017.  Kirshman Decl. ¶ 19.  Immediately thereafter, Xanthe headed to work where she voluntarily met with Genentech and its attorneys to discuss the matters revealed in Genentech's internal investigation.  *Id.*  Xanthe sat for a second voluntary interview on September 18, 2017. *Id.*  Quach voluntarily met with Genentech's counsel on October 6, 2017.  McCloskey Decl. ¶ 30.

In their separate interviews, both Xanthe and Quach confirmed the bulk of the

---

[9] *JHL Biotech Raises $106 Million in Pre-IPO Funding*, ChinaBioToday (May 29, 2018), http://www.chinabiotoday.com/articles/JHL-106-Million-Pre-IPO.

1309589

wrongdoing alleged in this action.  For example, Xanthe admitted that she: (a) worked in JHL's lab in December 2013; (b) worked closely with John Chan while he was employed at JHL, holding weekly Skype calls with him for over a year, during which time she coached him in his role as JHL's formulation scientist; (c) saved Genentech documents to personal external storage devices, and then emailed them from home using her personal email account; (d) created folder directories on her Genentech-issued computer, organized by drug, that contained Genentech information alongside JHL documents; (e) understood that the Genentech documents she downloaded and stored contain confidential, proprietary, and trade secret information that Genentech would never share with a competitor; and (f) allowed James Quach to use her Genentech credentials to download and save hundreds of confidential Genentech documents relating to Genentech's manufacturing protocols onto an external hard-drive shortly before he left for JHL's manufacturing plant in China.  *See* Kirshman Decl. ¶ 19.

For his part, Quach admitted that he: (a) visited Xanthe's home three times in July 2017, after having accepted a position at JHL; (b) used Xanthe's log-in information to access Genentech's secure document repository; (c) downloaded hundreds of confidential Genentech documents to an external flash drive; (d) left to work at JHL's manufacturing facility in August 2017; and (e) asked Xanthe to send him additional Genentech documents after arriving in China, which she did.  *See* McCloskey Decl. ¶¶ 30–31.

At the government's request, Genentech took no public action that could have compromised the government's investigation, including filing a civil complaint or seeking preliminary injunctive relief.  Peters Decl. ¶ 3.  The criminal investigation led to a sealed grand jury indictment on October 25, 2018, charging Xanthe, Allen, Quach, and Chan with criminal trade secret theft and violations of the Computer Fraud and Abuse Act.  The indictment was unsealed only after the indicted individuals were arrested and made initial appearances on October 29, 2018.  Genentech filed its complaint seeking injunctive relief immediately following the indictment's unsealing, and filed this motion that same week.  *Id.* ¶ 4.

## III.   LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that: (1) it is likely to succeed

on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) an injunction serves the public interest. *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014). In this Circuit, "'serious questions going to the merits' and a balance of hardships that tips sharply in [plaintiff]'s favor can support issuance of a preliminary injunction so long as [plaintiff] also shows a likelihood of irreparable injury and that the injunction is in the public interest." *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at \*6 (N.D. Cal. May 15, 2017) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)).

## IV.   ARGUMENT

### A.   Genentech is likely to succeed on the merits of its DTSA and CUTSA claims.

The Defend Trade Secrets Act (DTSA) allows an owner of a misappropriated trade secret to bring a civil action if the "trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Similarly, CUTSA provides relief under substantially identical circumstances, but without any interstate or foreign commerce requirement. *See* Cal. Civ. Code §§ 3426.1 *et. seq.* Based on both statutes' plain language, Genentech is likely to succeed in showing that Xanthe's and Quach's theft of Genentech's trade secret information and the Defendants' wrongful receipt and misappropriation of that information constituted violations of DTSA and CUTSA.

To begin with, the information Defendants misappropriated from Genentech are "trade secrets" under both DTSA and CUTSA. Both statutes impose substantially the same three prerequisites for protection as a trade secret: (1) the subject of the misappropriation must be "information" (of *any* type under CUTSA, and effectively any type under DTSA); (2) the owner must have made "reasonable" efforts to maintain the information's secrecy; and (3) the information must derive independent economic value from its secrecy. *See* 18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1; *see also Waymo*, 2017 WL 2123560, at \*7 (noting that both DTSA and CUTSA "offer essentially the same definitions"). These three factors are satisfied here.

***First***, the Defendants misappropriated scientific and technical information regarding the processes by which Genentech tests, analyzes, controls, and formulates Pulmozyme®, Rituxan®,

18

1309589

1    Avastin®, and Herceptin®, as well as documents setting forth product quality criteria and

2    physicochemical characteristics relating to those drugs. They also stole Genentech's proprietary

3    manufacturing processes, protocols, and procedures designed to ensure GMP compliance.  Such

4    information falls squarely within the definition of "trade secret" information under both federal

5    and state law.  *See* 18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1.  Indeed, "confidential

6    formulas" and "manufacturing techniques"—two of the types of information at issue here—are

7    specifically identified as examples of trade secrets in DTSA's legislative history.  H.R. Rep. No.

8    114-529 at 197 (2016).[10]  The Ninth Circuit has likewise concluded that "specific instructions on

9    how to prepare and manufacture" a product constitute actionable trade secrets.  *OTR Wheel*

10   *Eng'g, Inc. v. W. Worldwide Svcs., Inc.*, 602 F. App'x 669, 672 (9th Cir. 2015).

11        Importantly, Genentech need not prove that every single document Defendants stole

12   constitutes a trade secret.  Where, as here, an employee downloads a large volume of confidential

13   information on a competitor's behalf, it is enough to raise "serious questions going to the merits

14   concerning whether *some* information within the . . . downloaded files has been used by

15   defendants and qualifies for trade secret protection."  *Waymo*, 2017 WL 2123560, at *8.  Even

16   "[t]wo examples will suffice."  *Id.*  Here, Genentech's 2019.210 Statement lists dozens of specific

17   examples of trade secrets, and identifies scores of documents containing them.

18        ***Second***, Genentech took reasonable measures to keep the stolen information secret.

19   Among other things, Genentech limited access to the information, entered into confidentiality

20   agreements with all of its employees (including Xanthe, Allen, Jordanov, Lin, and Quach)

21   prohibiting unauthorized disclosure or use of Genentech's confidential information during or after

22   their employment, and stored the information in password-protected document repositories.  *See*

23   Kirshman Decl. ¶¶ 26–60.  These steps more than suffice to demonstrate reasonable efforts to

24   maintain secrecy.  *See, e.g.*, *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir.

25   1993) (holding that a company that "required employees to sign confidentiality agreements

26

27   _____

[10] The trade secrets at issue are also "related to a product" used in "interstate or foreign
28   commerce." 18 U.S.C. § 1836(b)(1).  Genentech medicines are sold throughout the United States
     and internationally by Roche, Genentech's parent company.  McCloskey Decl. ¶ 9.

19

1309589

1   respecting its trade secrets" took "reasonable steps" to ensure secrecy); *Henry Schein Inc. v.*

2   *Cook*, 2016 WL 3418537, at *4 (N.D. Cal. June 22, 2016) (finding confidentiality agreements and

3   restricted access "through password-protected programs" sufficient); *Pyro Spectaculars N., Inc. v.*

4   *Souza*, 861 F. Supp. 2d 1079, 1090–91 (E.D. Cal. 2012) (same).

5        ***Third***, Genentech has derived independent economic value from this information's

6   secrecy.  The information includes documents that serve as blueprints for the development and

7   quality testing of four of Genentech's proprietary medicines: Pulmozyme®, Rituxan®, Avastin®,

8   and Herceptin®.  *See* Moore Decl. ¶¶ 6–8.  Genentech will continue to suffer economic harm if

9   this information remains available for use by JHL or other companies in the business of

10  developing biosimilars of these and other Genentech products.

11       Genentech is also likely to establish that Defendants misappropriated these trade secrets.

12  DTSA defines "misappropriation" as

13           disclosure or use of a trade secret of another without express or implied consent by
             a person who (i) used improper means to acquire knowledge of the trade secret;
14           [or] (ii) at the time of disclosure or use, knew or had reason to know that the
             knowledge of the trade secret was (I) derived from or through a person who had
15           used improper means to acquire the trade secret; (II) acquired under circumstances
             giving rise to a duty to maintain the secrecy of the trade secret or limit the use of
16           the trade secret; or (III) derived from or through a person who owed a duty to the
             person seeking relief to maintain the secrecy of the trade secret or limit the use of
17           the trade secret.

18  18 U.S.C. § 1839(5)(B).  "Improper means" is specifically defined to include "theft, bribery,

19  misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage

20  through electronic or other means." 18 U.S.C. § 1839(6)(A).  CUTSA defines "misappropriation"

21  and "improper means" in nearly identical terms.  *See* Cal. Civ. Code § 3426.1.

22       Defendants' actions fall squarely within these definitions.  As described in detail above,

23  acting on JHL's behalf, Xanthe compiled Genentech's trade secret information in folders on her

24  Genentech-issued laptop computer; provided some or all of those materials to Allen for his work

25  for JHL; held weekly Skype calls with a JHL formulation scientist she had handpicked to work

26  with her on JHL's biosimilars; and relied on Genentech trade secret information while working

27  surreptitiously for JHL.  For example, Xanthe and Allen copied Genentech's—"the

28  innovator's"—analytical method for Pulmozyme® and put it to use for JHL's biosimilar version

of that same medicine, all with the knowledge and blessing of JHL's leadership, including Jordanov and Lin. For his part, Quach downloaded hundreds of manufacturing protocols that would aid JHL as it established a new manufacturing facility in China just before he left the United States to work there, and then he asked for and received additional trade secret materials from Xanthe after arriving at JHL.

Genentech is also likely to succeed in showing that Defendants disclosed or used Genentech's trade secrets for the benefit of JHL knowing that they had been acquired in the scope of Xanthe's then-current employment with Genentech, i.e., circumstances giving rise to a duty to maintain their secrecy. *See* 18 U.S.C. § 1839(5)(B)(ii)(II); Cal. Civ. Code § 3426.1(b)(2)(B)(ii). Defendants likewise knew or had reason to know that the trade secrets were derived from a person (Xanthe) who owed a duty to Genentech to maintain their secrecy. *See* 18 U.S.C. § 1839(5)(B)(ii), (6)(A); Cal. Civ. Code § 3426.1(a), (b)(2)(B). Xanthe repeatedly certified her compliance with Genentech's Code of Conduct, which expressly imposes a duty to protect Genentech's confidential information. And as former Genentech employees, Allen, Jordanov, Lin, and Quach likewise knew that JHL had come by the information improperly.

Moreover, although not required to prove a violation, there is little question that JHL *actually used* Genentech's trade secret information. Genentech information appears inside JHL's own confidential documents—with methods, protocols and specifications copied verbatim from Genentech's trade secret materials. *See* Balogh Decl. ¶ 21.

Courts in this district have issued preliminary injunctive relief under similar circumstances. *Waymo* is particularly instructive. There, Waymo accused its competitor, Uber, of knowingly hiring a former Waymo employee who downloaded 14,000 confidential Waymo files regarding self-driving car technology and took them with him on the way out the door. Although the court questioned whether every document downloaded constituted a trade secret, it concluded that Uber hired the former Waymo employee "even though it knew or should have known" that the employee possessed "confidential files containing Waymo's intellectual property," that "at least some information from those files, if not the files themselves, has seeped into Uber's own . . . development efforts," and "that at least some of said information likely

21

1    qualifies for trade secret protection." *Waymo*, 2017 WL 2123560, at *10. This case is even

2    stronger than *Waymo*: evidence reveals that Xanthe and Allen provided Genentech trade secret

3    information directly to JHL personnel—including its CEO—explaining that the required

4    materials for Genentech's method "will be in-house at JHL soon," allowing JHL to "try out the

5    method." McCloskey Decl. ¶ 26, Ex. 16.

6         *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016), is also

7    analogous. There, the court issued a preliminary injunction because the plaintiff showed that the

8    defendant had (1) emailed and downloaded to personal devices confidential information from her

9    employer before leaving employment, and (2) signed agreements containing confidentiality

10   provisions. In *Cook*, the court issued an injunction broadly preventing the former employee, "and

11   all those acting in concert or participation with her . . . from directly or indirectly accessing,

12   using, disclosing, or making available to any person or entity other than Plaintiff, any of

13   [Plaintiff]'s confidential, proprietary, or trade secret documents, data or information." *Id.* at

14   1079. Genentech seeks similar relief here, and the Court should grant it for similar reasons.

15        Genentech's likelihood of succeeding on its trade secret misappropriation claims is

16   sufficient to satisfy the first preliminary injunction factor. But Genentech is also likely to succeed

17   on its claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and California's

18   Computer Data Access and Fraud Act, Cal. Pen. Code § 502(c)(1). Xanthe and Quach knowingly

19   and without permission accessed Genentech's computer network to wrongfully obtain data;

20   indeed, they have both admitted that misconduct. Genentech is also likely to succeed on its state

21   law claims for breach of contract, intentional interference with contractual relations, breach of

22   duty of loyalty, and aiding and abetting the breach of that duty. The Proprietary Agreements

23   Xanthe and Quach signed are valid and enforceable in California. *See Oculus Innovative Scis.,*

24   *Inc. v. Nofil Corp.*, 2007 WL 4044867, at *3 (N.D. Cal. Nov. 15, 2007). By failing to protect

25   Genentech's confidential information, Xanthe and Quach violated their contracts, and Xanthe also

26   violated her duty of loyalty to Genentech. Their co-defendants knowingly aided those violations.

27        **B.    Genentech is suffering irreparable harm.**

28        Courts in this district and elsewhere have frequently held that threatened or continued use

22

1309589

of misappropriated trade secrets presumptively constitutes irreparable harm for purposes of granting preliminary injunctive relief.  *See, e.g.*, *Gallagher Benefits Servs., Inc. v. De La Torre*, 2007 WL 4106821, at *5 (N.D. Cal. Nov. 16, 2007), *aff'd in relevant part*, 283 F. App'x 543 (9th Cir. 2008); *W. Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 WL 1625945, at *6 (N.D. Cal. June 8, 2009) ("The Court presumes that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated."); *Vinyl Interactive, LLC v. Guarino*, 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009) (same); *Pixon Imaging, Inc. v. Empower Techs. Corp.*, 2011 WL 3739529, at *6 n.7 (S.D. Cal. Aug. 24, 2011) ("[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always show irreparable harm."); *Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*, 2015 WL 7575925, at *4 (M.D.N.C. Nov. 25, 2015) ("In most instances, courts presume irreparable harm when a trade secret has been misappropriated.").  That presumption applies here.

Even beyond this presumption, Genentech will continue to suffer immediate and irreparable injury without relief.  JHL misappropriated Genentech's trade secrets, and is currently using them to develop biosimilars intended to compete directly with Genentech's medicines.[11] With each passing day, JHL continues to wrongfully leverage Genentech's trade secrets to bolster its own know-how and to make progress toward marketing its own versions of Genentech's medicines.  As explained above, the threat is imminent; JHL is currently running a global Phase III clinical trial of its Rituxan® biosimilar (the last clinical trial phase before commercialization) and has signed a lucrative deal with Sanofi to market it.

Any progress Defendants make in their efforts harms Genentech in ways that cannot be repaired with money damages awarded later.  For this reason, "[c]ommercial advantage is grounds for finding irreparable harm under the CUTSA."  *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013); *see also Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1031 (E.D. Cal. 2011) (holding that harms to "competitive advantage and loss of market status . . . warrant injunctive relief

---

[11] JHL's actions are also harming other biosimilar manufacturers, who are competing ethically and lawfully by developing biosimilar products based on their own hard work.

23
PLAINTIFF GENENTECH, INC.'S AMENDED NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:18-cv-06582-WHA

1309589

1    because such harms are inestimable.").  This is particularly true with respect to JHL's efforts to

2    market a Pulmozyme® biosimilar.  JHL has trumpeted the fact that it is the only manufacturer

3    holding clinical trials for a Pulmozyme® biosimilar, and is poised to launch the first biosimilar to

4    compete with Pulmozyme® anywhere in the world.  McCloskey Decl. ¶ 33, Ex. 21.

5        Again, *Waymo* is instructive.  Finding irreparable harm in that case, the court described

6    the "root problem" as the fact that a former Waymo employee had downloaded thousands of

7    confidential files that could be used to further Uber's product development.  *Waymo*, 2017 WL

8    2123560, at *10.  Because Uber could always claim it came by its development breakthroughs

9    independently—a defense JHL may advance here—"misuse of Waymo's trade secrets might be

10   virtually untraceable."  *Id.*  Furthermore, the court observed, it would be a "bone-crushing

11   endeavor" to "identify and enjoin parts of defendants' technology" that leveraged Waymo's trade

12   secrets after the fact—and doing so probably would not "fully restore the parties to their

13   respective competitive positions if no misappropriation had occurred."  *Id.* at *11.  Accordingly,

14   the court found it "far better to instead put in prophylactic measures now to prevent

15   misappropriation (or further misappropriation)" of the stolen trade secrets.  *Id.*  So too here.

16       Genentech suffers other irreparable harms apart from damage to its commercial position.

17   For instance, as in *Waymo*, if Defendants use Genentech trade secrets to "accelerate their own

18   progress" in drug development, "that momentum would improve their ability to attract investors

19   and talented engineers away from competitors—including [Genentech] itself."  *Id.*  "That

20   poaching scenario—and the harm it entails" constitutes a cognizable irreparable harm.  *Id.*  Such

21   harm is hardly hypothetical in this case.  JHL's meteoric rise has attracted several well-known

22   U.S.-based investors, including the likes of Sequoia Capital and Kleiner Perkins.  Moreover,

23   Jordanov and Lin publicly tout how many of their employees hail from Genentech, and JHL

24   consistently solicits talent from Genentech's ranks.  McCloskey Decl. ¶¶ 33–35, Exs. 21–23.

25   Each breakthrough JHL enjoys (thanks to Genentech's trade secrets) enhances JHL's standing

26   and helps to lure talent from Genentech to JHL.

27       Furthermore, Defendants are using Genentech's trade secrets to secure partnerships and

28   other business arrangements with third parties, including the above-mentioned deal with

24

1309589

1  pharmaceutical giant Sanofi.  These arrangements evidence Defendants' intention to use and

2  disclose Genentech's trade secrets to benefit Genentech's competitors.  Genentech's harm from

3  such further dissemination of its trade secrets is incalculable, and could result in the total

4  destruction of their economic value.  This undoubtedly constitutes irreparable harm.  *Cf. Faiveley*

5  *Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) ("[R]ebuttable

6  presumption of irreparable harm might be warranted in cases where there is a danger that, unless

7  enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or

8  otherwise irreparably impair the value of those secrets.").

9      **C.      The balance of equities and public interest favor Genentech.**

10         Defendants will suffer no prejudice if they are barred from using information they have no

11  legitimate right to possess.  Indeed, the "balance of hardships tips in favor of plaintiff seeking

12  [an] injunction when it would do no more than require Defendant to comply with federal and state

13  . . . laws." *Cook*, 191 F. Supp. 3d at 1077 (internal quotation marks omitted); *see also TMX*

14  *Funding, Inc. v. Impero Techs., Inc.*, 2010 WL 1028254, at *8 (N.D. Cal. Mar. 18, 2010) (finding

15  the balance of hardships favors a plaintiff seeking to enjoin trade secret misuse).  The public

16  interest also favors an injunction: "safeguards imposed . . . in response to brazen misappropriation

17  of trade secrets . . . would hardly discourage legitimate competition in a field where intellectual

18  property rights are important to innovation." *Waymo*, 2017 WL 2123560, at *12.

19  **V.      CONCLUSION**

20         As set forth with specificity in the accompanying proposed order, Genentech respectfully

21  requests that the Court grant this motion for a preliminary injunction, enjoining Defendants from

22  using Genentech's trade secrets in any way and ordering them to locate, preserve, and return all

23  relevant information.

24  Dated:  November 6, 2018                    KEKER, VAN NEST & PETERS LLP

25

26                                     By:    */s/ Elliot R. Peters*
                                            ELLIOT R. PETERS

27                                          Attorney for Plaintiff
                                           GENENTECH, INC.

28

PLAINTIFF GENENTECH, INC.'S AMENDED NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:18-cv-06582-WHA

1309589