DARIN W. SNYDER (S.B. #136003)
dsnyder@omm.com
MICHAEL F. TUBACH (S.B. #145955)
mtubach@omm.com
DAVID R. EBERHART (S.B. #195474)
deberhart@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, California 94111-3823
Telephone:    +1 415 984 8700
Facsimile:     +1 415 984 8701

Attorneys for Defendant
JHL BIOTECH, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO

| | |
|---|---|
| GENENTECH, INC., | Case No. 3:18-cv-06582-WHA |
| Plaintiff, | **DEFENDANT JHL BIOTECH, INC.'S OPPOSITION TO PLAINTIFF GENENTECH, INC.'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| JHL BIOTECH, INC., XANTHE LAM, an individual, ALLEN LAM, an individual, JAMES QUACH, an individual, RACHO JORDANOV, an individual, ROSE LIN, an individual, JOHN CHAN, an individual, and DOES 1-50, | Date:    February 14, 2019<br>Time:    8:00 a.m.<br>Dept:    Courtroom 12, 19th Floor<br>Judge:   Hon. William H. Alsup |
| Defendants. | Complaint Filed: October 29, 2018<br>Trial Date: Not Set |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................... 2

       A.     Biologics and the Regulatory Pathway ................................................... 2

       B.     Formation and Growth of JHL ................................................................ 3

       C.     Procedural History ................................................................................... 4

III.   LEGAL STANDARD .......................................................................................... 4

IV.    ARGUMENT ....................................................................................................... 5

       A.     Genentech Fails to Show Irreparable Harm Absent an Injunction ......... 5

              1.     There Is No Presumption of Irreparable Harm ............................. 5

              2.     Genentech Fails to Show the Requisite Harm ............................... 7

                     a.     Two-Year Delay Proves No Harm to Genentech Is
                            Imminent ........................................................................... 7

                     b.     None of the Claimed Harm Is Irreparable ........................ 8

       B.     Genentech Fails to Show Likely Success on the DTSA and CUTSA Claims ....... 10

              1.     Much of the Information Is Not Trade Secrets ............................ 10

                     a.     Genentech Asserts Public Information As Trade Secrets ............. 11

                     b.     Lack of Reasonable Particularity ................................... 13

                     c.     Lack of Reasonable Measures to Protect Secrecy .......... 15

              2.     JHL Is Not Currently Using Genentech Trade Secrets .............. 16

       C.     The Balance of Equities Is in JHL's Favor, Not Genentech's Favor .......... 18

              1.     Genentech Will Experience No Hardship If Its Motion Is Denied ........... 18

              2.     A Preliminary Injunction Would Impose Significant Hardship on
                     JHL ............................................................................................... 19

                     a.     Genentech's Requested Relief Is Overbroad and Vague ............. 19

                            (1)     The Proposed Prohibitory Injunctive Terms Are
                                    Vague and Overbroad (Paragraphs 1-4) ............... 20

                            (2)     The Proposed Mandatory Injunctive Terms Are
                                    Overbroad, Vague, and Would Change the Status
                                    Quo (Paragraphs 5-7) ........................................... 22

                     b.     The Injunction Would Impair JHL's Development ........ 23

       D.     Genentech Has Failed to Show an Injunction Is in the Public Interest ........ 24

V.     CONCLUSION ................................................................................................. 25

1

# TABLE OF AUTHORITIES

2

Page

3

## CASES

4

*02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,*
  399 F. Supp. 2d 1064 (N.D. Cal. 2005) ...................................................... 22

5

*Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.,*
  2015 WL 7575925 (M.D.N.C. 2015) ........................................................... 7

6

*Alamar Biosciences, Inc. v. Difco Labs., Inc.,*
  1995 WL 912345 (E.D. Cal. 1995) ....................................................... 15, 16

7

*Albion Labs., Inc. v. Seroyal Brands, Inc.,*
  1979 WL 24987 (N.D. Cal. 1979) ............................................................. 19

8

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ............................................................... 4, 5

9

10

*Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.,*
  226 Cal. App. 4th 26 (2014) ................................................................. 13

11

*Am. Can Co. v. Mansukhani,*
  742 F.2d 314 (7th Cir. 1984) ............................................................ 19, 21

12

13

*Am. Cyanamid Co. v. U.S. Surgical Corp.,*
  833 F. Supp. 92 (D. Conn. 1992) ............................................................ 24

14

*Barney v. Burrow,*
  558 F. Supp. 2d 1066 (E.D. Cal. 2008) ...................................................... 25

15

16

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.,*
  331 F. Supp. 3d 977 (N.D. Cal. 2018) ...................................................... 16

17

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.,*
  2013 WL 557102 (N.D. Cal. 2013) ........................................................... 20

18

19

*Campbell Soup Co. v. ConAgra, Inc.,*
  977 F.2d 86 (3d Cir. 1992) .................................................................. 6

20

*CanWe Studios LLC v. Sinclair,*
  2013 WL 12120437 (C.D. Cal. 2013) ......................................................... 15

21

22

*Cypress Semiconductor Corp. v. Superior Court,*
  163 Cal. App. 4th 575 (2008) ........................................................... 15, 16

23

*Delphon Indus., LLC v. Int'l Test Sols. Inc.,*
  2011 WL 4915792 (N.D. Cal. 2011) ........................................................... 25

24

*Droeger v. Welsh Sporting Goods Corp.,*
  541 F.2d 790 (9th Cir. 1976) ................................................................ 16

25

26

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.,*
  894 F. Supp. 2d 691 (E.D. Va. 2012) ...................................................... 21, 22

27

28

**TABLE OF AUTHORITIES**
(continued)

Page

*E.W. Bliss Co. v. Struthers, Dunn, Inc.*,
   408 F.2d 1108 (8th Cir. 1969)..................................................................... 19, 21

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)............................................................................................. 5

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009)...................................................................... 6, 7, 10

*First W. Capital Mgmt. Co. v. Malamed*,
   874 F.3d 1136 (10th Cir. 2017)........................................................................... 6

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
   654 F.3d 989 (9th Cir. 2011).............................................................................. 5

*Founder Starcoin, Inc. v. Launch Labs, Inc.*,
   2018 WL 3343790 (S.D. Cal. 2018) ................................................................. 11

*Friends of the Wild Swan v. Weber*,
   767 F.3d 936 (9th Cir. 2014).............................................................................. 8

*Gable-Leigh, Inc. v. N. Am. Miss*,
   2001 WL 521695 (C.D. Cal. 2001)..................................................................... 6

*Gallagher Benefits Servs., Inc. v. De La Torre*,
   2007 WL 4106821 (N.D. Cal. 2007)................................................................... 6

*Groupion, LLC v. Groupon, Inc.*,
   826 F. Supp. 2d 1156 (N.D. Cal. 2011) ............................................................. 7

*GSI Tech., Inc. v. United Memories, Inc.*,
   2013 WL 12172990 (N.D. Cal. 2013) ................................................................. 6

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013)............................................................................ 5

*Imax Corp. v. Cinema Techs., Inc.*,
   152 F.3d 1161 (9th Cir. 1998)........................................................................... 13

*In re Gen. Capacitor*,
   325 F. Supp. 3d 1029 (N.D. Cal. 2018) ....................................................... 10, 15

*Integral Sys., Inc. v. Peoplesoft, Inc.*,
   1991 WL 498874 (N.D. Cal. 1991)................................................................... 16

*John M. Floyd & Associates, Inc. v. First Imperial Credit Union*,
   2017 WL 4810223 (S.D. Cal. 2017) ................................................................. 15

*Koninklijke Philips Elecs. N.V v. Seoul Semiconductor Co.*,
   2011 WL 13227959 (C.D. Cal. 2011) ................................................................. 7

*Oren Enters., Inc. v. Stefanie Cove & Co.*,
   2017 WL 8220230 (C.D. Cal. 2017).................................................................. 7

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Overstreet v. Amphenol Griffith Enters. LLC*,
    2014 WL 763518 (D. Ariz. 2014) ............................................................................. 6

4

*Perez v. Valley Garlic, Inc.*,
    2016 WL 6094809 (E.D. Cal. 2016) .................................................................... 19, 22

5

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ................................................................................. 10

6

7

*Perfect 10, Inc. v. Google, Inc.*,
    653 F.3d 976 (9th Cir. 2011) ............................................................................ 5, 6, 9

8

*Pixon Imaging, Inc. v. Empower Techs. Corp.*,
    2011 WL 3739529 (S.D. Cal. 2011) ......................................................................... 6

9

10

*Protech Diamond Tools, Incorporation v. Liao*,
    2009 WL 1626587 (N.D. Cal. 2009) .................................................................... 7, 10

11

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
    923 F. Supp. 1231 (N.D. Cal. 1995) ....................................................................... 15

12

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ................................................................................... 8

13

14

*Shapiro v. Hasbro, Inc.*,
    653 F. App'x 568 (9th Cir. 2016) ........................................................................... 11

15

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.*,
    2008 WL 166950 (N.D. Cal. 2008) .................................................................... 19, 24

16

17

*Silvaco Data Sys. v. Intel Corp.*,
    184 Cal. App. 4th 210 (2010), *disapproved on other grounds by Kwikset Corp.*
    *v. Superior Court*, 51 Cal. 4th 310 (2011) ............................................................. 13

18

19

*Social Apps, LLC v. Zynga, Inc.*,
    2012 WL 2203063 (N.D. Cal. 2012) .................................................................... 13, 14

20

*SRI Int'l v. Acoustic Imaging Techs. Corp.*,
    1993 WL 356896 (N.D. Cal. 1993) ......................................................................... 25

21

22

*Swarmify, Inc. v. Cloudflare, Inc.*,
    2018 WL 1142204 (N.D. Cal. 2018) ............................................................... passim

23

*Symantec Corp. v. McAfee Assocs., Inc.*,
    1998 WL 740798 (N.D. Cal. 1998) ........................................................................... 6

24

*Union Pac. R. Co. v. Mower*,
    219 F.3d 1069 (9th Cir. 2000) ............................................................................ 19, 21

25

26

*United States v. Pac. Design Furniture, Inc.*,
    2015 WL 5440588 (C.D. Cal. 2015) ........................................................................ 19

27

28

1

**TABLE OF AUTHORITIES**
**(continued)**

2

Page

3

*Verigy US, Inc. v. Mayder*,
    2008 WL 564634 (N.D. Cal. 2008)........................................................................... 18

4

*Vinyl Interactive, LLC v. Guarino*,
    2009 WL 1228695 (N.D. Cal. 2009)........................................................................... 6

5

6

*W. Directories, Inc. v. Golden Guide Directories, Inc.*,
    2009 WL 1625945 (N.D. Cal. 2009)........................................................................... 6

7

*Waymo LLC v. Uber Techs., Inc.*,
    2017 WL 2123560 (N.D. Cal. 2017)................................................................... passim

8

9

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................................ 4, 6

10

*X Corp. v. Doe*,
    805 F. Supp. 1298 (E.D. Va. 1992) ........................................................................... 22

11

12

**STATUTES**

13

Cal. Civ. Code § 3426.1 .................................................................................. 10, 15, 16

14

**OTHER AUTHORITIES**

15

Restatement (Third) of Unfair Competition  (1995) ..................................................... 16

16

**RULES**

Fed. R. Civ. P. 65(d)(1)(B)-(C)................................................................................... 19

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.        INTRODUCTION**

2            Preliminary injunctive relief is an extraordinary remedy to which Genentech is not

3    entitled. Genentech's motion overreaches in three significant ways.

4            First, Genentech fails to show irreparable harm, which dooms the motion. Genentech

5    wrongly claims irreparable harm is presumed. Further, Genentech's two-year delay in bringing

6    suit belies any irreparable harm. And the purported harms Genentech identifies are insufficient to

7    meet the standard. Loss of market share would be reparable through money damages. Regardless,

8    it is not imminent, as shown both by Genentech's delay and the fact that JHL is years away from

9    commercialization of any competing drug. Loss of talent and investors would be neither

10   significant to Genentech nor causally connected to the injunction sought: that injunction would

11   leave JHL free to recruit Genentech's employees and solicit investors.

12           Second, Genentech fails to show a likelihood of success on the merits because it has

13   included substantial public material in its ill-defined claimed trade secrets, has admitted its failure

14   to take reasonable measures to protect the secrecy of other information, and has not adequately

15   proven use or misappropriation. JHL submits herewith expert declarations demonstrating that

16   JHL's procedures do not employ Genentech trade secrets—instead, any common information

17   originates with the vast public literature and standards in the field. Nor does Genentech provide

18   any proof of acquisition by JHL of the materials allegedly downloaded in July 2017. Further,

19   Genentech failed to reasonably protect its trade secrets: it reported Ms. Lam to the FBI but failed

20   to take standard measures to prevent misuse of her access to Genentech's systems.

21           Finally, Genentech fails to account for the harm that would be suffered by JHL and the

22   public by an overbroad injunction. As biosimilar producers race to market, any delay to JHL

23   caused by the overbroad injunction could be significant. The public's interest is likewise pro-

24   competitive, especially here where consumers will benefit from life-saving medicines that

25   Genentech's monopolistic prices currently render cost-prohibitive.

26           Any one of these grounds is sufficient to deny Genentech's motion. It should be denied.

27

28

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA

1    **II.     FACTUAL BACKGROUND**

2         **A.     Biologics and the Regulatory Pathway**

3         Biopharmaceuticals, a.k.a. biologics, are pharmaceuticals derived from biological (rather

4    than chemical) processes. Biologics treat a fast-growing list of diseases. (Eberhart Decl. ¶2, Ex. 1

5    at 1.) It is estimated that seven of the world's ten best-selling therapies are biologics. (*Id.*) The

6    high prices of biologics, however, deprive many patients of these therapies. (Dickey Decl. ¶8.)

7         Genentech has been selling—and profiting handsomely—from biologics for decades.

8    Three of the biologics at issue here—Avastin, Herceptin, and Rituxan—accounted for

9    approximately 47.3%, or $19.8 billion, of Genentech's parent company's $41.8 billion in overall

10   pharmaceutical sales in 2017. (Eberhart Decl. ¶3, Ex. 2 at 12.)  The fourth, Pulmozyme, brought

11   in 2017 revenues of ~$740 million. (*Id.*) Genentech receives over $50 million ***daily*** from these

12   four drugs. In 2017, Genentech's parent claimed to be the world's largest biotech company with

13   the largest biologics manufacturing capacity in the industry. (*Id.* ¶4, Ex. 3 at 1; ¶11, Ex. 10 at 4.)

14        Genentech biologics profits are threatened by a new class of drugs called "biosimilars."

15   "Biosimilars" are highly similar versions of already approved biologics. (Lin Decl. ¶2.)[1]  Like

16   generic drugs, biosimilars will likely be more affordable than the corresponding biologics.

17   (Dickey Decl. ¶8.) Biosimilars are enabled by the expiration of numerous patents and by changes

18   to the pathway for regulatory approval of biosimilars. Biologics generating estimated sales of

19   $100 billion annually as of 2013 have recently lost patent protection or will lose patent protection

20   in the next few years, potentially tripling the size of the biosimilars market between 2018 and

21   2020. (Dickey Decl. ¶9; Eberhart Decl. ¶6, Ex. 5 at 1.)

22        Biosimilars offer greater affordability, in part, because of the availability of abbreviated

23   regulatory approval processes in jurisdictions including the European Union. (*See* Eberhart Decl.

24   ¶5, Ex. 4 at 4-5.) These abbreviated regulatory pathways enable a shorter and less expensive drug

25   development program, producing cost savings that may be passed on to consumers. (*Id.* ¶5, Ex. 4

26   at 5.) All companies seeking to sell a biologic or biosimilar must demonstrate to the relevant

27   _____

[1] By definition, a generic drug is an identical copy of the corresponding brand name drug. Unlike
28   generic drugs, a biosimilar will not be identical to its corresponding biologic but will be
     sufficiently similar to the existing biologic to pass regulatory standards.

1  regulator that the proposed product is safe, pure, and potent for its approved use conditions, but

2  the process for making this showing is simplified for biosimilars. (*Id.*) A biosimilar sponsor need

3  not independently establish the safety and effectiveness of the product; instead, it may

4  demonstrate biosimilarity to the reference drug. (*Id.*) The sponsor also may rely on existing

5  knowledge about the reference drug to support the safety and efficacy of the biosimilar. (*Id.*)

6       All biopharmaceutical companies, whether developing biosimilars or new biologics, use

7  extensive public domain information regarding biologic drug development. Regulators require

8  manufacturers to establish "Good Manufacturing Practice" or "GMP" systems to control the

9  quality, consistency, and reproducibility of their manufacturing processes. (Rudge Decl. ¶20.)

10  GMP guidelines are internationally standardized and adopted in various forms by regulatory

11  agencies worldwide, including the Federal Drug Administration ("FDA") in the U.S. (*Id.*)

12  Industry sources publish detailed guidance on implementation of GMP guidelines, including how

13  to draft a general protocol or standard operating procedure ("SOP") related to GMP. (*Id.* ¶22.)

14  Accordingly, drug companies—including Genentech and JHL—commonly ██████████████

15  ████████ in their GMP documents and SOPs. (*Id.* ¶27.)

16      **B.**    <u>Formation and Growth of JHL</u>

17       JHL was founded in 2012 and is a newcomer to the industry. (Lin Decl. ¶2.) JHL focuses

18  on biosimilar development and contract manufacturing. JHL's development efforts include four

19  "Core Product Candidates." (*Id.* ¶7.) All four are biosimilars of Genentech products, and this

20  litigation challenges all four: (1) dornase alfa (biosimilar of Genentech's Pulmozyme); (2)

21  rituximab (biosimilar of Genentech's Rituzan); (3) trastuzumab (biosimilar of Genentech's

22  Herceptin); and (4) bevacizumab (biosimilar of Genentech's Avastin). (*Id.*; Compl. ¶¶82, 126.)

23       JHL has not sought U.S. regulatory approval for any of these candidates. (Lin Dec. ¶9.)

24  JHL is in the process of seeking approval in other jurisdictions, including China and the EU. (*See*

25  *id.* ¶9.) No regulator has yet approved marketing of any of these candidates in any market, and

26  JHL does not expect to be ready to sell any such product before 2021. (*Id.* ¶8.)

27       JHL's mission is to reduce the cost of life-saving medicines to patients and the healthcare

28  system as a whole (Lin Decl. ¶3), including in developing countries where Genentech's products

1  have been cost-prohibitive. (*See* Dickey Decl. ¶8.) Because JHL's competitors are incentivized to

2  launch competing products as soon as the reference drugs' patents expire, it is important for JHL

3  to seek regulatory approvals expeditiously. (*See* Dickey Decl. ¶9.)  The success of JHL's business

4  hinges on its ability to launch timely its Core Product Candidates to match those competitors.

5  Any delay in the development, testing, or regulatory approval process could cause significant

6  harm to JHL's growing business, as it would lose the advantage of being one of the first to enter

7  the marketplace. (*See id*.) As a still-developing company, JHL has no marketing or sales

8  department and has not established its reputation in the biologics industry. (Lin Decl. ¶¶4-5.)

9      **C.    Procedural History**

10     Genentech commenced suit on October 29, 2018. (Compl. ¶244.) Genentech's claims

11  center on the conduct of four individuals—Xanthe Lam, Allen Lam, John Chan, and James

12  Quach—who allegedly worked for JHL and allegedly downloaded, received, or facilitated the

13  transfer of Genentech's confidential, proprietary, and trade secret information. (*Id*. ¶¶27, 127-28

14  (Ms. Lam); 169 (Mr. Lam); 69, 165 (Chan); 199 (Quach).)

15     Genentech seeks to enjoin a broad range of acts by JHL: using or disclosing the alleged

16  trade secrets; making or selling products, or using processes or methods, that utilize, embody, or

17  were developed with the benefit or use of any alleged trade secret; and submitting to regulators

18  information derived from, containing, or embodying any alleged trade secret. (Proposed Order

19  ¶¶1-4.) Genentech also asks the Court to require JHL to take several affirmative acts: to return

20  Genentech trade secret information or materials derived from them; to investigate the alleged

21  trade secret disclosures; and to log any communications wherein any of four individuals "may

22  have mentioned" any confidential or trade secret Genentech information. (*Id*. ¶¶5-7.)

23  **III.   LEGAL STANDARD**

24     "A preliminary injunction is an extraordinary remedy never awarded as of right." *All. for*

25  *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011), citing *Winter v. Nat. Res. Def.*

26  *Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish

27  [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the

28  absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

1   injunction is in the public interest." *All. for the Wild Rockies*, 632 F.3d at 1131; *see also Waymo*

2   *LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *6 (N.D. Cal. 2017). *Winter* "requires the

3   plaintiff to make a showing on all four prongs." *All. for the Wild Rockies*, 632 F.3d at 1135.

4   Where there are only "serious questions going to the merits," as opposed to a "likelihood" of

5   success on the merits, there must be a "hardship balance that tips *sharply* toward the plaintiff" to

6   support issuance of an injunction, "assuming the other two elements of the *Winter* test are also

7   met." *Id.* at 1132 (emphasis added). Genentech fails on all four prongs.

8   **IV.   ARGUMENT**

9       **A.   Genentech Fails to Show Irreparable Harm Absent an Injunction**

10       Genentech's failure to establish irreparable harm is glaring and dispositive; accordingly,

11   JHL addresses that factor first. Genentech wrongly contends there is a presumption of irreparable

12   harm.  And it relies in error on presumed alleged harm that is inconsistent with its two-year delay

13   in bringing suit and that either could be remedied with monetary damages or is not significant,

14   imminent, or connected to the requested injunction. (Mot. at 22:27-25:8.) This failure is a

15   "showstopper." *See Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 1142204, at *6 (N.D. Cal. 2018).

16       **1.   There Is No Presumption of Irreparable Harm**

17       There is no presumption of irreparable harm for trade secret misappropriation. (*Cf.* Mot. at

18   22:28-23:12.) Such a presumption once existed broadly for intellectual property but has

19   progressively eroded following the Supreme Court's rejection of it in the patent context. *eBay*

20   *Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006). The reasoning of *eBay* was not

21   patent specific; rather, it reflected the equitable foundations of injunctive relief and the need to

22   comply with traditional equitable principles. *Id*. After *eBa*y, the Ninth Circuit eliminated the

23   presumption in the contexts of copyrights and trademarks. *Flexible Lifeline Sys., Inc. v. Precision*

24   *Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011) (copyright); *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d

25   976, 981 (9th Cir. 2011) (same); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d

26   1239, 1249 (9th Cir. 2013) (trademark).

27       The reasoning of *eBay*, *Flexible Lifeline*, *Herb Reed*, and *Perfect 10* applies equally to

28   trade secrets: there is no basis to abandon "the traditional four-factor framework that governs the

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA

1  award of injunctive relief, or to undermine the equitable principle that such relief is an

2  extraordinary and drastic remedy that is never awarded as of right." *Perfect 10*, 653 F.3d at 980.

3  To hold otherwise would also be inconsistent with *Winter*, which requires a sufficient showing on

4  all four prongs. *See Winter*, 555 U.S. at 20-22 (requiring plaintiff to show only "possibility" of

5  irreparable harm "is too lenient"); *see also Overstreet v. Amphenol Griffith Enters. LLC*, 2014

6  WL 763518, at *9 (D. Ariz. 2014) (post-*Winter*, "irreparable harm may not be implied"). In

7  *Waymo*, the parties briefed this issue, but this Court expressly did not decide it because *Waymo*

8  had actually shown a likelihood of irreparable harm. 2017 WL 2123560, at *10 ("This order need

9  not reach the issue[.]"). This Court implicitly rejected such a presumption in *Swarmify* when it

10  denied a preliminary injunction solely based on the failure to prove irreparable harm. *Swarmify*,

11  2018 WL 1142204, at *6, citing *Winter*, 555 U.S. at 20. This Court should now reach this issue

12  and follow the Second, Third, and Tenth Circuits and reject a presumption in trade secret cases.

13  *See, e.g.*, *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009);

14  *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992); *First W. Capital Mgmt. Co.*

15  *v. Malamed*, 874 F.3d 1136, 1142-43 (10th Cir. 2017).[2]

16      Genentech fails to address this precedent, instead citing only five district court cases, two

17  of which are outside this district. All three Northern District cases are pre-*Flexible Lifeline* and do

18  not reconcile their holdings with *eBay*. *See Gallagher Benefits Servs., Inc. v. De La Torre*, 2007

19  WL 4106821, at *5 (N.D. Cal. 2007) (pre-*Winter* and pre-*Flexible Lifeline*, makes no mention of

20  presumption; holds plaintiff "must also demonstrate some degree of irreparable harm"); *W.*

21  *Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 WL 1625945, at *6 (N.D. Cal. 2009)

22  (pre-*Flexible Lifeline*); *Vinyl Interactive, LLC v. Guarino*, 2009 WL 1228695, at *8 (N.D. Cal.

23  2009) (pre-*Flexible Lifeline*). The two out-of-district cases cited by Genentech do not actually

24  rely on presumed irreparable harm. *Pixon Imaging, Inc. v. Empower Techs. Corp.*, 2011 WL

25  3739529, at *6 (S.D. Cal. 2011) (irreparable harm based on proof disclosure would cripple

26  ────────────
[2] *See also GSI Tech., Inc. v. United Memories, Inc.*, 2013 WL 12172990, at *11 (N.D. Cal. 2013)

27  ("misappropriation of proprietary information alone does not create a presumption"). Some courts
eliminated the presumption before *eBay. See, e.g.*, *Symantec Corp. v. McAfee Assocs., Inc.*, 1998
WL 740798, at *2 n.6 (N.D. Cal. 1998) (presumption "does not apply in trade secret cases");

28  *Gable-Leigh, Inc. v. N. Am. Miss*, 2001 WL 521695, at *18 (C.D. Cal. 2001) (same).

1    plaintiff's business and monetary damages inadequate due to defendant's inability to pay);

2    *Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*, 2015 WL 7575925, at *4 (M.D.N.C.

3    2015) (irreparable harm where damages "would be extremely difficult to quantify").

4              **2.      Genentech Fails to Show the Requisite Harm**

5         Lacking presumed irreparable harm, Genentech fails to establish the "single most

6    important prerequisite for the issuance of a preliminary injunction." *Faiveley*, 559 F.3d at 118.

7    Genentech must show that an injury it would suffer absent an injunction would be imminent,

8    significant, non-speculative, and irreparable. *Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d

9    1156, 1167 (N.D. Cal. 2011); *see also Swarmify*, 2018 WL 1142204, at *5. For multiple reasons,

10   Genentech has not satisfied its burden.

11             **a.      Two-Year Delay Proves No Harm to Genentech Is Imminent**

12        Genentech's two-year delay is sufficient grounds to deny its motion. "[U]ndue delay,

13   standing alone, constitutes grounds for rejecting a motion for preliminary injunction." *Protech*

14   *Diamond Tools, Incorporation v. Liao*, 2009 WL 1626587, at *6 (N.D. Cal. 2009); s*ee also Oren*

15   *Enters., Inc. v. Stefanie Cove & Co.*, 2017 WL 8220230, at *5 (C.D. Cal. 2017); *Koninklijke*

16   *Philips Elecs. N.V v. Seoul Semiconductor Co.*, 2011 WL 13227959, at *6 (C.D. Cal. 2011).

17   Genentech "first received notice of the allegations described herein on or about October 11,

18   2016" (Compl. ¶244), but it chose to wait more than two years before it sought injunctive relief.

19        In *Oren Enterprises* and *Protech*, six-month and three-year delays precluded preliminary

20   injunctive relief. *Oren Enters.*, 2017 WL 8220230, at *5 (six months); *Protech*, 2009 WL

21   1626587, at *6 (three years). The plaintiff in *Protech* argued its delay was excusable, because it

22   had no reason to sue before defendants withdrew their petition to cancel the trademark at issue.

23   The court disagreed, because the delay meant that the "allegedly infringing conduct ha[d] been

24   occurring continually and without interruption for years, without any legal action being taken by

25   Plaintiff." 2009 WL 1626587, at *6. Similarly, Genentech waited two years after first learning of

26   the alleged misappropriation, including a year after the FBI executed a search warrant on the

27   Lam's home and terminating Ms. Lam's employment. Having decided to await the outcome of a

28   criminal investigation, Genentech cannot credibly claim that additional harm is imminent.

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA

1    Even if Genentech had not delayed, Genentech could not show imminent harm. *See*

2  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014) (harm must be imminent).

3  JHL is still years away from competing with Genentech: JHL will not sell a competing product

4  anywhere before 2021. (Lin Decl. ¶8.) Genentech contends that harm is imminent because JHL is

5  running a Phase III trial of the biosimilar for Rituxan. (Mot. at 23:18-23:19.) But a Phase III trial

6  is but one step in the regulatory process. Many hurdles and at least two years remain before JHL

7  could sell a Rituxan biosimilar. (Lin Decl. ¶8.)

8                      **b.      None of the Claimed Harm Is Irreparable**

9    Nor has Genentech demonstrated that any alleged harm is irreparable. Genentech's proof

10  is meager: Genentech identifies three supposed harms and cites only paragraphs 33 through 35 of

11  the McCloskey Declaration and Exhibits 21 through 23 thereto. (Mot. at 23:13-25:8.) Each

12  assertion of irreparable harm should be rejected by the Court.

13    First, JHL allegedly is using trade secrets to make progress toward wrongfully competing

14  with Genentech (*id*. at 23:12-20) and any such progress harms Genentech "in ways that cannot be

15  repaired with money damages awarded later" (*id*. at 23:21-24:4). But purported use of

16  misappropriated trade secrets to compete does not constitute *irreparable* harm, especially in a

17  non-nascent industry like this one where lost market share calculations are feasible. *Swarmify*,

18  2018 WL 1142204, at *5; *see also Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental,

19  Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("economic injury alone does not support a finding of

20  irreparable harm"). As the Dickey declaration submitted herewith explains, neither the broader

21  pharmaceutical industry nor the narrower biopharmaceutical industry is nascent. (Dickey Decl. ¶¶

22  13-15.)  Any harm to Genentech's position resulting from JHL's alleged misappropriation of

23  trade secrets will be appropriately measured by the lost profits suffered by Genentech. (*Id.* ¶¶ 15-

24  16.) Just as it has been possible to calculate incumbents' lost profits to small-molecule generics, it

25  is possible to calculate incumbents' lost profits to biosimilars. (*Id.* ¶¶ 13-15.)

26    Genentech conflates this case with *Waymo*, suggesting that any misuse of Genentech's

27  trade secrets by JHL would be "virtually untraceable" and thus any damage irreparable. (Mot. at

28  24:5-26.) But unlike the self-driving car market at issue in *Waymo*—which this Court called

8

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA

1    "unquestionably nascent" because no one had yet commercialized the technology at issue,

2    *Swarmify*, 2018 WL 1142204, at *5—the biopharmaceutical industry is not nascent: biologics

3    have been around for decades, and Genentech has commercialized the four at issue to generate

4    $50 million a day. (Dickey Decl. ¶¶ 7, 13.) JHL's biosimilars will be quasi-generics of existing

5    biologics, not completely new drugs. (Lin Decl. ¶2.) As in *Swarmify*, Genentech's "comparison of

6    this case to *Waymo* collapses under even superficial scrutiny." 2018 WL 1142204, at *6.

7          Second, Genentech suggests that a loss of investors and talent to JHL would constitute

8    irreparable harm. (Mot. at 24: 16-26.) This claim is not credible: Genentech was a public

9    company from 1980 through 2009 and has been a wholly owned subsidiary of another public

10   company, Roche Holding AG, ever since. (Eberhart Decl. ¶¶7-9, Ex. 6 at 1; Ex. 7 at 2; Ex. 8, at

11   1.) It also has roughly 15,000 employees. (*Id.* ¶10, Ex. 9.) The evidence Genentech cites

12   (McCloskey Exs. 21-23) amply demonstrates that no claimed harm would be significant,

13   imminent, or even likely: Exhibit 21 is an article that claims JHL employs "more than half a

14   dozen" former Genentech employees; and Exhibits 22 and 23 are communications from Mr.

15   Jordanov and Ms. Lin to two Genentech employees, with no indication that any "poaching"

16   occurred. Again, any comparison to *Waymo* is inapt. Neither the number nor the type of

17   employees lost to or approached by JHL has been shown to be significant, unlike in *Waymo*

18   where the poached individual was plaintiff's "former star engineer." *Waymo*, 2017 WL 2123560,

19   at *1, 11. Nor has Genentech made any showing that any investment in JHL has resulted in or

20   will result in any tangible harm to Genentech. (*See* Mot. at 24: 16-26.)

21         Genentech also fails to show that the alleged loss of talent or investors to JHL has any

22   "causal connection" to an act of trade secret misappropriation by JHL or any other defendant. *See*

23   *Perfect 10*, 653 F.3d at 982 (no irreparable harm where plaintiff failed to show "causal

24   connection" between irreparable harm and conduct sought to be enjoined). Absent that

25   connection, there is nothing improper about JHL asking Genentech employees if they wish to join

26   JHL or obtaining investors. Nor would the injunctive relief sought by Genentech preclude JHL

27   from continuing to recruit talent and investors. An alleged harm that would exist with or without

28   the requested injunctive relief cannot justify the imposition of a preliminary injunction. *Id.*

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA

Finally, Genentech claims the JHL-Sanofi deal "evidences Defendants' intention to use and disclose Genentech's trade secrets to benefit Genentech's competitors." (Mot. at 25:1-2.) But, like the supposed misappropriation, Genentech has known of this deal for more than two years. (*Id*. at 15:4-5.) That delay belies any claim of irreparable harm. *See Protech*, 2009 WL 1626587, at *6. Nor can Genentech demonstrate that this deal presents some risk that JHL will destroy an alleged trade secret through disclosure: as the Second Circuit explained in *Faiveley*, "once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge." *Faiveley*, 559 F.3d at 119.

**B.     Genentech Fails to Show Likely Success on the DTSA and CUTSA Claims**

Genentech contends its likely success on its federal and state trade secret claims supports injunctive relief.[3] The elements of those claims are essentially the same. *See Waymo*, 2017 WL 2123560, at *7. Genentech must show the information at issue (1) is likely to meet the definition of a trade secret; and (2) was likely misappropriated by Defendants. *Id.*; *see also In re Gen. Capacitor*, 325 F. Supp. 3d 1029, 1036 (N.D. Cal. 2018) (explaining elements of CUTSA claim). Genentech has not established it is likely to prove either element.

**1.     Much of the Information Is Not Trade Secrets**

Under CUTSA, a trade secret is information that: "(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1.[4] Genentech asserts ownership of a broad spectrum of trade secrets that would occupy much of the field of biologics. But many of its alleged trade secrets are either "generally known to the public" or were not the subject of reasonable efforts to maintain their secrecy. *See id.* And Genentech's

---

[3] Genentech limits its proof to the Defend Trade Secrets Act ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA") claims but argues in passing that it is likely to succeed on all of its other claims. (Mot. at 22:12-26.) Genentech offers no evidence to support this bald contention, and it should be summarily dismissed. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) (moving party has burden of showing likely success on the merits).
[4] The slight differences in the DTSA definition are immaterial here.

1    descriptions are so vague and/or overbroad that JHL cannot determine the substance of the claim.

2                    **a.        Genentech Asserts Public Information As Trade Secrets**

3              Information that is in the public domain does not qualify as a trade secret and cannot

4    support a preliminary injunction. *Shapiro v. Hasbro, Inc.*, 653 F. App'x 568, 568-69 (9th Cir.

5    2016); *Founder Starcoin, Inc. v. Launch Labs, Inc.*, 2018 WL 3343790, at *7 (S.D. Cal. 2018).

6    Tellingly, Genentech never identifies any specific information that it claims as a trade secret. (*See*

7    Mot. at 18:19-20:10.) This is no oversight: public disclosures span the breadth of the alleged trade

8    secrets, including each of the categories in Genentech's Statement Regarding Trade Secrets

9    ("Statement") relating to stability, potency, purity, identity, and quality. (*See, e.g.*, Tessier Decl.

10   ¶¶30-43, 49-62, 95, 144, 154, 197-98; Rudge Decl. ¶32.) Genentech claims as its "trade secrets"

11   information that is the subject of vast disclosures in myriad public sources: regulatory authority

12   requirements, guidelines from numerous countries, standards and compendia from multiple

13   industry organizations, and patents, publications and presentations from various companies,

14   including Genentech. (*See* Tessier Decl. ¶¶30-43; Rudge Decl. ¶¶24, 27, 32.) Many of

15   Genentech's allegedly trade secret documents expressly cite these public sources. In sum,

16   Genentech does not show a likelihood of proving a specific, misappropriated trade secret.

17           One of the few alleged trade secrets Genentech's motion specifically identifies is

18   Genentech's "confidential stability protocol for Pulmozyme." (Mot. at 14:2-12; Balogh Decl.

19   ¶21.) But that stability protocol is the subject of several public disclosures. For example, the

20   allegedly proprietary "specifications" described in Genentech's motion and Trade Secret No.1

21   can be found in Genentech's Certificate of Analysis for Pulmozyme, a disclosure generally

22   provided to every customer who purchases the drug product. (*See* Tessier Decl. ¶¶67-68.) Further,

23   the ICH guidelines have long provided comprehensive guidance for stability studies, including

24   suggested temperatures, time intervals, and procedures for stability study protocols for drug

25   substance, drug product, and degradation studies. (*See id*. ¶¶49-60, 71.)

26           For over twenty years, Genentech has been disclosing details about Pulmozyme that it

27   now claims as a trade secret. (*See id*. ¶77.) In one article, Genentech describes the techniques it

28   uses in characterizing Pulmozyme, ███████████████████████████████████████████

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA

1   ████████████████████████████████████████████████████████████

2   ████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████   Genentech's publications

4   specifically disclose the allegedly trade secret details of Genentech's methyl green SOP,

5   including the "equipment, concentrations of reagents, and order of steps to be taken." (Mot. at

6   11:2-17; Balogh Decl. ¶21.) For example, in a 1994 publication, Genentech disclosed the

7   equipment and the recipe for the reagents used, and also taught how these solutions should be

8   made and stored. (*See* Tessier Decl. ¶89.) Indeed, all the critical steps for sample preparation, test

9   procedure, and potency measurement are in Genentech's publications. (*See id*. ¶¶86-92.)

10       Supposed trade secret details about Genentech's Rituxan have similarly been widely

11   disclosed. These disclosures include the allegedly trade secret "formulation plan" (Mot. at 9:4-8,

12   and McCloskey Ex. 4). █████████████████████████████████████

13   ████████████████████████████████████████   These disclosures

14   also include the details of a validation protocol discussed in an email thread between Mr. and Ms.

15   Lam that Genentech's motion highlights. (Mot. at 7:28-8:10, McCloskey Exs. 1 & 2.) ████████

16   ██████████████████████████████████████████████████████████████

17   █████████████████████████████████████████████████████

18   █████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████

21   ███████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ██████████████████████████████████████████████████████████

24       Genentech has also disclosed its allegedly trade secret ████████████████

25   ████████████████████████████████████████████████████████████████

26   ██████████████████████████████████   For example, Genentech publicly disclosed

27   ████████████████████████████████   in its published patent application US

28   2015/0086537.  (Tessier Decl. ¶104.) Similarly, █████████████████████████████████

1  ██████ can be found in various publications, including Genentech US patent 9,226,961. (*See*

2  *id*. ¶154.) And ██████████████████████ are in many public documents,

3  including Genentech's published patent application US 2011/0044977. (*See id*. ¶¶187-88.)

4      Genentech's alleged trade secrets related to its GMP-related protocols are also publicly

5  available, which reflects Genentech's ████████████████████████████

6  (*See, e.g*., Rudge Decl. ¶¶27, 41, 60-63, 124, 152.) For example, Genentech's ████████

7  ████████████████████████ is extensively detailed in the public

8  literature, including in at least five Roche/Genentech presentations and publications on this exact

9  topic. (*Id*. ¶¶60-63.) Similarly, Genentech's SOP for ████████████████████—

10 one of the documents allegedly downloaded by Ms. Lam (*see* McCloskey Decl. ¶24, Ex. 14)—

11 ████████████████████ (*See* Rudge Decl. ¶152.) And Genentech's protocol for

12 ████████████████████████████████

13 ████████████████████████████████████

14 ████████████████████ (*See* Rudge Decl. ¶41.)

### b.    Lack of Reasonable Particularity

16     "It is critical to any CUTSA cause of action—and any defense—that the information

17 claimed to have been misappropriated be clearly identified." *Silvaco Data Sys. v. Intel Corp.*, 184

18 Cal. App. 4th 210, 221 (2010), *disapproved on other grounds by Kwikset Corp. v. Superior*

19 *Court*, 51 Cal. 4th 310 (2011). Until the claimed trade secret is specifically described, "it will

20 likely be impossible to intelligibly analyze the remaining elements that constitute the cause of

21 action." *Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*, 226 Cal. App. 4th 26, 43 (2014). The

22 plaintiff must accordingly identify the trade secret with sufficient particularity to distinguish it

23 from matters of general knowledge or special knowledge of persons in the trade. *See Imax Corp.*

24 *v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65, 1167-68 (9th Cir. 1998). A description of a

25 category of trade secrets, or even subcategories of information within a category, is not sufficient

26 to identify a protectable secret for purposes of defining the proper scope of discovery, let alone to

27 form the basis of a preliminary injunction. *See Social Apps, LLC v. Zynga, Inc.*, 2012 WL

28 2203063, at *4 (N.D. Cal. 2012) (identifying specific lines of code and file names was

13

1    sufficiently detailed; identifying general concepts and subcategories within them was not).

2    Genentech attempts to identify its trade secrets in two different ways; both fail.

3           First, Genentech describes 31 of the 36 claimed trade secrets[5] using broad categories—

4    such as ███████████████████████████████████████ and

5    ████████████████████████████████████████—boilerplate

6    argumentation, and some additional detail provided by way of subcategories or citations to multi-

7    page "example" documents. This is insufficient. *See Social Apps*, 2012 WL 2203063, at *3 (trade

8    secret disclosure describing "broad categories . . . with some detail provided in the nature of sub-

9    categories" was insufficient). For example, Genentech claims its ████████████████

10   ████████████████████████████████████████████

11   ██████████████████████████████████████████████

12   ████████████████████████ (Statement at 7.) Genentech provides as ████████

13   ██████████████████████████████████████

14   ███████████████████████████████████████

15   ████████████████████████████████████████████

16   ███████████████████████ Because much of the information in the

17   documents Genentech cites is available in the public domain, it is extremely difficult to

18   distinguish public information from the claimed trade secrets. ██████████████████

19   ███████████████████████████████ (Rudge Decl. ¶¶153, 155-56).

20        ████████████████████████████████████

21   ██████████████████████████████████ But Genentech

22   makes no effort to separate alleged trade secret content from public domain information. ████

23   ███████████████████████████████████████████

24   ██████████████████████████████████████

25   ████████████████████████████████████████████

26   ████████████████████ (Trade Secret Appendix at 16.)

27           Genentech's statement of trade secrets is similar to that in *John M. Floyd & Associates,*

28   _____

     [5] Genentech's alleged trade secrets numbered 1-6, 8-13, 15-20, 22-27, and 29-35.

1   *Inc. v. First Imperial Credit Union*, 2017 WL 4810223, at *4 (S.D. Cal. 2017). There, the plaintiff

2   claimed elements of its proprietary program, including "software, recommendations, [] policies,

3   implementation procedures, forms of customer communications, and other written materials,"

4   were trade secrets. *Id.* Like Genentech, the plaintiff had identified a range of documents it

5   contended *contained* its trade secrets but had not identified specific information it claimed to be

6   trade secrets. *See id.* The court held this disclosure was "insufficient to establish the necessary

7   distinctions between its proprietary information and general knowledge in the trade," where

8   defendants argued the alleged trade secrets were common or generally known in the industry. *Id.*

9   The *John M. Floyd* court granted summary judgment against plaintiff on this basis. *Id.*

10        Because Genentech has failed to identify with specificity its claimed trade secrets, it

11   cannot show a likelihood of success, and the preliminary injunction should be denied on this basis

12   alone. *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231,

13   1252 (N.D. Cal. 1995) (preliminary injunction denied where "plaintiffs [had not] identified their

14   trade secrets with sufficient definiteness to support injunctive relief"); *CanWe Studios LLC v.*

15   *Sinclair*, 2013 WL 12120437, at *3 (C.D. Cal. 2013) (where plaintiff failed to identify claimed

16   trade secret with sufficient particularity to separate it from publicly known matters, court declined

17   to consider it in determining likelihood of success for preliminary injunction).

18        **c.    Lack of Reasonable Measures to Protect Secrecy**

19        Information does not qualify as a trade secret where the owner has not taken "efforts that

20   are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1;

21   *Religious Tech.*, 923 F. Supp. at 1253; *see also Cypress Semiconductor Corp. v. Superior Court*,

22   163 Cal. App. 4th 575, 588 (2008); *Gen. Capacitor*, 325 F. Supp. 3d at 1036. Once the owner of a

23   trade secret discovers evidence of potential misappropriation, the owner must take reasonable

24   steps to protect the trade secret from further dissemination. *Alamar Biosciences, Inc. v. Difco*

25   *Labs., Inc.*, 1995 WL 912345, at *6 (E.D. Cal. 1995). In *Alamar*, it was undisputed that years

26   before bringing suit the plaintiff "strongly suspected" its former employee misappropriated trade

27   secrets in a bacteria testing technology, "looked at the possibility" of bringing a lawsuit, and

28   prepared an internal report about the former employee's work on the alleged trade secrets;

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA

1    however, the plaintiff failed to contact the former employee or otherwise investigate whether he

2    was actually using the trade secret. *Id.* at *4-5. The plaintiff's "failure to bring suit, or even

3    approach and warn [the accused misappropriator] establishe[d] that [the plaintiff] did not take

4    reasonable steps to protect its trade secrets." *Id.* at *6.

5          Genentech alleges it became aware of potential trade secret misappropriation by Ms. Lam

6    on October 11, 2016. (Compl. ¶244.) Genentech should have taken immediate steps to prevent

7    any further dissemination of trade secrets by Ms. Lam, such as by changing her ability to

8    download or send documents externally, changing her job duties to limit access to trade secrets,

9    retrieving any trade secret documents from her possession, and by notifying JHL that it should

10   determine whether it had received any alleged trade secrets. Further, there were products then

11   commercially available that Genentech could have used to monitor and control the use of Ms.

12   Lam's credentials. (Racich Decl. ¶¶ 11-12, 14.) Genentech could have implemented many of

13   these steps without "alerting" her. But Genentech took none of these actions, alleging only that it

14   "closely monitored" Ms. Lam and chose to prompt a criminal investigation. Genentech did not

15   limit Ms. Lam's access to its alleged trade secrets until it placed her on leave eleven months later.

16   (Compl. ¶37.) During that 11-month period, Mr. Quach allegedly used Ms. Lam's credentials to

17   download "hundreds" of trade secret Genentech documents. (*Id.* ¶249.) Genentech did not

18   undertake "efforts that [were] reasonable under the circumstances to maintain [the] secrecy" of

19   the materials available to or through Ms. Lam during those eleven months. Cal. Civ. Code §

20   3426.1; *see also Cypress*, 163 Cal. App. 4th at 588.

21         **2.**    **JHL Is Not Currently Using Genentech Trade Secrets**

22         To justify enjoining JHL's current policies and procedures, Genentech must show that

23   those policies and procedures are "closely similar" to (*Droeger v. Welsh Sporting Goods Corp.*,

24   541 F.2d 790, 793 (9th Cir. 1976)), bear a "substantial identity" to (*Integral Sys., Inc. v.

25   Peoplesoft, Inc.*, 1991 WL 498874, at *13 (N.D. Cal. 1991)), or are "substantially derived from"

26   (*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 986 (N.D. Cal. 2018), citing

27   Restatement (Third) of Unfair Competition § 40 cmt. c (1995)), Genentech's alleged trade

28   secrets. Genentech falls far short: its motion devotes only two sentences and cites only one

                    16

1   paragraph of one declaration (which concerns outdated, draft JHL materials). (Mot. at 21:16-19;

2   Balogh Decl. ¶21). Nor will Genentech be able to meet this burden. Although constrained by

3   regulatory and industry standards, many of JHL's protocols and policies that address the same

4   issues as Genentech's alleged trade secrets are materially different from Genentech's. And

5   Genentech fails to allege any facts showing receipt by JHL of the alleged July 2017 downloads.

6           First, the evidence regarding many alleged trade secrets is either insufficient or

7   contradicted by JHL's evidence. For example, one of the few alleged trade secrets mentioned in

8   Genentech's motion concerns the results of tests investigating "the stability and compatibility of

9   Pulmozyme with Stedim bags for storage, shipping, and handling." (Mot. at 12:19-28.) ███████

10  ████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████████████

15  █████████████████████████████████████████████

16          Genentech also cites its "methods to test and ensure the . . . potency . . . of its . . . Avastin,

17  and Herceptin medicines." (Mot. at 5:11-21.) But JHL's methods differ in many crucial aspects

18  from Genentech's.  (Tessier Decl. ¶¶141-49, 174-82.) ██████████████████████████

19  ████████████████████████████████████████████████████████████████████

20  ███████████████████████████████████

21          JHL is a small company with its own unique facilities and different equipment and

22  processes, which accounts for many significant differences between Genentech's and JHL's

23  GMP-related procedures. (See Rudge Decl. ¶¶29-30, 32.) For example, Genentech ████████

24  ██████████████████████████████████████████████████████████████, but JHL does

25  not use such a system.  (See Rudge Decl. ¶90; Shaw Decl. ¶6.) In other areas, JHL does not have

26  (or need) the same type of protocol developed by Genentech. Thus, JHL does not have a formal

27  SOP for its ██████████████████████████████████████████████████████████████

28  ██████████████         that looks very different from Genentech's ████████████████████ (See

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA

1    Rudge Decl. ¶107; Wei Decl. ¶7; Wei Ex. 6.)

2        These are only a few examples of ways in which JHL's materials differ from the alleged

3    trade secrets. The expert declarations of Scott R. Rudge and Peter M. Tessier describe several

4    more, ████████████████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ██████████████████████████████████████████

7        Second, Genentech fails to allege any facts showing that JHL received the materials

8    allegedly downloaded by Mr. Quach. Mr. Quach's consulting term for JHL did not begin until

9    August 2017, and he has never been a JHL employee. (Lin Decl. ¶6.) Notably, Genentech alleges

10   that Mr. Quach voluntarily told Genentech why he took the documents, but it never alleges that

11   he claimed to have provided those documents or their content to JHL. (Compl. ¶40.) In short,

12   Genentech has offered no allegations, much less evidence, that JHL misappropriated this material.

13       **C.**      **The Balance of Equities Is in JHL's Favor, Not Genentech's Favor**

14        Genentech does not demonstrate that the balance of hardships favors an injunction.

15   Genentech argues only that the hardships favor the plaintiff when the injunction would do no

16   more than require a defendant to comply with the law. (Mot. at 25.) That may be true, but

17   Genentech's proposed injunction goes much further. It would impede JHL's lawful competition

18   with Genentech and cause potentially irreparable harm to JHL's business. In contrast, Genentech

19   fails to demonstrate any hardship it would suffer, particularly given Genentech's two-year delay.

20        **1.**      **Genentech Will Experience No Hardship If Its Motion Is Denied**

21        An injunction should not be granted if its impact on the enjoined party would be more

22   severe than the injury the moving party would suffer if it were not granted. *Verigy US, Inc. v.*

23   *Mayder*, 2008 WL 564634, at *10 (N.D. Cal. 2008). Even a limited injunction may impose undue

24   hardship on a defendant where the plaintiff has made only a limited showing of misappropriation.

25   *See Waymo*, 2017 WL 2123560, at *12.

26        Here, Genentech would suffer no injury, because Genentech has not shown irreparable

27   harm, as explained above. Further, Genentech's two-year delay in seeking an injunction tips the

28   balance of hardships against Genentech. *See Silicon Image, Inc. v. Analogix Semiconductor, Inc.*,

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA

1   2008 WL 166950, at *18 (N.D. Cal. 2008) (balance of hardships did not tip sharply in plaintiff's

2   favor where it delayed seeking injunctive relief for two years). Nor is JHL yet selling drugs that

3   compete with Genentech; JHL is at least two years from reaching any market. (Lin Decl. ¶8.)

**2.      A Preliminary Injunction Would Impose Significant Hardship on JHL**

5        In contrast, JHL will experience significant hardship if the requested injunction is granted

6   because of the excessively broad scope of the requested injunction and the significant harm the

7   injunction would cause its business operations and reputation.

**a.      Genentech's Requested Relief Is Overbroad and Vague**

9        Genentech's proposed injunction would impose an unjustifiably heavy burden of

10  compliance, because it is both broader than necessary to preserve the status quo and not

11  sufficiently specific to give JHL notice of what is prohibited. Every injunction must state its terms

12  specifically and describe in "reasonable detail" the acts restrained or required. Fed. R. Civ. P.

13  65(d)(1)(B)-(C). Underlying Rule 65 is the principle that those against whom an injunction is

14  issued are entitled to receive fair notice of what is prohibited. *Union Pac. R. Co. v. Mower*, 219

15  F.3d 1069, 1077 (9th Cir. 2000). An injunction involving a restraint on the use or disclosure of

16  trade secrets is fatally vague if the trade secrets are not specified. *E.W. Bliss Co. v. Struthers,*

17  *Dunn, Inc.*, 408 F.2d 1108, 1113-15 (8th Cir. 1969) (injunction that restrained defendants from

18  using or disclosing "vague and ill-defined" trade secrets violated Rule 65(d) specificity

19  requirement); *Albion Labs., Inc. v. Seroyal Brands, Inc.*, 1979 WL 24987, at *2 (N.D. Cal. 1979).

20       An injunction must also be narrowly drawn to remedy the specific harm alleged. *Perez v.*

21  *Valley Garlic, Inc.*, 2016 WL 6094809, at *11 (E.D. Cal. 2016); *United States v. Pac. Design*

22  *Furniture, Inc.*, 2015 WL 5440588, at *3 (C.D. Cal. 2015). In a trade secret case, an injunction is

23  overbroad when it goes beyond restraining defendant's unlawful conduct and inhibits lawful

24  competition. *E.W. Bliss*, 408 F.2d at 1114-15. Products or processes that themselves are not trade

25  secrets may only be enjoined if "substantially derived from" a claimed trade secret and not from

26  public information. *See Am. Can Co. v. Mansukhani*, 742 F.2d 314, 331 (7th Cir. 1984) (court

27  erred in issuing preliminary injunction by applying standard that may have enjoined products

28  defendant developed from public information and skill, not from plaintiff's trade secrets).

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA

1

2

**(1)    The Proposed Prohibitory Injunctive Terms Are Vague
and Overbroad (Paragraphs 1-4)**

3      Genentech asks that JHL be enjoined from disclosing or using Genentech's trade secret

4  information, without defining "trade secret information."  ([Proposed] Order Granting Pl.

5  Genentech, Inc.'s Mot. for Prelim. Inj. ("Proposed Order") at 1.) Genentech goes further, asking

6  this Court to enjoin JHL from "promot[ing], offer[ing] to sell, market[ing], commercializ[ing], or

7  sell[ing] biologics" or other products that "utilize, embody, or were developed, in whole or in part,

8  with the benefit or use" of Genentech trade secret information; and from using any processes or

9  methods or submitting to any regulatory body documents or "materials" that are "derived from,

10 contain, or embody, in whole or in part," Genentech trade secret information. (*Id.*)

11     The vagueness and breadth of the proposed injunction would impose substantial undue

12 hardship on JHL. The proposed language is vague: Genentech does not specifically identify the

13 "trade secrets" it seeks to enjoin JHL from using. *See Brocade Commc'ns Sys., Inc. v. A10*

14 *Networks, Inc.*, 2013 WL 557102, at *8 (N.D. Cal. 2013) (description for injunction inadequate

15 where it described "general functionality rather than the specific feature described by the trade

16 secret"). Moreover, Genentech's trade secret identification is too broad to form the basis of an

17 appropriately specific injunction, in at least two ways. First, the claimed trade secrets whose use

18 is sought to be restrained themselves incorporate public information. For instance, Genentech

19 claims Defendants misappropriated technical information regarding the "processes by which

20 Genentech tests, analyzes, controls, and formulates Pulmozyme, Rituxan, Avastin, and Herceptin;

21 documents setting forth product quality criteria; and protocols and procedures to ensure GMP

22 compliance." (Mot. 19.) As JHL has demonstrated, significant portions of these claimed trade

23 secrets are in the public domain or commonly known in the industry. (Rudge Decl.¶32; Tessier

24 Decl. ¶9a.) Similar to Waymo in *Waymo v. Uber*, Genentech "has overreached in attempting to

25 claim ownership over general principles and approaches in the field." 2017 WL 2123560, at *9.

26 This overreaching weighs against issuing the broad injunction Genentech seeks. *See id.* at *12.

27     Second, Genentech's disclosure ███████████████████████████████████████

28 ██████████████████████████████████████████████████████████████████████

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████ (*E.g.*, Statement

3 at 4.) Further, Genentech claims trade secret protection over information in a substantial number

4 of documents that it has provided to neither JHL nor the Court. (*See* Appendices A.1-A.5.)

5       Third, Paragraphs 2, 3, and 4 of Genentech's proposed injunction add another layer of

6 overbreadth by seeking to restrain the use of products, processes and methods, and the submission

7 of "documents or other materials" to regulators, that "***utilize,*" "*embody,*" or "*were developed***

8 ***with***," even in part, the alleged trade secrets. (Proposed Order 1.) Compliance would impose the

9 additional burden of guessing whether products, processes, or methods "utilize, embody, or were

10 developed with" the general concepts and categories claimed as trade secrets. JHL would be

11 placed in the untenable position of either forgoing use of publicly available information that may

12 be included in a Genentech document or risking a contempt citation for failing to comply with the

13 injunction. *See Union Pac.*, 219 F.3d at 1077; *see also E.W. Bliss*, 408 F.2d at 1114-15

14 (preliminary injunction was overbroad where it restrained competition in broad fields within

15 which plaintiff's trade secrets related only to minute details). Because the proposed injunction

16 would inevitably require JHL to refrain from using public and independently derived information

17 to assure compliance, the proposed injunction is impermissibly overbroad. *See Mansukhani*, 742

18 F.2d at 331 (preliminary injunction overbroad where "[p]laintiff was entitled to protection only if

19 defendants' new inks were substantially derived from plaintiff's trade secrets and not from public

20 information and Mansukhani's general skill, experience and knowledge").

21       Fourth, the relief requested in Paragraphs 2 through 4 of the Proposed Order should also

22 be denied: these provisions seek to stop JHL from producing any of the four biosimilars at issue,

23 but Genentech cannot show it is entitled to such an extreme measure. A "production injunction"

24 is an injunction that prohibits a defendant from making the product that was allegedly developed

25 with the use of a misappropriated trade secret. *E.I. DuPont de Nemours & Co. v. Kolon Indus.,*

26 *Inc.*, 894 F. Supp. 2d 691, 710-11 (E.D. Va. 2012). In contrast, a use injunction, which is what

27 Genentech requests in Paragraph 1 of the Proposed Order, merely prohibits the continued use of

28 the allegedly misappropriated trade secrets. *02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,

399 F. Supp. 2d 1064, 1070 (N.D. Cal. 2005). A production injunction is a more extreme measure and is only justified where a use injunction would be ineffective because "the misappropriated trade secrets are 'inextricably connected' to the defendant's manufacture of the product." *Id.* (denying production injunction where plaintiff failed to show any harm that could only be eliminated "through the drastic measure of a production injunction"). An "inextricable connection" is found where the alleged trade secrets form such an "integral and substantial part of a comprehensive manufacturing process or technology" that the defendant would not be able to make a comparable product absent the trade secrets. *E.I. DuPont*, 894 F. Supp. 2d at 711.

Here, the Court should not include paragraphs 2 through 4 or any similar relief, because Genentech cannot show that a use injunction would be ineffective or that its alleged trade secrets are "inextricably connected" to JHL's protocols and systems for the four relevant biosimilars. Rather, JHL's protocols and systems are materially different, as explained in Section B2 *supra*.

**(2)      The Proposed Mandatory Injunctive Terms Are Overbroad, Vague, and Would Change the Status Quo (Paragraphs 5-7)**

Paragraphs 5, 6, and 7 seek to impose disproportionately burdensome affirmative obligations on JHL. They would require JHL to return "all copies of" Genentech documents and information," including "any confidential, proprietary, and/or trade secret information acquired from Genentech" and "all copies of all materials . . . containing [or] derived from any[] Genentech trade secrets" (¶5); to investigate and provide an accounting under oath setting forth any person to whom JHL disclosed any Genentech materials (¶6); and to provide a log of all oral and written communications "wherein Xanthe Lam, Allen Lam, John Chan, or James Quach may have mentioned any Genentech [confidential information]" to any "officer, director, employee, agent, supplier, or consultant" of JHL (¶7). (Proposed Order ¶¶5-7.)

Genentech cannot show that its requested mandatory relief is narrowly tailored and necessary to provide it complete relief. *See Perez*, 2016 WL 6094809, at *11; *X Corp. v. Doe*, 805 F. Supp. 1298, 1311-12 (E.D. Va. 1992) (denying request for preliminary injunction to return confidential documents where not necessary to prevent harm to plaintiff). These paragraphs suffer from the same vagueness and overbreadth problems discussed *supra* in Section C.2.A.1. They

22

1    also suffer from additional overbreadth and vagueness problems: paragraph 5, requiring JHL to

2    "return" materials "containing any, or derived from any" Genentech trade secrets, would involve

3    "returning" documents that were never in Genentech's possession in the first place, potentially

4    compelling JHL to reveal its own confidential and proprietary information to Genentech.

5    (Proposed Order ¶5.) Paragraph 7 would require JHL to determine whether any of four

6    individuals "may have mentioned" any unspecified "Genentech confidential, proprietary, or trade

7    secret information," in broadly defined communications, imposing the enormous burden on JHL

8    of parsing potentially tens of thousands of emails and other communications.

9            Paragraphs 6 and 7, which would order an investigation, an accounting, and a

10   communication log completed within 30 days, are particularly inappropriate at this stage of the

11   litigation, as they effectively seek expedited discovery without good cause for doing so or even

12   meeting the standard for mandatory injunctive relief. They appear to have been copied from the

13   unique relief granted by this court in *Waymo*, but the different circumstances there mean that the

14   same provisions are not justified here. In *Waymo*, Waymo had actually sought and the court had

15   ordered expedited discovery. *Waymo*, 2017 WL 2123560, at *5. In that context, especially given

16   the extensive invocations of privilege, ordering an "investigation" and "log of communications"

17   was uniquely appropriate. Moreover, the mandatory aspects of the *Waymo* injunction were also

18   more limited in scope to specifically defined "downloaded materials" and communications

19   relating to the one engineer who had broadly asserted privilege. *See id.* at *13-14.

20           Here, Genentech has moved for an injunction immediately after filing its Complaint and

21   has not sought expedited discovery. As a result, Genentech has not shown that expedited

22   discovery at all is warranted, much less **broader** relief than that granted in *Waymo*.  And even if it

23   were entitled to some form of similar relief, the requested relief here suffers from the same

24   vagueness problems identified above: Genentech asks for an investigation relating to trade secrets

25   that have not actually been identified to JHL and relating to documents to which JHL's counsel

26   has not been provided access. (*See* Proposed Order ¶¶5-7.)

27                   **b.      The Injunction Would Impair JHL's Development**

28   The issuance of a preliminary injunction would have a disparate impact on JHL, a relative

23

1    newcomer to the biopharmaceutical industry, as compared to Genentech, one of the largest

2    players in the industry. *See Silicon Image*, 2008 WL 166950, at \*18 (balance of hardships weighs

3    in defendant's favor where defendant had a disproportionately small share of market as compared

4    to plaintiff). Genentech is an established player in the pharmaceutical industry, having already

5    captured a significant share of the market and billions of dollars for sales of the four drugs at

6    issue. (Dickey Decl. ¶7.) In contrast, JHL's business is critically dependent on continuing without

7    delay its development efforts for its Core Product Candidates. None of JHL's biosimilar

8    candidates has reached the market yet; thus, JHL has not yet generated any profits from selling

9    biosimilars. (Lin Decl. ¶¶4, 8.) Because the relevant patents for the four drugs at issue are all

10   expiring in the next few years, or have already expired, JHL anticipates competition with other

11   companies to reach the market first with biosimilars for the four reference biologics. If JHL's

12   drug development is delayed such that it is unable to launch its products around the same time its

13   competitors do, JHL will be placed at a competitive disadvantage and may never be able to

14   capture the market share required to become profitable. (*See* Dickey Decl. ¶9.)

15          The harm to JHL is especially unjustified because the overbroad injunction sought by

16   Genentech would prevent JHL from using even certain publicly available information to develop

17   its Core Product Candidates.  This would impair JHL's ability to lawfully compete and potentially

18   damage JHL's reputation and customer (and potential customer) relationships. *See Am. Cyanamid*

19   *Co. v. U.S. Surgical Corp.*, 833 F. Supp. 92, 133 (D. Conn. 1992) (balance of hardships weighs

20   heavily in favor of defendant where it would suffer reputational harm and loss of customers if

21   injunction against competitive product was granted and plaintiff would suffer only loss of market

22   share). JHL's only current clients are CDMO clients (*see* Lin Decl. ¶4), and as a relatively new

23   player in the CDMO business, JHL is still building its reputation with its clients.  The overbroad

24   production injunction sought here could have a devastating impact on JHL's ability to maintain

25   its clients and obtain new ones, and potentially could cripple JHL's ability to sell its biosimilar

26   products to new customers in the future.

27          **D.      Genentech Has Failed to Show an Injunction Is in the Public Interest**

28          Genentech's sole argument relating to the public's interest is a citation to this Court's

24

1   decision in *Waymo*, explaining that "safeguards imposed . . . in response to brazen

2   misappropriation of trade secrets . . . would hardly discourage legitimate competition."  (Mot. at

3   25:15-25:18) (citing *Waymo*, 2017 WL 2123560, at *12). This superficial comparison to *Waymo*

4   misses the significance of the injunction's scope in that case. In *Waymo*, the public's interest

5   favored the "limited relief granted" because that relief only prohibited illegitimate competition—

6   not legitimate competition between the parties. 2017 WL 2123560, at *12 (the granted relief

7   "[would] not stop [defendant] from continuing to develop its technology"). This distinction is

8   critical. As discussed above, Genentech's requested relief goes well beyond restraining unlawful

9   conduct by reaching public information and inhibiting lawful competition between JHL and

10  Genentech. Lawful competition serves the public interest. *Delphon Indus., LLC v. Int'l Test Sols.*

11  *Inc.*, 2011 WL 4915792, at *9 (N.D. Cal. 2011) ("public interest weighs in favor of a marketplace

12  with a greater number of competitors"); *Barney v. Burrow*, 558 F. Supp. 2d 1066, 1084 (E.D. Cal.

13  2008); *SRI Int'l v. Acoustic Imaging Techs. Corp.*, 1993 WL 356896, at *4 (N.D. Cal. 1993).

14       Genentech also ignores entirely the public's interest in access to life-saving medicine at

15  lower prices. Biosimilars are expected to substantially reduce the cost of biologic medicines and

16  expand access to biologics to patients in existing markets, and even developing markets.  (Dickey

17  Decl. ¶8.)  Because Genentech's requested injunction could slow public access to biosimilars, the

18  public interest weighs in favor of denying an injunction.

19  **V.    <u>CONCLUSION</u>**

20       For the foregoing reasons, the Court should deny Genentech's motion.

21       Dated:  January 4, 2019

22                                                    DARIN W. SNYDER
                                                      MICHAEL F. TUBACH
23                                                    DAVID R. EBERHART
                                                      O'MELVENY & MYERS LLP
24

25
                                                      By:      /s/ *Darin W. Snyder*
26                                                    _____
                                                             Darin W. Snyder
27                                                    Attorneys for Defendant
                                                      JHL BIOTECH, INC.
28

JHL'S OPP. TO MOT. FOR PI
3:18-CV-06582-WHA