KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS - #158708
epeters@keker.com
LAURIE CARR MIMS - #241584
lmims@keker.com
STEVEN P. RAGLAND - #221076
sragland@keker.com
CODY S. HARRIS - #255302
charris@keker.com
ELIZABETH K. McCLOSKEY - #268184
emccloskey@keker.com
SEAN M. ARENSON - #310633
sarenson@keker.com
MAYA PERELMAN - #318554
mperelman@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:      415 397 7188

Attorneys for Plaintiff
GENENTECH, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GENENTECH, INC., <br><br> Plaintiff, <br><br> v. <br><br> JHL BIOTECH, INC., XANTHE LAM, an individual, ALLEN LAM, an individual, JAMES QUACH, an individual, RACHO JORDANOV, an individual, ROSE LIN, an individual, JOHN CHAN, an individual, and DOES 1-50, <br><br> Defendants. | Case No. 3:18-cv-06582-WHA <br><br> **GENENTECH, INC.'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** <br><br> Date:          February 14, 2019 <br> Time:          8:00 a.m. <br> Dept:          Courtroom 12, 19th Floor <br> Judge:        Hon. William Alsup <br><br> Date Filed:  October 29, 2018 <br> Trial Date:  None Set |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     RELEVANT FACTUAL ALLEGATIONS ...........................................................2

    A.   JHL's criminal scheme to steal Genentech's trade secrets .......................2

    B.   Xanthe and Allen Lam's actions in California on behalf of JHL .............4

III.    THE COURT HAS PERSONAL JURISDICTION OVER JHL............................5

    A.   Legal Standard ..........................................................................................5

    B.   JHL has more than "minimum contacts" with California...........................6

        1.   JHL committed torts in California through its agents Xanthe and
            Allen Lam. .......................................................................................6

        2.   JHL purposefully directed its illegal activities at California, causing
            harm in the state. ............................................................................9

    C.   All other requirements for jurisdiction are satisfied. .............................11

        1.   Genentech's claims "arise out of or relate to" JHL's California
            activities. .......................................................................................11

        2.   JHL should reasonably expect to be haled into court in California
            after stealing trade secrets in California.......................................12

    D.   If the Court has a question about exercising jurisdiction, it should order
        jurisdictional discovery. ..........................................................................14

IV.     GENENTECH HAS PROPERLY PLED EACH OF ITS CAUSES OF ACTION...........14

    A.   Legal Standard ........................................................................................14

    B.   Genentech has properly pled that Defendants misappropriated Genentech's
        trade secrets in violation of CUTSA and DTSA....................................15

        1.   The Complaint sufficiently alleges that Jordanov and Lin stole trade
            secrets............................................................................................15

        2.   The Complaint sufficiently alleges that Chan stole trade secrets. .............18

        3.   Defendants are liable under DTSA because their misappropriation
            continued after the statute was enacted........................................19

    C.   Genentech has properly pled that all defendants conspired to violate DTSA
        and CUTSA..............................................................................................20

    D.   CUTSA does not supersede Genentech's common-law claims.............................23

        1.   Genentech's claim for intentional interference with contractual
            relations depends on different facts than its trade secret claims.................23

1

2.      Genentech's claims for breaches of duty of loyalty, and the aiding
                    and abetting thereof, are also not superseded. ...........................................25

2

E.      Genentech has properly pled that JHL violated the CDAFA and conspired
            to violate the CFAA. ...........................................................................................26

3

4

F.      Genentech's common-law claims are timely. ........................................................28

5

V.      CONCLUSION.............................................................................................................30

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GENENTECH, INC.'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 3:18-cv-06582-WHA

1316863

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*4580 Thousand Oaks Blvd. Corp. v. Feldman*,
  2012 WL 12884636 (C.D. Cal. July 30, 2012)..................................................................5

*AccuImage Diagnostics Corp v. Terarecon, Inc.*,
  260 F. Supp. 2d 941 (N.D. Cal. 2003) ...............................................................21, 22

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
  368 F.3d 1174 (9th Cir. 2004) ...............................................................................6

*Adobe Sys. Inc. v. Cardinal Camera & Video Ctr., Inc.*,
  2015 WL 5834135 (N.D. Cal. Oct. 7, 2015)......................................................10

*Alfus v. Pyramid Tech. Corp.*,
  745 F. Supp. 1511 (N.D. Cal. 1990) ...................................................................21

*AllCells, LLC v. Zhai*,
  2017 WL 2929380 (N.D. Cal. Mar. 27, 2017)....................................................15

*Anokiwave, Inc. v. Rebeiz*,
  2018 WL 4407591 (S.D. Cal. Sept. 17, 2018) ...................................................24

*Asahi Metal Indus. Co. v. Super. Ct.*,
  480 U.S. 102 (1987)............................................................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................15

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
  874 F.3d 1064 (9th Cir. 2017) ...........................................................................9, 10

*Baker Hughes Inc. v. Homa*,
  2013 WL 5775636 (S.D. Tex. 2013) ...............................................................10, 11

*Ballard v. Savage*,
  65 F.3d 1495 (9th Cir. 1995) .............................................................................11, 12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................22, 27

*Blanco v. Am. Home Mortg. Servicing, Inc.*,
  2009 WL 4674904 (E.D. Cal. Dec. 4, 2009) .....................................................28

*Boschetto v. Hansig*,
  539 F.3d 1011 (9th Cir. 2008) .............................................................................5, 8

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985) ................................................................................................13

*Butcher's Union Local No. 498 v. SDC Inv., Inc.,*
  788 F.2d 535 (9th Cir. 1986) ..................................................................................14

*Calder v. Jones,*
  465 U.S. 783 (1984) ................................................................................................11

*Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.,*
  2017 WL 1436044 (N.D. Cal. Apr. 24, 2017) .........................................................19

*Cervantes v. City of San Diego,*
  5 F.3d 1273 (9th Cir. 1993) ....................................................................................29

*CollegeSource, Inc. v. AcademyOne, Inc.,*
  653 F.3d 1066 (9th Cir. 2011) ....................................................8, 11, 12, 13, 14

*Creager v. Masuo Yoshimoto,*
  2005 WL 8156308 (N.D. Cal. Nov. 22, 2005) ..........................................................8

*Dahlia v. Rodriguez,*
  735 F.3d 1060 (9th Cir. 2013) ................................................................................15

*Daimler AG v. Bauman,*
  571 U.S. 117 (2014) ..................................................................................................6

*De La Paz v. Bayer Healthcare LLC,*
  159 F. Supp. 3d 1085 (N.D. Cal. 2016) ..................................................................29

*Dole Food Co., Inc. v. Watts,*
  303 F.3d 1104 (9th Cir. 2002) ..................................................................................6

*E.D.C. Techs., Inc. v. Seidel,*
  216 F. Supp. 3d 1012 (N.D. Cal. 2016) ..................................................................26

*Facebook, Inc. v. MaxBounty, Inc.,*
  274 F.R.D. 279 (N.D. Cal. 2011) ............................................................................27

*Fox Ins. Co. v. Centers for Medicare & Medicaid Servs.,*
  715 F.3d 1211 (9th Cir. 2013) ................................................................................23

*Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.,*
  905 F.3d 597 (9th Cir. 2018) ....................................................................................6

*Gates Learjet Corp. v. Jensen,*
  743 F.2d 1325 (9th Cir. 1984) ................................................................................13

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.,*
  328 F.3d 1122 (9th Cir. 2003) ................................................................................13

iv

*Int'l Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp.*,
189 F.2d 177 (9th Cir. 1951) ....................................................................................22

*Integral Dev. Corp. v. Tolat*,
2013 WL 5781581 (N.D. Cal. Oct. 25, 2013)...........................................................26

*Jablon v. Dean Witter & Co.*,
614 F.2d 677 (9th Cir. 1980) ....................................................................................28

*Koi Design, LLC v. Mark's Work Wearhouse*,
2010 WL 11508546 (C.D. Cal. 2010).........................................................................9

*In re: Lenovo Adware Litig.*,
2016 WL 6277245 (N.D. Cal. Oct. 27, 2016).............................................................27

*Mattel, Inc. v. MGA Entertinament, Inc.*,
2011 WL 8427611 (C.D. Cal. Mar. 28, 2011).............................................................26

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
647 F.3d 1218 (9th Cir. 2011) .....................................................................................5

*Montana Silversmiths, Inc. v. Taylor Brands, LLC*,
850 F. Supp. 2d 1172 (D. Mont. 2012)........................................................................11

*Myers v. Bennett Law Offices*,
238 F.3d 1068 (9th Cir. 2001) .................................................................................7, 8

*Olenicoff v. UBS AG*,
2010 WL 8530286 (C.D. Cal. Mar. 16, 2010)...............................................20, 21, 27

*OSU Student All. v. Ray*,
699 F.3d 1053 (9th Cir. 2012) ...................................................................................14

*Paccar Int'l, Inc. v. Commercial Bank of Kuwait, S.A.K.*,
757 F.2d 1058 (9th Cir. 1985) .....................................................................................6

*Panavision Int'l, L.P. v. Toeppen*,
141 F.3d 1316 (9th Cir. 1998) .............................................................................12, 14

*Picot v. Weston*,
780 F.3d 1206 (9th Cir. 2015) .....................................................................................6

*Powell Prod., Inc. v. Marks*,
948 F. Supp. 1469 (D. Colo. 1996).............................................................................16

*Republic of Kazakhstan v. Ketebaev*,
2017 WL 6539897 (N.D. Cal. Dec. 21, 2017)............................................................13

*Sarkis v. Lajcak*,
2009 WL 3367069 (N.D. Cal. Oct. 15, 2009).............................................................10

v

*SBM Site Servs., LLC v. Garrett*,
    2012 WL 628619 (D. Colo. Feb. 27, 2012) ...................................................28

*Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*,
    119 F. Supp. 2d 1121 (W.D. Wash. 2000) ...............................................28

*Sinatra v. Nat'l Enquirer, Inc.*,
    854 F.2d 1191 (9th Cir. 1988) ...............................................................13

*Sonoma Pharm., Inc. v. Collidion Inc.*,
    2018 WL 3398940 (N.D. Cal. June 1, 2018) ...........................................19

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ...............................................................14

*Steves & Sons v. JELD-WEN, Inc.*,
    271 F. Supp. 3d 835 (E.D. Va. 2017) ....................................................22

*SunPower Corp. v. SolarCity Corp.*,
    2012 WL 6160472 (N.D. Cal. Dec. 11, 2012) ........................................24

*Supermail Cargo, Inc. v. United States*,
    68 F.3d 1204 (9th Cir. 1995) ..........................................................28, 29

*Thomas v. Baca*,
    2005 WL 1030247 (C.D. Cal. May 2, 2005) ...........................................21

*United States v. Texas*,
    507 U.S. 529 (1993) ...............................................................................23

*Vendavo, Inc. v. Price f(x) AG*,
    2018 WL 1456697, (N.D. Cal. Mar. 23, 2018) .......................................19

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
    592 F.3d 954 (9th Cir. 2010) .................................................................30

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
    2007 WL 4284759 (D. Nev. Nov. 28, 2007) ...........................................10

*Walden v. Fiore*,
    571 U.S. 277 (2014) .........................................................................6, 11

*Way.com, Inc. v. Singh*,
    2018 WL 6704464 (N.D. Cal. Dec. 20, 2018) ..........................................9

*Waymo LLC v. Uber Techs., Inc.*,
    2017 WL 2123560 (N.D. Cal. May 15, 2017) .........................................15

*Waymo LLC v. Uber Techs., Inc.*,
    256 F. Supp. 3d 1059 (N.D. Cal. 2017) .............................................23, 24

*Wells Fargo & Co. v. Wells Fargo Express Co.*,
556 F.2d 406 (9th Cir. 1977) ................................................................................. 14

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
433 F.3d 1199 (9th Cir. 2006) .................................................................................. 5

*Yulaeva v. Greenpoint Mortg. Funding, Inc.*,
2009 WL 2880393 (E.D. Cal. Sept. 3, 2009) .......................................................... 20

*Zayo Grp. LLC v. Hisa*,
2013 WL 12201401 (C.D. Cal. Sept. 17, 2013) ...................................................... 26

**State Cases**

*Angelica Textile Servs., Inc. v. Park*,
220 Cal. App. 4th 495 (2013) .................................................................................. 24

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
7 Cal. 4th 503 (1994) ......................................................................................... 19, 20

*Doctors' Co. v. Superior Court*,
49 Cal. 3d 39 (1989) ................................................................................................. 8

*Fox v. Ethicon Endo–Surgery, Inc.*,
35 Cal. 4th 797 (2005) ............................................................................................ 29

*Hutcheson v. Eskaton FountainWood Lodge*,
17 Cal. App. 5th 937 (2017) ..................................................................................... 8

*PMC, Inc. v. Kadisha*,
78 Cal. App. 4th 1368 (2000) .................................................................................. 16

*Pooshs v. Philip Morris USA, Inc.*,
51 Cal. 4th 788 (2011) ............................................................................................ 29

*Silvaco Data Sys. v. Intel Corp.*,
184 Cal. App. 4th 210 (2010) ............................................................................ 17, 24

*Wyatt v. Union Mortg. Co.*,
24 Cal. 3d 773 (1979) ................................................................................ 19, 20, 22, 27

**Federal Statutes**

18 U.S.C. § 1030(b) ........................................................................................... 26, 27

18 U.S.C. § 1030(g) ................................................................................................ 26

18 U.S.C. § 1832(a)(5) ............................................................................................ 22

18 U.S.C. § 1836(b) ................................................................................................ 22

18 U.S.C. § 1839 ................................................................................................15, 16, 18

**State Statutes**

Cal. Civ. Code § 3426.1 ......................................................................................15, 16, 18

**Other Authorities**

Fed. R. Civ. P. 8 ..........................................................................................................21, 22

Fed. R. Civ. P. 9(b) .....................................................................................................21, 27

Fed. R. Civ. P. 12(b)(2)...................................................................................................*passim*

Fed. R. Civ. P. 12(b)(6).............................................................................................2, 14, 15

Restat. 3d of Agency, § 4.01 (2006) ...............................................................................8

viii

Plaintiff Genentech, Inc. ("Genentech") submits the following Consolidated Opposition to the Motions to Dismiss filed by defendant JHL Biotech, Inc. ("JHL") and the individual defendants.  By agreement of the parties, and under the Court's Order of January 17, 2019, ECF Nos. 88, 90, this consolidated Memorandum responds to the Motions to Dismiss and Joinders filed by all seven defendants.

## I.       INTRODUCTION

Genentech's 73-page Complaint details an elaborate scheme by JHL and the individual defendants to steal Genentech's trade secrets in order to compete unfairly against Genentech and others in the biologics market.  JHL recruited defendant Xanthe Lam and her husband Allen Lam because it knew that Xanthe—a Genentech employee—had access to valuable Genentech trade secrets, and was willing to divulge them for a price.  It solicited those trade secrets from her, knowingly accepted and used them to launch its business, and openly discussed with Xanthe her fear that her conduct would "get her into trouble."  The Complaint's detailed allegations are more than adequate to make a prima facie showing of personal jurisdiction over JHL and to state claims for relief.  Defendants' motions to dismiss are meritless and should be denied.

JHL's challenge to personal jurisdiction mischaracterizes Genentech's Complaint and ignores the criminal scheme that JHL directed at—and largely perpetrated in—California.  As alleged in the Complaint (and supported with documentary evidence), JHL's principals Racho Jordanov and Rose Lin handpicked Xanthe and Allen Lam to misappropriate Genentech trade secrets for JHL, supervised them along the way, and tasked them with building an operation to compete with Genentech *while Xanthe continued to work for Genentech* so that she could continue funneling Genentech's proprietary information to JHL.  JHL both authorized the Lams' misconduct in advance—recruiting them for that very purpose—and ratified it afterward, thanking them for it, toasting it, and knowingly accepting its benefits.  JHL can hardly feign surprise that it is being haled into court in California to answer for its conduct.

Indeed, JHL's jurisdictional challenge is especially groundless considering that—although it submitted a declaration addressing several peripheral matters—it has not contested most of Genentech's allegations in its motion.  For purposes of evaluating jurisdiction, the Court must

accept those uncontested allegations as true, and they demonstrate far more than the required prima facie showing of minimum contacts with California.

The defendants' motions to dismiss under Rule 12(b)(6) are equally meritless. Genentech's allegations of trade-secret theft under both CUTSA and DTSA are more than sufficient, and they include allegations that the defendants' theft and ongoing use of the trade secrets continued past May 11, 2016, and into the present.  Defendants' attacks on Genentech's conspiracy allegations misapprehend those claims, under which each defendant is liable for their participation in a scheme to violate CUTSA and DTSA.  Their pre-emption arguments ignore the differences between Genentech's common-law claims and its trade-secret claims.  And JHL's statute-of-limitations argument is based on a misreading of the relevant allegations.  The October 2016 date on which defendants rely was when Genentech first learned of Xanthe's role aiding a *separate* Taiwanese competitor, AP Biosciences, Inc. That information initiated the investigation, but it was not until weeks later, in November of 2016—well within the limitations period—that Genentech first had reason to suspect that JHL was involved, which led to the discovery of the allegations set forth in the Complaint.

In short, neither Rule 12(b)(2) nor Rule 12(b)(6) requires dismissal of any claim against any defendant.  The Court should deny the motions in their entirety.

## II.    RELEVANT FACTUAL ALLEGATIONS

### A.    JHL's criminal scheme to steal Genentech's trade secrets

As alleged in detail in Genentech's complaint, JHL's scheme to misappropriate Genentech's trade secrets was directed at, and largely perpetrated in, California, where Genentech is headquartered.  JHL was founded by California-resident Defendants Racho Jordanov and Rose Lin.  Compl. ¶¶ 45–46, 61, 64.  Jordanov and Lin founded JHL with the intent of copying medicines developed and marketed by Genentech.  *Id.* ¶¶ 43–45.  When emailing potential investors and others regarding JHL-related business, Jordanov and Lin touted JHL's "U.S. Office" address in their email signatures, and that address was located in California.  *Id.* ¶ 46. JHL's principal officers made these representations while their company was actively misappropriating Genentech's trade secrets in California, and while they were raising money

from venture capital firms, including California-based Kleiner Perkins Caufield & Byers, to finance their scheme.  *Id.* ¶¶ 12, 13, 41, 184.

Jordanov and Lin recruited defendants Xanthe and Allen Lam for the purpose of misappropriating Genentech's trade secrets.  *Id.* ¶¶ 12, 26, 29, 30, 52, 56.  They knew that Xanthe worked for Genentech in South San Francisco, thus giving her access to Genentech's proprietary information.  *Id.* ¶¶ 26, 29, 30, 52, 56.  They also knew that Xanthe was bound by duties of confidentiality and loyalty to Genentech, and that she was barred from working for or providing assistance to JHL in light of her ongoing employment at Genentech.  *Id.* ¶¶ 142, 239–40.  Jordanov and Lin made the Lams part owners of JHL, granting them "founders shares" in the company.  *Id.* ¶¶ 12, 55.  They permitted Xanthe to exercise managerial authority within JHL from California, even as she continued to work for Genentech.  *Id.* ¶¶ 161, 165.

In December 2013, Xanthe traveled to JHL's lab in Taiwan to work, telling her Genentech co-workers that she was taking a vacation.  *Id.* ¶¶ 27, 39, 152–59.  Far from a rogue actor, she was photographed toasting JHL's grand opening alongside the two co-founders.  *Id.* ¶¶ 153–54.  While at JHL, Xanthe expressed in an email that she was left "in charge of the company" while Jordanov and Lin traveled back to the United States.  *Id.* ¶¶ 159.  JHL also granted Xanthe recruiting, hiring, and supervisory responsibilities; at Xanthe's suggestion, Jordanov and Lin hired defendant John Chan to work for JHL as a lead formulation scientist with responsibility for developing JHL's biosimilar versions of Genentech's medicines.  *Id.* ¶¶ 31, 67–68, 161.  As alleged in the Complaint (and supported by documentary evidence), Chan considered himself to be Xanthe's direct report.  *Id.* ¶¶ 161, 165.

JHL sent its own sensitive and confidential documents to Xanthe in California, where she edited and worked on them with the benefit of Genentech's trade secrets.  *Id.* ¶¶ 22, 25, 129–34.  Jordanov and Lin communicated directly with Xanthe regarding Genentech trade secrets while she was in California.  *Id.* ¶¶ 142, 175.  They knowingly received and used the stolen information that she provided.  *Id.* ¶ 26.  Jordanov and Lin even took Xanthe to dinner to thank her for her efforts and talked to her about her fear that her activities would "get her into trouble."  *Id.* ¶ 174.

### B.      Xanthe and Allen Lam's actions in California on behalf of JHL

Working from California at JHL's behest and for JHL's benefit, Xanthe created a directory on her Genentech-issued laptop computer with folders for each of JHL's biosimilar products. *Id.* ¶¶ 22–25, 29, 129–34.  Between 2013 and 2015, Xanthe curated and supplemented her JHL folders with a mix of confidential JHL documents alongside relevant Genentech trade-secret information. *Id.* ¶¶ 25, 129–34.  Xanthe took that computer (including the documents she had downloaded in California) to JHL's laboratory in December 2013, and connected it to JHL's Wi-Fi network. *Id.* ¶ 156.  She returned to Genentech in January 2014, but her work for JHL "continued unabated." *Id.* ¶ 160.[1]  Upon her return to California, she conducted weekly Skype meetings with John Chan, the formulation scientist she had recruited to JHL. *Id.* ¶¶ 165–67.  During these weekly sessions, Xanthe and Chan discussed Chan's work on developing biosimilar versions to Genentech's medicines, and Xanthe also forwarded confidential Genentech documents to Chan. *Id.* ¶¶ 165–69.  Knowing that she was breaking the law, she warned Chan not to leave a paper trail. *Id.* ¶¶ 168–72.  Xanthe eventually stopped having the weekly discussions with Chan because they were "too sensitive" and she didn't want "to get into trouble" by continuing them. *Id.* ¶ 173.  While in California, Xanthe also reviewed and worked on JHL protocols and procedures, including by inserting edits and comments based on testing parameters copied verbatim from Genentech's trade secret documents. *Id.* ¶¶ 25, 132–37.

In May 2017, Xanthe recruited a recently-fired Genentech employee, James Quach, to work for JHL. *Id.* ¶ 196–97.  By early July, JHL had offered Quach a job in its manufacturing facility in Wuhan, China. *Id.* ¶¶ 57–58.  After Xanthe secured a job for him at JHL, she allowed him to visit her home in South San Francisco three times and use her Genentech credentials to unlawfully access and download Genentech documents. *Id.* ¶ 256. When he determined that he needed even more Genentech proprietary information, Xanthe obtained the documents he requested and sent them to him from California. *Id.*

---

[1] JHL's claim that "Genentech's allegations show that [JHL's] consulting relationship [with Xanthe] terminated on December 27, 2013" ignores this express allegation, and much of the rest of the Complaint as well.  Def. JHL Biotech Inc.'s Not. of Mot. & Mot. to Dismiss at 12, ECF No. 57.

Allen Lam served as a consultant for JHL from 2013 through the fall of 2015, and again for several months during 2017. *Id.* ¶ 30. Allen "received 20,000 JHL stock options in 2013, invested in JHL's Series B round of financing in April 2015, prior to JHL's public stock offering in Taiwan, and received a salary from JHL of approximately $10,000 per month." *Id.* ¶¶ 54–55. JHL listed Allen as its "Director, Quality Control" in a June 2015 presentation. *Id.* ¶ 30. Allen often worked remotely for JHL from South San Francisco, where he resides with Xanthe. *Id.* ¶¶ 30, 56. Allen "was deeply involved in JHL's efforts to develop biosimilars of Genentech's Rituxan®, Pulmozyme®, Avastin®, and Herceptin® medicines." *Id.* ¶ 54. He worked with Xanthe to create "several internal JHL Formulation Development presentations, dating from January 2014 to April 2015," copies of which Xanthe maintained on her Genentech-issued laptop. *Id.* ¶ 141. Allen acted as a conduit between Xanthe and JHL, receiving documents from Xanthe and passing them to Chan. *Id.* ¶ 168–70. Allen also emailed Lin directly about Genentech's trade secrets. *Id.* ¶ 175.

## III. THE COURT HAS PERSONAL JURISDICTION OVER JHL

### A. Legal Standard

"Where, as here, the defendant's motion [under Rule 12(b)(2)] is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). Courts "must evaluate all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006). Moreover, when evaluating the plaintiff's showing, "[u]ncontroverted allegations in the plaintiffs' complaint must be taken as true." *Boschetto v. Hansig*, 539 F.3d 1011, 1015 (9th Cir. 2008). A defendant must specifically rebut each jurisdictional fact; he cannot "defeat jurisdiction by denying that he engaged in any tortious conduct," because "such an argument can succeed only if the court accepts [the defendant]'s version of events." *4580 Thousand Oaks Blvd. Corp. v. Feldman*, 2012 WL 12884636, at *6 n.33 (C.D. Cal. July 30, 2012). All factual disputes must be resolved in the plaintiff's favor. *Mavrix*, 647 F.3d at 1223.

Although "[p]ersonal jurisdiction must exist for each claim," *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004), "[i]f personal jurisdiction exists over one claim, but not others, the district court may exercise pendent personal jurisdiction over any remaining claims that arise out of the same 'common nucleus of operative facts' as the claim for which jurisdiction exists." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015).

**B.     JHL has more than "minimum contacts" with California.**

The Ninth Circuit uses a three-part test to analyze specific jurisdiction over nonresidents in tort cases: (1) the defendant must "purposefully direct his activities" toward the forum, (2) "the claim must be one which arises out of or relates to the defendant's forum-related activities"; and (3) the exercise of jurisdiction "must be reasonable." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).

All three parts are met here.  JHL, through Xanthe and Allen Lam, committed torts in California, which by itself satisfies the first two prongs.  *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 603 (9th Cir. 2018).  And JHL's principal officers, Jordanov and Lin, also directed intentional acts at California, because the entire purpose of their scheme was to steal trade secrets from Genentech in California using a California-based Genentech employee who had access to Genentech's computer systems.  This is far from a case where JHL's contacts with California were "random, fortuitous, or attenuated." *Walden v. Fiore*, 571 U.S. 277, 286 (2014).  Having orchestrated and executed a scheme to steal trade secrets in California, JHL must answer for its conduct in a court in this forum.[2]

**1.     JHL committed torts in California through its agents Xanthe and Allen Lam.**

Generally, "[t]he commission of an intentional tort in a state is a purposeful act that will satisfy the first two requirements [of the minimum contacts test]." *Paccar Int'l, Inc. v.*

---

[2] Defendants Xanthe Lam, Allen Lam, John Chan, and James Quach purport to join JHL's jurisdictional challenge under Rule 12(b)(2) but offer no independent argument in support of the motion.  *See* ECF Nos. 66, 68, 69.  As alleged in the Complaint—and nowhere controverted—each of these individual defendants is domiciled in California.  Compl. ¶¶ 52, 56, 59, 71.  Accordingly, they are subject to general jurisdiction in this state.  *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

*Commercial Bank of Kuwait, S.A.K.*, 757 F.2d 1058, 1064 (9th Cir. 1985); *see also Freestream Aircraft*, 905 F.3d at 603.  Moreover, because a corporation can act only through its individual employees or agents, their conduct—when within the scope of the individual's actual or apparent authority or subsequently ratified by the corporation—is imputed to the corporation in evaluating personal jurisdiction.  *See Myers v. Bennett Law Offices*, 238 F.3d 1068, 1073 (9th Cir. 2001).

The Complaint sets forth in detail how Xanthe and Allen Lam misappropriated Genentech's trade secrets in California on JHL's behalf, and with JHL's advance authorization and subsequent ratification.  As summarized in Section II above—and detailed in the cited paragraphs of the Complaint—Xanthe created folders for each JHL biosimilar product on her Genentech-issued laptop, with each folder containing a mix of JHL information and relevant Genentech trade secrets.  *Id.* ¶¶ 22–25, 29, 129–34.  She allowed defendant Quach to use her home computer and Genentech credentials to download Genentech trade secrets on three occasions and sent him even more once he was working for JHL in China.  *Id.* ¶ 256.  And she obtained and sent additional Genentech trade secrets to her "direct report" Chan in Taiwan, taking care to avoid any paper trail.  *Id.* ¶¶ 31, 161, 168–72.  Allen acted as a conduit for Genentech trade secrets between Xanthe and JHL, including when he worked from South San Francisco with Xanthe.  *Id.* ¶¶ 30, 56, 168–70, 175.

The Lams' actions are imputed to JHL because—as the Complaint alleges—JHL authorized them in advance and ratified them afterward.  JHL recruited the Lams knowing that Xanthe worked at Genentech and had access to Genentech's trade secrets.  Compl. ¶¶ 26, 239–40.  Defendant Lin identified Xanthe and Allen Lam as JHL assets because she knew from prior experience that they were willing leverage Xanthe's access to Genentech's proprietary information for a competitor.  *Id.* ¶¶ 34, 215–18.  Jordanov and Lin "solicited Genentech's confidential, proprietary, and trade secret information from Xanthe," and directly communicated with her regarding her work for JHL.  *Id.* ¶¶ 142, 239–40.  And after the Lams delivered the goods, Jordanov and Lin "knowingly received and utilized a significant amount of stolen Genentech confidential materials and know-how, which JHL then put to use in its own product development, formulation, manufacturing, and regulatory efforts."  *Id.* ¶ 26.

1      Critically, JHL disputes none of these facts in its motion, much less through evidence,

2    meaning that the Court must accept them as true in assessing its jurisdiction under Rule 12(b)(2).

3    *Boschetto*, 539 F.3d at 1015.  These allegations demonstrate that the Lams were acting as JHL's

4    agents in California, because JHL both authorized their conduct in advance and ratified it

5    afterward.  *See Myers*, 238 F.3d at 1073; *see also Creager v. Masuo Yoshimoto*, 2005 WL

6    8156308, at *6 (N.D. Cal. Nov. 22, 2005) ("Principals can ratify the actions of its agent by

7    'support, acceptance and follow through on the efforts initiated.'"); Restat. 3d of Agency, § 4.01

8    (2006) ("Ratification is the affirmance of a prior act done by another…. A person ratifies an act

9    by … conduct that justifies a reasonable assumption that the person so consents.").

10      JHL's counter-arguments are unavailing.  It relies on the Declaration of Dahjan Lin— a

11    member of the California bar—to assert that JHL has no record of a written contract, office

12    assignment, JHL email account, or "payroll payments" to Xanthe Lam.  *See* Decl. of Dahjan Lin

13    in Supp. of Def. JHL Biotech, Inc.'s Mot. to Dismiss Pl.'s Compl. for Lack of Personal

14    Jurisdiction ("Lin Decl."), ¶¶ 9–10, ECF No. 57-1.  But the fact that JHL chose not to formally

15    document its criminal scheme with Xanthe is irrelevant.  There is "no jurisdictional significance"

16    to the particular legal form of the relationship between a principal and its agent when the agent

17    acts at the principal's direction.  *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1078

18    (9th Cir. 2011) (attributing to a corporation the jurisdictional contacts of its "contractor"); *see*

19    *also Hutcheson v. Eskaton FountainWood Lodge*, 17 Cal. App. 5th 937, 958 (2017), *reh'g denied*

20    (Dec. 15, 2017), *review denied* (Feb. 28, 2018) ("[A]n agency relationship may arise by oral

21    consent or by implication from the conduct of the parties."); *Doctors' Co. v. Superior Court*, 49

22    Cal. 3d 39, 46 n.4 (1989) ("[A]n independent contractor may or may not be an agent.").  The law

23    does not permit thieves to escape accountability by labeling their operatives as "independent

24    contractors."  Regardless of the Lams' specific job titles or contractual relationships with JHL,

25    the Complaint alleges facts demonstrating that they were acting as JHL's agents because

26    Jordanov and Lin (and others) invited their conduct, approved it, assisted with it, and knowingly

27    exploited the stolen information they provided for JHL's benefit.

28      Ignoring Genentech's detailed allegations, JHL also argues that the Complaint offers

nothing more than "conclusory allegations of agency," Def. JHL Biotech Inc.'s Not. of Mot. & Mot. to Dismiss ("JHL Mot.") at 11, ECF No. 57, citing *Koi Design, LLC v. Mark's Work Wearhouse*, 2010 WL 11508546 (C.D. Cal. 2010).  But in *Koi Design*, the only agency allegation was the unsupported assertion that two co-defendants were "agents of one another."  *Id.* at *7. Here, by contrast, Genentech has pled detailed facts establishing JHL's relationship with the Lams, most of which JHL has not disputed.  Standing alone, these allegations are sufficient to defeat JHL's Rule 12(b)(2) challenge because they demonstrate that JHL committed a tort in California by stealing Genentech's trade secrets in California.

### 2.    JHL purposefully directed its illegal activities at California, causing harm in the state.

JHL is also independently subject to personal jurisdiction because its chief officers Jordanov and Lin directed their illegal activities at California.  "Purposeful direction" toward a forum is found when a defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068–69 (9th Cir. 2017).  As a court in this district recently held, an out-of-state competitor "purposefully directed its activities at California when it allegedly stole the trade secrets of a company it knew to be based in California, causing harm it knew would be suffered here."  *Way.com, Inc. v. Singh*, 2018 WL 6704464, at *8 (N.D. Cal. Dec. 20, 2018).

That is precisely the situation here.  JHL nowhere disputes that Jordanov and Lin are JHL's agents whose conduct is attributable to the corporation.  And as summarized in Section II.A. above, Jordanov and Lin orchestrated and executed an elaborate scheme to steal trade secrets from Genentech's South San Francisco headquarters.  They recruited the Lams specifically for this purpose, knowing that Xanthe owed a duty of confidentiality to Genentech. Compl. ¶¶ 26, 142, 143, 235, 306.  They solicited Genentech's trade secrets from Xanthe and discussed the logistics of the scheme with her as it unfolded.  *Id.* ¶¶ 239–40.  And they knowingly accepted and used Genentech's stolen information.  *Id.* ¶ 26.  Moreover, Jordanov and Lin did not act alone:  Chan, as a high-level manager at JHL, was also acting as JHL's agent in soliciting and

receiving these trade secrets from Xanthe in California.[3]  *Id.* ¶¶ 31, 68–69, 164–66.  From his perch at JHL's manufacturing facility in China, Quach likewise requested and received Genentech trade secret information from California.  *Id.* ¶¶ 203, 256.

Each of these allegations concerns "intentional acts" taken by Jordanov and Lin (or at their direction and with their ratification) that were "expressly aimed" at California, and that "caus[ed] harm that the defendant[s] kn[ew] [was] likely to be suffered" in California.  *Axiom Foods*, 874 F.3d at 1068.

JHL's citation to *Sarkis v. Lajcak*, 2009 WL 3367069 (N.D. Cal. Oct. 15, 2009) shows how far it must reach to try to dispute jurisdiction.  In *Sarkis*, the defendant placed an ad in *The Economist* magazine that led to its hiring the plaintiff in California.  *Sarkis*, 2009 WL 3367069, at *3–4.  Finding no personal jurisdiction, the Court held that the defendant had not specifically targeted California to recruit the plaintiff.  *Id.* at *3.  The facts here are completely different.  JHL specifically recruited the Lams *because* Xanthe worked at Genentech in California and had access to its computer systems, and orchestrated and executed the entire scheme described in the Complaint to obtain Genentech's trade secrets.

Other cases cited by JHL involve conclusory, unsupported allegations that in no way resemble the fulsome and specific allegations here.[4]  JHL also leans on *Baker Hughes Inc. v. Homa*, 2013 WL 5775636 (S.D. Tex. 2013), an out-of-circuit district court case that is factually distinguishable. In *Baker Hughes*, a Texas-based corporation alleged that an Austrian competitor had misappropriated its trade secrets through two of its Virginia-based employees.  Under the particular facts of that case, the court found that hiring employees in Virginia "did not 'reach into' Texas," and that at most, the defendant had sent a single email to a Texas-based employee.  *Id.* at

---

[3] JHL attempts to distance itself from Chan by arguing that a JHL subsidiary—"JHL Biotech, Inc. *Taiwan*"—signed Chan's employment contract.  JHL Mot. at 9; Lin Decl. ¶ 12.  But Genentech has alleged that Chan was hired as JHL's lead formulation scientist, that he was hired to be Xanthe's direct report, and that he worked closely with Xanthe while Xanthe was in California.  Compl. ¶¶ 31, 39, 69, 161, 165–67, 254.  JHL has not disputed those facts, nor can it: documentary evidence supports them.  The details of Chan's employment contract are irrelevant.

[4] *See, e.g.*, *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 2007 WL 4284759, at *3, 6 (D. Nev. Nov. 28, 2007); *Adobe Sys. Inc. v. Cardinal Camera & Video Ctr., Inc.*, 2015 WL 5834135, at *5 (N.D. Cal. Oct. 7, 2015).

*18–19.  Here, by contrast, Genentech has pled extensive facts showing that JHL's chief officers purposefully reached into California to work directly with a California-based Genentech employee and her husband for the specific purpose of stealing Genentech's trade secrets from California.  Moreover, in *Baker Hughes*, the plaintiff could not establish a "nexus" between its competitor's "recei[pt] and possess[ion]" of its trade secrets and the forum state.  *Id.* at *14.  Here, JHL knowingly misappropriated Genentech's trade secrets *from* California, where Genentech is headquartered.  And to the extent that JHL relies on *Baker Hughes* to argue that jurisdiction requires *use* of the stolen trade secrets in California, or competition taking place within California, JHL is mistaken. The Ninth Circuit has "repeatedly held that a corporation incurs economic loss, for jurisdictional purposes, in the forum of its principal place of business."  *CollegeSource*, 653 F.3d at 1079 (citations omitted).[5]

JHL's reliance on *Walden v. Fiore*, 571 U.S. 277 (2014), is also misplaced.  That lawsuit's only connection to the forum state was that the plaintiff happened to reside there.  *Id.* at 290.  Far more is alleged here.  Indeed, the Court in *Walden* contrasted that case with *Calder v. Jones*, 465 U.S. 783 (1984), which involved "ample" jurisdictionally relevant contacts because "California [wa]s the focal point both of the [wrongful act] and of the harm suffered."  *Walden*, 571 U.S. at 287.  The same is true here.  JHL purposefully directed its conduct at California because the entire purpose of its scheme was to steal trade secrets from Genentech's California headquarters.

## C.   All other requirements for jurisdiction are satisfied.

### 1.   Genentech's claims "arise out of or relate to" JHL's California activities.

The Ninth Circuit "rel[ies] on a 'but for' test to determine whether a particular claim arises out of forum-related activities and thereby satisfies the second requirement for specific jurisdiction."  *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995).  That test is easily satisfied

---

[5] *Montana Silversmiths, Inc. v. Taylor Brands, LLC*, 850 F. Supp. 2d 1172 (D. Mont. 2012), an in-circuit case distinguished by *Baker Hughes*, is much more analogous to the facts here.  There, the court found personal jurisdiction in Montana over a Tennessee company that used trade secrets obtained by a former, Montana-based employee to compete with the Montana-based plaintiff.  *Id.* at 1182.  The case for personal jurisdiction is even stronger here: Xanthe wasn't even a *former* employee when she was working for JHL; she was still working at Genentech in California.

1   here.  Genentech's California and federal trade-secret misappropriation claims arise out of JHL's

2   conduct in reaching into California to misappropriate Genentech's trade secrets; Genentech's

3   common law claims for intentional interference with contractual relations and aiding and abetting

4   breach of duty of loyalty arise out of JHL's conduct in reaching into California to recruit Xanthe

5   Lam despite its knowledge of her legal obligations to Genentech; and Genentech's California and

6   federal computer-fraud claims arise out of Xanthe's conduct as JHL's agent in providing Quach

7   access to Genentech's protected computer system.  But for these contacts with California,

8   Genentech's claims against JHL would not have arisen.  *Id.*

9
    **2.      JHL should reasonably expect to be haled into court in California
10               after stealing trade secrets in California.**

11          When the first two prongs of the minimum contacts analysis are satisfied, courts "presume

12   that an otherwise valid exercise of specific jurisdiction is reasonable."  *Ballard*, 65 F.3d at 1500;

13   *see also Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 114 (1987) ("When minimum

14   contacts have been established, often the interests of the plaintiff and the forum in the exercise of

15   jurisdiction will justify even the serious burdens placed on the alien defendant.").  To defeat

16   jurisdiction, the defendant must "present a *compelling* case that the presence of some other

17   considerations would render jurisdiction unreasonable."  *Ballard*, 65 F.3d at 1500.  As detailed

18   below, the Ninth Circuit considers seven factors to determine whether the defendant has met its

19   burden.  *CollegeSource*, 653 F.3d at 1079.  Here, JHL has not carried its "heavy burden of

20   rebutting the strong presumption in favor of jurisdiction" on any of these factors—much less on

21   enough of them to overcome the presumption that this case should proceed in this forum.  *See*

22   *Ballard*, 65 F.3d at 1500.

23          **Purposeful injection into the forum state's affairs**: "Actions directed at a forum

24   resident expected to cause harm in the forum constitute purposeful injection."  *CollegeSource*,

25   653 F.3d at 1080.  JHL's purposeful injection into California (detailed above) was extensive and

26   this factor weighs solidly in favor of exercising jurisdiction here.

27          **Burden on the defendant**:  Jurisdiction is proper unless the burden on the defendant of

28   litigating in the forum is so great as to constitute a deprivation of due process.  *See Panavision*

1   *Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998).  JHL does not—and cannot—meet its

2   burden on this factor.  Advances in transportation and technology have rendered this factor far

3   less important than in days past.  *See CollegeSource*, 653 F.3d at 1080.  And, more to the point,

4   JHL's filings with this Court demonstrate that it is able and willing to litigate in this forum.  All

5   the key witnesses (Jordanov, Lin, the Lams, Chan, and Quach) reside in the United States, and

6   other witnesses have submitted declarations stating under penalty of perjury that they can and will

7   testify in this action if called as a witness.  *See, e.g.*, ECF Nos. 57-1, 77-8, 77-21, 77-36, 77-38,

8   77-40.  They can hardly claim that it would violate due process to follow through on their

9   promises.

10   **Conflict with the defendant's state**:  Although "[l]itigation against an alien defendant

11   creates a higher jurisdictional barrier than litigation against a citizen from a sister state, … this

12   factor is not controlling."  *Republic of Kazakhstan v. Ketebaev*, 2017 WL 6539897, at *10 (N.D.

13   Cal. Dec. 21, 2017).  Nor could it be, because "it would always prevent suit against a foreign

14   national in a United States court."  *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1333 (9th Cir.

15   1984).  Here, JHL does not even claim that this case presents a significant issue regarding

16   sovereignty, contending only that "the exercise of jurisdiction *may* conflict with the sovereignty

17   of Taiwan."  JHL Mot. at 15 (emphasis added).  That vague and unsubstantiated possibility hardly

18   suffices to carry JHL's burden.  JHL neither explains how the lawsuit would actually conflict

19   with Taiwan's sovereignty, nor presents any evidence that litigation here would offend or insult a

20   foreign nation.

21   **California's interest**: The fourth factor—"the forum state's interest"—clearly favors

22   jurisdiction.  "A State generally has a 'manifest interest' in providing its residents with a

23   convenient forum for redressing injuries inflicted by out-of-state actors."  *Burger King Corp. v.

24   Rudzewicz*, 471 U.S. 462, 473 (1985).  Indeed, "California maintains a strong interest in

25   providing an effective means of redress for its residents [who are] tortiously injured."  *Sinatra v.

26   Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1200 (9th Cir. 1988).  This interest applies equally to a

27   "corporation whose principal place of business is in California."  *Harris Rutsky & Co. Ins. Servs.

28   v. Bell & Clements Ltd.*, 328 F.3d 1122, 1133 (9th Cir. 2003).

**Efficiency:** This factor "is no longer weighed heavily given the modern advances in communication and transportation." *Panavision*, 141 F.3d at 1323.

**Plaintiff's interest:** This factor—the "plaintiff's interest in convenient and effective relief"—clearly favors Genentech, which is seeking the speedy resolution of its claims in this forum.

**Existence of an alternative forum**: This final factor comes into play "only when the forum state is shown to be unreasonable." *CollegeSource*, 653 F.3d at 1080.  Because JHL has made no showing that litigating this case in California is unreasonable, the existence of an alternative forum—perhaps Taiwan—is of no moment.

In sum, JHL has not made—and cannot make—a "compelling case" that exercising jurisdiction in California is unreasonable.  Jurisdiction in this forum is proper, and the Court should deny JHL's motion to dismiss under Rule 12(b)(2).

> **D.     If the Court has a question about exercising jurisdiction, it should order jurisdictional discovery.**

The foregoing facts amply demonstrate that the Court has jurisdiction over JHL.  But if some question remains, the Court should order jurisdictional discovery.  Such discovery "should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary."  *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) (citation omitted); *see also Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) (holding that district court abused its discretion by refusing jurisdictional discovery).  Thus, to the extent that any question remains about the Court's jurisdiction over JHL, the Court should order appropriate discovery, including production of relevant documents and depositions.

# IV.    GENENTECH HAS PROPERLY PLED EACH OF ITS CAUSES OF ACTION

## A.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and "must plausibly suggest an entitlement to relief."  *Starr v. Baca*, 652 F.3d 1202,

1216 (9th Cir. 2011).  "Plausibility" means "less than a probability," and does not require a plaintiff to "prove the case on the pleadings."  *OSU Student All. v. Ray*, 699 F.3d 1053, 1078 (9th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).  The Court must "accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party."  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1066 (9th Cir. 2013) (citation omitted).

### B.   Genentech has properly pled that Defendants misappropriated Genentech's trade secrets in violation of CUTSA and DTSA.

Genentech's Complaint easily passes the 12(b)(6) standard in alleging that Jordanov, Lin, Allen Lam, and Quach violated both DTSA and CUTSA by misappropriating Genentech's trade secrets.[6]  CUTSA and DTSA claims have substantially the same elements.  *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017).  Under both statutes, misappropriation includes "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," and "[d]isclosure or use of a trade secret of another … by a person who … [u]sed improper means to acquire … the secret; or … [a]t the time of disclosure or use, knew or had reason to know that" the trade secret was acquired through "improper means," "under circumstances giving rise to a duty to maintain its secrecy," or "from or through a person who owed" such a duty.  Cal. Civ. Code § 3426.1(b); *see also* 18 U.S.C. 1839(5).  "'Improper means' includes theft, … misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Cal. Civ. Code § 3426.1(a); *see also* 18 U.S.C. 1839(6).  The DTSA applies "with respect to any misappropriation of a trade secret … for which *any act* occurs on or after" May 11, 2016.  *AllCells, LLC v. Zhai*, 2017 WL 2929380, at *1 (N.D. Cal. Mar. 27, 2017).

### 1.   The Complaint sufficiently alleges that Jordanov and Lin stole trade secrets.

Genentech's complaint pleads facts that establish both primary and secondary liability by Jordanov and Lin for trade-secret misappropriation.  As detailed above, *see supra* Parts II.A, III.B.2, Genentech alleges that Jordanov and Lin both personally knew of and directly

---

[6] Defendants JHL, Xanthe Lam, and Quach do not challenge these claims under Rule 12(b)(6).

1    participated in the misappropriation of Genentech's trade secrets by (among other things):

2    recruiting Xanthe and Allen Lam to work for JHL knowing that they would steal Genentech

3    information for JHL; soliciting Genentech's trade secrets from Xanthe; communicating directly

4    with Xanthe about Genentech's proprietary analytical methods; and working closely with Xanthe

5    as she developed JHL's formulation and analytical development strategy by using Genentech's

6    trade-secret information.  *See* Compl. ¶¶ 34, 142–43, 156–57, 175, 239–40.  These allegations

7    suffice to subject Jordanov and Lin to personal liability for trade-secret misappropriation, without

8    resorting to principles of secondary liability.  *See* Cal. Civ. Code § 3426.1(b); 18 U.S.C. § 1839.

9         Jordanov and Lin are *also* liable by virtue of their status as JHL officers because they

10   "knew or should have known about the misappropriation" and "allow[ed] it to occur."  *PMC, Inc.*

11   *v. Kadisha*, 78 Cal. App. 4th 1368, 1389 (2000), *as modified on denial of reh'g* (Apr. 7, 2000).[7]

12   The allegations summarized above against Jordanov and Lin demonstrate this, at a minimum.

13        Jordanov and Lin allege that they could not have known about Xanthe's trade-secret

14   misappropriation because "[t]he formulations for Genentech's drug products are publicly-

15   disclosed information."  Def. Racho Jordanov's Mem. of P. & A. in Supp. of Mot. to Dismiss

16   ("Jordanov Mot.") at 7–8, ECF No. 62-1; Def. Rose Lin's Not. of Joinder & Not. of Mot. & Mot.

17   to Dismiss ("Lin Mot.") at 7, ECF No. 59.  This argument not only relies on matters outside the

18   four corners of the Complaint, but it is also wrong.  Genentech nowhere bases any claim on the

19   acquisition and use of any public formulations.[8]  Rather, the Complaint alleges that Jordanov and

20   ───────────────────────
     [7] *PMC, Inc. v. Kadisha* (on which Jordanov and Lin rely) further explains that a corporate officer
21   need not have "*personally* used trade secrets" to be liable for misappropriation so long as he or
     she "knows or has reason to know about tortious misappropriation."  78 Cal. App. 4th at 1387–
22   89; *see also Powell Prod., Inc. v. Marks*, 948 F. Supp. 1469, 1481, 1483 (D. Colo. 1996) (denying
     defendant corporate officers' motion for summary judgment on a trade secret misappropriation
23   claim where there was evidence that they "knew that [the employee stealing trade secrets] had
     worked for plaintiff; [and] knew that plaintiff owned a machine that produced applicators and that
24   the design of that machine was confidential").

25   [8] Genentech does not oppose Jordanov and Lin's request for judicial notice of a portion of
     Genentech's Statement Regarding Trade Secrets Pursuant to California Code of Civil Procedure
26   2019.210 ("2019 Statement").  *See* ECF Nos. 63, 63-1.  The 2019 Statement does not support
     Defendants' motions.  Genentech's claims are based on the misappropriation of its trade-secret
27   information, not on any public information.  As the 2019 Statement explains—in the exact same
     portion defendants cite—"Genentech possesses *undisclosed proprietary information* regarding
28   how Genentech came to decide upon the most suitable formulation for [their products], and the
     relative strengths and weaknesses of various formulations . . . that Genentech considered
     internally.  That information is a trade secret."  *See* ECF No. 21, ¶¶ 6, 13, 20, 27, 29 (emphasis

Lin "knowingly received and utilized a significant amount of **stolen Genentech confidential materials and know-how**, which JHL then put to use in its own product development, formulation, manufacturing, and regulatory efforts." Compl. ¶ 26 (emphasis added).  The Complaint further alleges that Jordanov and Lin solicited Genentech's trade secret information, with Xanthe's assistance, "despite the fact that [they] knew she was employed by Genentech and knew that she was bound by a duty of confidentiality to Genentech."  *Id.* ¶¶ 239–40.  The entire purpose of the scheme was to obtain Genentech trade-secret information.

Lin also argues that her communications with Xanthe regarding Genentech's trade-secret analytical methods amount only to "passively receiv[ing] a trade secret." Lin Mot. at 8.  But Lin was far from "passive," as the allegations detailed above demonstrate.  The lone case on which Lin relies makes the point: *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 223 (2010), *disapproved of on other grounds by Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011), concerned "inadvertently coming into possession of a trade secret."  There was nothing inadvertent about Lin's conduct.  As the Complaint alleges, Lin not only recruited Xanthe specifically because she believed Xanthe would steal Genentech's trade secrets,  Compl. ¶ 34, but she exchanged "several communications" by text message with Xanthe, including one in which Xanthe directed Lin to review an email concerning Genentech trade secrets, which was followed by a 27-minute-long video conference, *id.* ¶ 175.

Finally, Jordanov tries to deny knowing that Xanthe was employed by Genentech while she was working for JHL by asserting that the Complaint alleges that Xanthe told Jordanov "she would be taking a leave of absence from Genentech during her work for JHL."  Jordanov Mot. at 7.  In fact, the Complaint alleges that Xanthe told someone *outside* of JHL the false cover-story that she was taking a leave of absence from Genentech, while informing Jordanov and Lin that she would need to "find someone to cover her duties at Genentech" while she worked for JHL. Compl. ¶ 143.  Far from being exculpatory, this fact evidences consciousness of guilt.  In any event, as former Genentech employees, Jordanov and Lin both knew that Xanthe was prohibited from consulting for any competitor, whether or not she was on leave.  *See id.* ¶¶ 96, 99, 306.

added).

GENENTECH, INC.'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 3:18-cv-06582-WHA

1316863

1   Thus, the Complaint alleges facts establishing Jordanov's and Lin's knowledge of and

2   participation in the misappropriation of Genentech's trade secrets, and states CUTSA and DTSA

3   claims against them both.

4   **2.      The Complaint sufficiently alleges that Chan stole trade secrets.**

5   The Complaint alleges that John Chan "solicited, and Xanthe provided, Genentech's

6   confidential, proprietary, and trade secret information for Chan's use in his role at JHL," and that

7   Chan received "a confidential Genentech Technical Report with the filename 'TR0467.pdf'" that

8   was "clearly labeled as 'GENENTECH Pharm R & D Technical Report – CONFIDENTIAL" and

9   "also clearly marked 'Confidential' and 'Internal Only' at the bottom of the cover page."  Compl.

10  ¶¶ 166, 169.  When Xanthe sent this document to Allen—with instructions to print it out and give

11  it to Chan—Xanthe emphasized its confidentiality by demanding Allen "tell [Chan] don't show it

12  to others."  *Id.* ¶ 31.  Nevertheless, Chan now claims that Genentech fails to allege that he knew

13  the stolen information constituted trade secrets.  Def. John Chan's Not. of Joinder & Mem. of P.

14  & A. in Supp. of Mot. to Dismiss ("Chan Mot.") at 3, ECF No. 66-1.  He is wrong, and these

15  allegations alone state a claim against Chan for knowing misappropriation of trade secrets.

16  Contrary to Chan's argument, the law does not even require actual knowledge.  CUTSA

17  and DTSA prohibit "[a]cquisition of a trade secret of another by a person who knows *or has*

18  *reason to know* that the trade secret was acquired by improper means," including in "breach of a

19  duty to maintain secrecy."  Cal. Civ. Code § 3426.1(a) & (b)(1) (emphasis added); *see also* 18

20  U.S.C. § 1839(5)(A) & (6)(A).  As the Complaint details, Chan "knew [Xanthe] was employed by

21  Genentech and knew or should have known that she was bound by a duty of confidentiality to

22  Genentech."  Compl. ¶ 241.  At a minimum, the allegations in the Complaint show that, as "head

23  of the Pulmozyme® biosimilar project" at JHL and a participant in the biotechnology industry, *id.*

24  ¶ 68, Chan had reason to know that the technical information he was receiving from a

25  competitor's employee included trade secrets.  The CUTSA and DTSA claims against Chan are

26  properly pled.

27

28

1316863

**3.      Defendants are liable under DTSA because their misappropriation continued after the statute was enacted.**

As numerous courts have explained, "DTSA applies to misappropriations that began prior to the DTSA's enactment if the misappropriation continues to occur after the enactment date, so long as the defendant took some relevant act after that date." *Sonoma Pharm., Inc. v. Collidion Inc.*, 2018 WL 3398940, at *5 (N.D. Cal. June 1, 2018) (internal citations and quotation omitted); *see also Vendavo, Inc. v. Price f(x) AG*, 2018 WL 1456697, at *3 (N.D. Cal. Mar. 23, 2018). Courts have further held that continued *use* of a trade secret that was originally *acquired* before DTSA's effective date is actionable. *See Cave Consulting Grp., Inc. v. Truven Health Analytics*, Inc., 2017 WL 1436044 at *4 (N.D. Cal. Apr. 24, 2017).

Genentech alleges conduct that extends beyond May 11, 2016—including, in particular, JHL's use of misappropriated trade secrets and further misappropriation well into 2017. *See, e.g.*, Compl. ¶¶ 28–29; 39–41; 199–203. The Complaint also alleges that all of the defendants are participants in JHL's conspiracy to steal Genentech's trade secrets, and therefore each is responsible for all acts in furtherance of the conspiracy. *See id.* ¶¶ 282–87. This includes JHL's continued use of the Genentech trade secrets that the defendants helped steal for JHL's benefit. *See, e.g., Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–511 (1994) ("By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability coequal with the immediate tortfeasors."); *see also Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 784 (1979).

Lin, Jordanov, Chan, and Allen Lam nevertheless assert that they cannot be liable under DTSA because the Complaint fails to allege that they misappropriated Genentech's trade secrets after May 11, 2016. Lin Mot. at 5; Jordanov Mot. at 4–5; Defs.' Xanthe Lam & Allen Lam's Not. of Mot. & Mot. to Dismiss ("Lams Mot.") at 6–7, ECF No. 67. They are mistaken. As discussed above, Genentech plausibly alleges both use of Genentech trade secrets beyond DTSA's enactment and "relevant act[s] after that date" that apply to each of these defendants. *Sonoma Pharm.*, 2018 WL 3398940, at *5. And if any one defendant did not personally pilfer information

after May 11, 2016, that is of no moment given the course of conduct and combined action alleged here. *Applied Equip.*, 7 Cal. 4th at 510–11.

### C. Genentech has properly pled that all defendants conspired to violate DTSA and CUTSA.

Defendants misapprehend Genentech's conspiracy allegations and incorrectly argue that the Complaint fails to plead facts sufficient to allege a conspiracy to steal trade secrets. Genentech neither alleges nor seeks to prove a freestanding conspiracy, untethered to specific statutory violations. Instead, Genentech alleges that the defendants conspired, confederated, and agreed to violate CUTSA and DTSA by stealing Genentech's trade secrets, making each member of the conspiracy liable under those statutes. It is proper to pursue civil liability for such tortious conduct by alleging a conspiracy.

Where "two or more persons agree to perform a wrongful act, the law places civil liability for the resulting damages on all of them, regardless of whether they actually commit the tort themselves." *Wyatt*, 24 Cal. 3d at 784. Under California law, conspiracy is "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip.* 7 Cal. 4th at 510–11. Defendants make much of the formal distinction between an independent cause of action and an actionable theory of liability, but its only substantive significance is that a conspiracy "must be activated by the commission of an actual tort" to be actionable. *Id.* at 511; *see also Olenicoff v. UBS AG*, 2010 WL 8530286, at *30 (C.D. Cal. Mar. 16, 2010) (sub. hist. omitted) (denying a motion to dismiss a separate civil conspiracy claim because the plaintiffs "adequately allege other independent claims").[9] As demonstrated above, the Complaint states a claim for the tort of trade-secret misappropriation, and every defendant acknowledges that Genentech has stated a misappropriation claim as to at least Xanthe. The only relevant question, then, is whether the Complaint adequately pleads a conspiracy encompassing Xanthe's trade-

---

[9] As Defendants acknowledge, the form of Genentech's pleading is no basis to disregard its substantive conspiracy allegations. *See* JHL Mot. at 21 (citing *Yulaeva v. Greenpoint Mortg. Funding, Inc.*, 2009 WL 2880393, at *5 (E.D. Cal. Sept. 3, 2009) for the proposition that the "civil conspiracy allegations" in a separately pled claim should be considered in the context of the underlying tort claims).

secret misappropriation, which it does.  *See supra* IV.B.1.[10]

Various defendants contend that Genentech's conspiracy allegations are deficient, but a cursory review of the Complaint disposes of that argument.  Some of the relevant allegations bear repeating:

- Jordanov and Lin recruited Xanthe and Allen Lam to steal trade secrets for JHL, and Xanthe and Allen agreed to do so.  Compl. ¶¶ 12–13.

- Xanthe then gathered Genentech trade secrets in a folder labeled "JHL" on her Genentech computer, used them for JHL's benefit, and shared them with Allen for his work at JHL.  Compl. ¶¶ 23–25, 127–37.

- Lin then agreed to hire Chan, whom Xanthe agreed to supervise, so that he could use Genentech trade secrets in "formulating" JHL's products, a position for which he was otherwise unqualified.  Compl. ¶¶ 31, 158–62 & Ex. A.

- JHL then agreed to hire Quach, who then agreed with Xanthe to download more trade secrets from Genentech's computer system and take them to his new job at JHL in China.  Compl. ¶¶ 194–203.

The allegations of the conspiratorial agreements are clear.  JHL's reliance on *Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511 (N.D. Cal. 1990), is misplaced, because that case involves the heightened pleading standard for fraud under Fed. R. Civ. P. 9(b).  This Complaint alleges neither fraud nor a conspiracy to commit fraud.  "[N]o heightened pleading standard applies to conspiracy claims.  All that is needed is a 'short and plain statement' putting the defendants on notice of the nature of the claim."  *Thomas v. Baca*, 2005 WL 1030247, at *5 (C.D. Cal. May 2, 2005) (quoting Fed. R. Civ. P. 8(a)); *see also Olenicoff*, 2010 WL 8530286, at *29 ("General allegations of agreement have been held sufficient, and the conspiracy averment has even been held unnecessary, providing the unlawful acts or civil wrongs are otherwise sufficiently alleged." (citation omitted)).  That standard is readily satisfied here, since "[a]n alleged conspirator's 'requisite concurrence and knowledge may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other

---

[10] Defendant Lin also argues that she cannot be held liable for a conspiracy involving both herself and JHL under the "agent's immunity rule."  Lin Mot. at 8–9.  But as she acknowledges, this rule "does not apply in cases where directors and officers of a corporation 'directly order[], authorize[], or participate[] in the tortious conduct.'"  *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 947 (N.D. Cal. 2003).  Lin is both a director and an officer of JHL, Compl. ¶ 234, and she ordered, authorized, and participated in the tortious conduct, *see supra* IV.B.1.  This rule does not apply.

circumstances.'" *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 952 (N.D. Cal. 2003) (quoting *Wyatt*, 24 Cal. 3d at 785).

At this stage, Rule 8 requires only that Genentech allege facts which "plausibly suggest[] … agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Genentech has cleared that bar. Because the factual allegations in the Complaint "sufficiently implicate [each Defendant] in an agreement to misappropriate [Genentech's] intellectual property," no Defendant can "persuasively argue that [Genentech's] conspiracy claim against him is groundless." *AccuImage*, 260 F. Supp. 2d at 952.[11]

Finally, Defendants argue that Genentech cannot hold co-conspirators liable under DTSA because there is no private right of action for conspiracy to violate DTSA, relying on a single case that is neither controlling law nor on-point. *See* JHL Mot. at 21–22 (citing *Steves & Sons v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 843 (E.D. Va. 2017)). In *Steves*, the plaintiff sought to bring a private civil claim under 18 U.S.C. § 1832(a)(5), which criminalizes the inchoate offense of conspiring to misappropriate trade secrets without requiring a primary offense of misappropriation. By contrast, Genentech alleges the actual theft of trade secrets, with sufficient concerted action amongst Defendants to subject each to joint liability. Compl. ¶ 283. Thus, Genentech does not purport to bring a claim under DTSA's criminal inchoate offense provision, but rather under its express private right of action for trade-secret misappropriation. *See* 18 U.S.C. § 1836(b); Compl. ¶¶ 284–87.

Defendants nowhere argue—and *Steves* neither holds nor suggests—that co-conspirators cannot be liable for their participation in a completed DTSA violation. Nor could they so argue. It is a "well established principle of tort law that where two persons act in concert to commit a wrong each is liable for the entire injury resulting therefrom and that one who abets a wrongful act is equally liable with the perpetrator." *Int'l Longshoremen's & Warehousemen's Union v.*

---

[11] JHL also argues that "[e]ven if it were adequately pled, any California law conspiracy claim arises from the identical nucleus of facts as the misappropriation claims and would be superseded by CUTSA." JHL Mot. at 21 n.9. That might make sense if civil conspiracy were a standalone claim, but, as JHL itself points out, it is a legal doctrine imposing liability on co-conspirators, not a separate cause of action that can be superseded. *See id.* at 21. Any co-conspirator liability for trade secret misappropriation under CUTSA would arise from CUTSA itself, and not from any superseded alternative legal theory.

1   *Juneau Spruce Corp.*, 189 F.2d 177, 190 (9th Cir. 1951).  "In order to abrogate a common-law

2   principle, the statute must 'speak directly' to the question addressed by the common law," and

3   nothing in DTSA displaces this ordinary rule of joint liability.  *United States v. Texas*, 507 U.S.

4   529, 534 (1993) (citation omitted); *see also Fox Ins. Co. v. Centers for Medicare & Medicaid

5   Servs.*, 715 F.3d 1211, 1224 (9th Cir. 2013) ("Courts read statutes and regulations to preserve

6   common law principles … absent an evident statutory purpose to the contrary.").

7        **D.     CUTSA does not supersede Genentech's common-law claims.**[12]

8        In California, "CUTSA provides the exclusive civil remedy for conduct falling within its

9   terms and supersedes other civil remedies for trade secret misappropriation."  *Waymo LLC v.

10  Uber Techs., Inc.*, 256 F. Supp. 3d 1059, 1062 (N.D. Cal. 2017) (citing Cal. Civ. Code § 3426.7).

11  "At the pleadings stage, the supersession analysis asks whether, stripped of facts supporting trade

12  secret misappropriation, the remaining factual allegations can be reassembled to independently

13  support other causes of action."  *Id.*  Here, Genentech's common law claims are not superseded

14  because, unlike in the cases Defendants rely upon, none of these claims depends upon the

15  misappropriation of any information, whether trade secret or otherwise.

16        **1.     Genentech's claim for intentional interference with contractual
17               relations depends on different facts than its trade secret claims.**

18        Genentech alleges—and Defendants do not dispute—that Xanthe owed certain

19  contractual obligations to Genentech.  For example, pursuant to her Proprietary Information and

20  Inventions Agreement, Xanthe agreed that while at Genentech, she would "refrain from engaging

21  in any employment or activity other than for Genentech in any business in which Genentech is or

22  could become engaged." Compl. ¶¶ 292–93.  And under the Code of Conduct, she promised that

23  she would not consult "for other biotech companies while she was a Genentech employee."  *Id.* ¶

24  10.  Genentech further alleges that "JHL, Jordanov, Lin, Allen, Chan, and Quach intentionally

25  interfered with Xanthe's contractual obligations by inducing Xanthe to ***engage in employment***

26

27  ───────────────────────
    [12] With the exception of Xanthe's motion to dismiss the breach-of-loyalty claim and Chan's
28  motion to dismiss the intentional interference claim, Defendants do not argue that Genentech has
    substantively failed to state these claims, only that they are superseded.  They thus concede that if
    these claims are not superseded, they are adequately pled.

*and/or other activity with Genentech competitor JHL*, thereby breaching her Proprietary Information Agreement with Genentech." *Id.* ¶ 308 (emphasis added).  Even if one were to strip away every other allegation regarding Defendants' acquisition and use of Genentech's trade secrets, these allegations would still state a claim for intentional interference.  Defendants' knowing and willful inducement of Xanthe's violation of her contractual prohibition on engaging in employment or similar activities with other biopharmaceutical companies while employed by Genentech is a stand-alone violation of Genentech's legal rights.

Defendants' reliance upon *Anokiwave, Inc. v. Rebeiz*, 2018 WL 4407591 (S.D. Cal. Sept. 17, 2018), is unavailing.  There, the court explained that while "CUTSA may supersede certain claims" that are premised on "the misappropriation of trade secrets," a cause of action "is not preempted, however, if the plaintiff asserts '*some other basis in fact or law on which to predicate the requisite property right*.'"  *Id.* at *3 (emphasis added).  Thus, "[a] non-CUTSA claim is not displaced if it has 'a basis independent of any misappropriation of a trade secret.'"  *Id.* (quoting *Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 507 (2013)).

For this reason, the California Court of Appeal held that a breach-of-fiduciary-duty claim was not superseded by CUTSA because it was based on the defendant's wrongful conduct in violating a noncompetition agreement and violating his duty of loyalty.  *Angelica Textile*, 220 Cal. App. 4th at 507.  Similarly, in another case, the Court of Appeal held that an unfair-business-practices claim was not superseded by CUTSA where it "d[id] not depend on the existence of a trade secret, but on knowingly facilitating another in the violation of its obligations under a judicial decree."  *Silvaco*, 184 Cal. App. 4th at 241–42.  Indeed, almost universally, cases finding CUTSA supersession involve claims based on misuse of *information*, most frequently the *same* information that is the subject of a separate trade secret misappropriation claim.  *See, e.g.*, *Waymo*, 256 F. Supp. 3d at 1063; *SunPower Corp. v. SolarCity Corp.*, 2012 WL 6160472, at *4–15 (N.D. Cal. Dec. 11, 2012).

Defendant Chan's further argument that the Complaint does not adequately allege that he intentionally interfered with Xanthe's contract with Genentech overlooks the reasonable inferences that can be drawn from the Complaint's detailed factual allegations.  Chan knew that

1   Xanthe was employed by Genentech and that in his job at JHL he was reporting to her as if she

2   was a JHL executive.  Compl. ¶¶ 159, 165, 241, 304.  Chan further knew that he regularly sought

3   Xanthe's assistance with his own job duties at JHL, which included creating products to compete

4   with those of Xanthe's employer.  *Id.* ¶ 164, 254.  Any rational person would understand that

5   Xanthe could not properly be giving him this guidance.  Indeed, Xanthe eventually had to stop

6   providing this assistance because it was "too sensitive" and she didn't "want to get into trouble."

7   *Id.* ¶¶ 165, 173.  It is more than reasonable to infer from these facts that Chan understood that

8   Xanthe's employment relationship with Genentech forbade her from abetting his work for JHL,

9   yet he continued to solicit and accept her assistance. These facts are sufficient to state a claim

10  against Chan for intentional interference.

### 2.   Genentech's claims for breaches of duty of loyalty, and the aiding and abetting thereof, are also not superseded.

13      Defendants argue that Genentech's claim for breach of duty of loyalty is superseded by

14  CUTSA because "Ms. Lam's alleged breach is trade secret misappropriation."  JHL Mot. at 20.

15  But the breach of duty of loyalty claim survives for the same reasons that Genentech's claim for

16  intentional interference is not superseded.  Defendants' characterize Xanthe's duty of loyalty as

17  "limited to maintain[ing] the confidentiality of Genentech's trade secrets," Lams MTD at 13, but

18  that misstates the allegations. Xanthe owed her employer a duty to not simultaneously and

19  surreptitiously engage in unauthorized work for a competitor, and *that* is the duty that Genentech

20  alleges she breached.  *See* Compl. ¶ 314 ("As alleged herein, Xanthe *consulted or otherwise*

21  *worked for or on behalf of* Eusol, Mycenax, JHL, APBio, and OBI—all Genentech competitors—

22  for her own personal gain while employed by Genentech. These actions were inimical to the best

23  interests of Genentech." (emphasis added)).[13]

24      Xanthe further argues incorrectly that no cause of action for breach of duty of loyalty

25  exists under California law absent a fiduciary relationship.  Lams MTD at 12.  But California

26  recognizes a duty of loyalty that is distinct from the duties of a fiduciary.  *See E.D.C. Techs., Inc.*

27

28

---

[13] Defendants' only argument that the aiding-and-abetting claim is superseded is that the underlying breach-of-loyalty claim is superseded.  JHL MTD at 20.  As demonstrated here, neither is.

1316863

*v. Seidel*, 216 F. Supp. 3d 1012, 1016 (N.D. Cal. 2016) ("Although they are similar, breach of fiduciary duty and breach of the duty of loyalty are two distinct claims under California law.") (citation omitted).  To claim otherwise, Xanthe relies on *Mattel, Inc. v. MGA Entertainment, Inc.*, 2011 WL 8427611 (C.D. Cal. Mar. 28, 2011), an outlier case from the Central District of California that this District has expressly declined to follow.  *See id.* (recognizing that *Integral Dev. Corp. v. Tolat*, 2013 WL 5781581, at *3 (N.D. Cal. Oct. 25, 2013), declined to follow *Mattel*).[14]  Xanthe is also incorrect that only managers have a duty of loyalty, as "California courts generally have not distinguished between managerial employees and lower-level employees with respect to the duty of loyalty, 'but rather use[ ] broad language suggesting that all employees owe a duty of loyalty to their employers.'" *E.D.C. Techs.*, 216 F. Supp. 3d at 1016 (citation omitted).  Xanthe does not argue—nor could she—that she did not substantively breach her duty of loyalty to Genentech by giving substantial assistance to its competitor.

Accordingly, Genentech's claim for breach of duty of loyalty passes muster at the pleading stage.

### E. Genentech has properly pled that JHL violated the CDAFA and conspired to violate the CFAA.

JHL wrongly asserts that no civil claim for conspiracy to violate the Computer Fraud and Abuse Act ("CFAA") exists.  JHL Mot. at 22–25.  Section 1030(b) provides that "[w]hoever *conspires to commit* or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section." 18 U.S.C. § 1030(b) (emphasis added).  The statute further provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  18 U.S.C. § 1030(g).  Thus, the statute's plain text makes clear that someone who conspires to violate the CFAA can be a "violator" subject to civil liability.  For this reason, at least one court in this District has denied a motion to dismiss a civil claim for conspiracy to violate the CFAA.  *See In re: Lenovo Adware Litig.*, 2016

---

[14] Even another court in the Central District has declined to follow *Mattel* in light of "several cases from state and federal courts in California" that hold that the duty of loyalty "extends to all employees."  *Zayo Grp. LLC v. Hisa*, 2013 WL 12201401, at *7 (C.D. Cal. Sept. 17, 2013).

WL 6277245, at *6 (N.D. Cal. Oct. 27, 2016) ("Section 1030(b) of the CFAA extends liability to anyone who 'conspires to commit' such acts.").

JHL's alternative argument—that Genentech has failed to adequately allege "any agreement between JHL and Ms. Lam or Mr. Quach to violate any law," JHL Mot. at 23—fails for several reasons. *First*, as explained above, general allegations regarding an agreement (even a tacit one) suffice, and an agreement may be inferred from the circumstances. *Olenicoff*, 2010 WL 8530286, at *29; *Wyatt*, 24 Cal. 3d at 785. That low pleading burden holds true for conspiracies to violate the CFAA, because "[t]he heightened pleading standards of Rule 9(b) do not apply to the Computer Fraud and Abuse Act." *Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 284 (N.D. Cal. 2011) (citation omitted). Read with the required liberality, Genentech's allegations at least "plausibly suggest" an agreement among JHL, Xanthe, and Quach to violate the CFAA, which is all that is required. *Twombly*, 550 U.S. at 545. *Second*, the Complaint unquestionably alleges an agreement between Xanthe and Quach to violate the CFAA, *see* Compl. ¶ 338, and that agreement is attributable to JHL. As explained above, Xanthe was working within the scope of her duties as JHL's agent when she provided Quach with unauthorized access to Genentech's protected computer network. *See* Part III.B.1, *supra*. *Third*, Genentech has alleged that Quach was acting as JHL's agent when he illegally accessed Genentech's protected computer system. By July 2017, JHL had offered Quach a job, and he downloaded Genentech's documents knowing he would be working there. Compl. ¶¶ 40, 256. He also asked for and received additional Genentech documents after arriving at JHL's plant in China. *Id.* ¶ 256. *Fourth*, even if Quach was not acting pursuant to JHL's authorization or direction at the time of his misconduct (and he was, since Xanthe had recruited him and provided him access to Genentech's computer system for JHL's benefit), Genentech has alleged that JHL ratified his conduct when it knowingly accepted the benefits of Quach's conduct. *Id.* ¶ 340.

JHL is also vicariously liable for Xanthe and Quach's violations of the CFAA and California's Computer Data Access and Fraud Act ("CDAFA"). As explained above, Genentech has alleged that Xanthe and Quach were acting as JHL's agents and operatives when they breached Genentech's computer systems; JHL cannot disavow them so easily now that the facts

have come out.  *See Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1122–25 (W.D. Wash. 2000) (defendant corporation liable for the CFAA violation of its agent committed while the agent was still employed by the plaintiff); *SBM Site Servs., LLC v. Garrett*, 2012 WL 628619, at *6 (D. Colo. Feb. 27, 2012) (employer vicariously liable for the CFAA violation of its agent).

### F.   Genentech's common-law claims are timely.

Defendants misread the Complaint to argue that Genentech had notice of Xanthe's misconduct by October 11, 2016, so the two common-law claims included in its October 29, 2018 Complaint (Claims 5 and 7) are untimely by about two weeks.  JHL Mot. at 16–18.  The Complaint establishes no such defense.

"When a motion to dismiss is based on the running of the statute of limitations, it can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled."  *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).  "In fact, a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim."  *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir. 1995).  Accordingly, resolving "statute of limitations claims on a motion to dismiss [is] generally disfavored as a matter of law."  *Blanco v. Am. Home Mortg. Servicing, Inc.*, 2009 WL 4674904, at *6 n.4 (E.D. Cal. Dec. 4, 2009).

The Complaint alleges that "on or about October 11, 2016," Genentech received "a tip . . . from a Genentech employee who was concerned that Xanthe was engaged in improper consulting activities outside of Genentech."  Compl. ¶ 244.  That tip consisted of a slide deck from a biotechnology company called AP Biosciences ("APBio")—*not JHL*—that "listed Xanthe as a 'Consultant' and part of the company's 'Leadership.'"  *Id.* ¶ 245; *see also id.* ¶¶ 204–09. Genentech then launched an internal investigation which "involved interviewing relevant Genentech personnel and collecting and monitoring Xanthe's email and electronic files, among other things."  *Id.* ¶ 247.  The Complaint does not allege that Genentech had notice of *JHL*'s involvement on October 11.  Quite to the contrary, Genentech knew only that Xanthe might be moonlighting in some way for APBio; there was no reason to suspect any of the claims alleged in

1316863

1    this action.

2        Under the discovery rule, "California law postpones the accrual of a claim 'until the

3    plaintiff discovers, or has reason to discover' the essential elements of that claim." *De La Paz v.*

4    *Bayer Healthcare LLC*, 159 F. Supp. 3d 1085, 1099 (N.D. Cal. 2016) (quoting *Fox v. Ethicon*

5    *Endo–Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005)).  Notice of a possible claim against one

6    potential defendant does not commence the limitations period with respect to a "separate . . .

7    cause of action against a *different* defendant."  *Pooshs v. Philip Morris USA, Inc.*, 51 Cal. 4th

8    788, 800 (2011).  Accordingly, Genentech's allegations regarding when it had reason to suspect

9    that Xanthe might be consulting for a company *other than JHL* does not and cannot establish that

10    it had any knowledge or suspicion of misconduct relating to JHL.

11        Moreover, because determining whether Genentech's common-law claims have been

12    tolled "requires reference to matters outside the pleadings," JHL's motion to dismiss for

13    untimeliness is not "amenable to resolution on a 12(b)(6) motion."  *Cervantes v. City of San*

14    *Diego*, 5 F.3d 1273, 1276 (9th Cir. 1993).  Genentech notes, however, that amending the

15    Complaint to clear up JHL's confusion would prove a simple task if the Court deemed the

16    exercise necessary.  Genentech had reason to suspect JHL's misconduct only as of mid-

17    November 2016.  After receiving the tip about APBio on October 11, 2016, Genentech mounted

18    an investigation into Xanthe Lam.  The investigation team's first employee interview took place

19    on November 2, 2016, and the team gained access to Xanthe's email and computer files between

20    on November 15 and November 17, 2016, respectively.[15]  Thus, Genentech discovered

21    information leading it to suspect the misconduct alleged in this action less than two years before

22    Genentech filed its Complaint.

23        Because it does not "appear[] beyond doubt that the plaintiff can prove no set of facts that

24    would establish the timeliness of the claim," Defendants' motion to dismiss on timeliness grounds

25    must be denied.  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th

26    Cir. 2010).

27

28

---

[15] Although these details regarding Genentech's investigation are not alleged in the Complaint, Genentech includes them here to demonstrate that Genentech will "be able to prove a set of facts under which this action would be timely."  *Supermail Cargo, Inc.*, 68 F.3d at 1207.

1

## V.   CONCLUSION

2

Genentech's allegations are detailed, extensive, and clear.  They are sufficient for this

3

Court to exercise jurisdiction over JHL Biotech, Inc. (and all defendants), and they establish

4

every required element to state a claim for all counts alleged.  Indeed, they do so with far more

5

particularity than necessary to survive Rule 12 scrutiny.  The Court should deny all of the

6

Defendants' motions to dismiss in their entirety.

7

8

Dated:  January 18, 2019                                        KEKER, VAN NEST & PETERS LLP

9

10

By:    /s/ Elliot R. Peters

11

Attorneys for Plaintiff

12

GENENTECH, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GENENTECH, INC.'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 3:18-cv-06582-WHA

1316863