IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GENENTECH, INC.,

        Plaintiff,

  v.

JHL BIOTECH, INC., *et al.*,

        Defendants.

_____/

No. C 18-06582 WHA

**OMNIBUS ORDER ON MOTIONS TO DISMISS, MOTION FOR PROVISIONAL RELIEF, AND MOTIONS TO STAY**

**INTRODUCTION**

In this action for trade secret misappropriation, computer fraud, and various state law claims, defendants move to dismiss and for a stay and plaintiff moves for provisional relief. For the reasons stated below, all motions are **GRANTED IN PART** and **DENIED IN PART**.

**STATEMENT**

This action centers on medicines called "biologics" — typically large-molecule, protein-based drugs produced by living cells and recombinant DNA technology. For the past several decades, California-based plaintiff Genentech, Inc. has sold (and continues to sell) various biologics used to treat diseases such as cancer and cystic fibrosis. Four of these — which include one of the top-selling drugs in the United States — lie at the heart of this action: Rituxan, Herceptin, Avastin, and Pulmozyme (Compl. ¶¶ 81–82, 84).[1]

---

[1] Pulmozyme® (dornase alfa) is an inhalation treatment for children and young adults with cystic fibrosis. Rituxan® (rituximab) is used to treat certain cancer patients with non-Hodgkin's lymphoma. Herceptin® (trastuzumab) is used to treat metastatic breast cancer patients with HER2 gene overexpression. Avastin® (bevacizumab) is used to treat metastatic colorectal cancer. Avastin® is now Genentech's best-selling cancer treatment and one of the top-selling drugs in the United States (McCloskey Decl. ¶¶ 5–8).

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

With many blockbuster biologics (including the four at issue here) facing a patent cliff and encouragement from regulators in the form of abbreviated approval pathways and other initiatives, competitors today increasingly seek to enter the market with "generic" versions of biologics called "biosimilars." Biological drug development, however, is a challenging pursuit in terms of time and resources. That is because biologics demand a complex manufacturing process based on biological processes — including genetically engineering a cell to produce a target protein, testing for quality, harvesting, purifying, and stabilizing the protein (*id.* ¶¶ 85–86; Eberhart Decl., Exh. 1 at 2).[2]

Unlike generic versions of small-molecule chemical drugs, which are relatively simple and well-defined, a biosimilar can never be an exact copy of the brand biologic ("reference product") because of the complexity of the manufacturing process and the drug itself. So to gain regulatory approval, biosimilar manufacturers must demonstrate that their product is "highly similar" to the reference product in terms of quality, safety, and efficacy through a series of tests. This can be a headache for competitors who must laboriously reverse engineer the innovator's manufacturing process. Due to the sensitive nature of the manufacturing process, even a minute change in the process can carry a downstream effect on the end product's characteristics. Biological drug manufacturers must also pass on-site inspections by regulatory authorities who monitor the manufacturers' facilities and equipment according to the standards set forth by "Good Manufacturing Practices" ("GMP"), which are designed to ensure that the drugs are consistently produced with the requisite quality, safety, and effectiveness (Compl. ¶¶ 17, 19–20, 88, 90).

Defendant JHL Biotech, Inc. is one such competitor seeking to enter the biosimilar market. A Taiwanese biotechnology startup founded in December 2012 by defendants (and former Genentech employees) Rose Lin and Racho Jordanov, JHL has set its sights on Genentech's Rituxan, Herceptin, Avastin, and Pulmozyme biologics. JHL is currently targeting the Chinese and European market and has already made great strides in its biosimilar

---

[2] Certain background information is found in declarations and exhibits submitted in connection with the motion for preliminary injunction, as noted. All other facts are taken from the complaint.

United States District Court

For the Northern District of California

development.  For example, it is currently the only manufacturer to hold clinical trials for a Pulmozyme biosimilar — thus positioning JHL to potentially be the first to launch a biosimilar of Pulmozyme.  JHL's other three biosimilars are also marching through important regulatory milestones.  The company went public in Taiwan.  And, JHL has partnered with French pharmaceutical company Sanofi S.A. to produce and market the Rituxan biosimilar in a deal worth up to $236 million (*id.* ¶¶ 32–33, 44, 46, 187, 191).

In October 2016, Genentech received an anonymous tip that defendant Xanthe Lam — then a principal scientist at Genentech and employee for thirty years — was consulting for another competitor in violation of the Roche U.S. Pharma Code of Conduct governing employees.[3]  Genentech's subsequent internal investigation (and a parallel FBI investigation) unearthed Xanthe's secret involvement with JHL's biosimilar development efforts.  In October 2017, Genentech terminated Xanthe for gross misconduct in connection with the allegations in the instant action.  The investigations revealed the following facts, many of which have already been confirmed by certain defendants during voluntary interviews with Genentech's outside counsel (*id.* ¶¶ 36, 39, 48, 51, 95, 101).

In mid-2013, JHL hired Xanthe's husband defendant Allen Lam (also a former Genentech employee) to consult on its biosimilar development efforts.  Starting in May 2013, Xanthe began secretly downloading confidential Genentech documents such as R&D technical reports, stabilities studies, degradation studies, validation reports, and testing protocols concerning the four biologics at issue — documents which she later admitted contained proprietary information that she otherwise would have never shared with a competitor.  She saved these documents, which were marked as "confidential," onto her Genentech-issued laptop in a folder labeled "JHL," which in turn contained subfolders labeled "Avastin_JHL," "Herceptin_JHL," "Pulmozyme_JHL," and "Rituxan_JHL."  Each subfolder contained Genentech documents alongside JHL documents related to JHL's biosimilar development efforts (*id.* ¶¶ 127, 129, 131, 172, 254).

---

[3]  Genentech has been wholly owned by the Roche Group since March 2009 (Compl. ¶ 43).

In June 2013, Xanthe's husband Allen traveled to Taiwan for six weeks to help JHL's development of analytical assays for the Rituxan biosimilar, with Xanthe assisting in the background. He continued to consult for JHL through the fall of 2015 and for several months in 2017. Allen was "deeply involved in" the development of JHL's biosimilars. He received 20,000 JHL stock options in 2013, is listed as a pre-IPO investor in JHL, and received an estimated $10,000 per month salary from JHL (*id.* ¶¶ 22, 53–55, 138–40).

In October 2013, Xanthe began directly working for JHL, unbeknownst to Genentech, who was still her employer. In December 2013, she too traveled to Taiwan for four weeks (with her Genentech-issued laptop in tow) to help JHL with its Rituxan biosimilar formulation strategy, all the while telling her Genentech coworkers that she was taking a vacation. While in Taiwan, Xanthe worked closely with Jordanov and Lin on formulation strategy and analytical development efforts for JHL's biosimilars (Compl. ¶¶ 146, 156–57).

In 2014, Xanthe helped the son of a family friend, defendant John Chan, land a job at JHL. This was his first job upon earning his Ph.D. At JHL, he became project leader for the Pulmozyme biosimilar development. Xanthe "coached" him and supervised his work by holding regular Skype meetings with Chan. In 2017, Chan left JHL for another biopharmaceutical company (*id.* ¶¶ 67–70, 254).

Xanthe continued to transmit confidential Genentech documents to JHL, usually through her husband Allen, while still serving as a principal scientist at Genentech. For example, in September 2014, she sent Allen a confidential technical report for Chan's use, noting to Allen that he should give Chan only a hard copy of the document and should tell Chan not to show it to others. She also continued to work on various JHL documents, using information from confidential Genentech documents to "edit and improve" JHL's protocols (*id.* ¶¶ 25, 31, 126).

In the summer of 2017, JHL hired defendant James Quach, another former Genentech employee, at Xanthe's recommendation. His work focused on managing JHL's manufacturing facility in China. On at least three occasions that summer shortly before leaving for his new job in China, Quach visited Xanthe's home, where she allowed Quach to use her Genentech log-in credentials to access and download onto a personal USB drive hundreds of confidential

United States District Court

For the Northern District of California

1  Genentech documents related to manufacturing policies and protocols.  And, once in China,

2  Quach again requested and received additional confidential Genentech documents from Xanthe

3  (*id.* ¶¶ 40, 57–58, 256).

4  Genentech "promptly" notified the United States Attorney's Office of the Lams'

5  conduct alleged herein, and the FBI launched its own investigation thereafter.  Supposedly at

6  the government's request, Genentech refrained from filing the instant suit or otherwise

7  interfering with the government's investigation and instead "closely tracked" Xanthe's

8  activities.  In September 2017, the FBI executed a search warrant of the Lams' home.  Thirteen

9  months later, on October 29, 2018, the indictment against Xanthe Lam, Allen Lam, James

10  Quach, and John Chan was unsealed.  Later that same day, Genentech filed the instant civil

11  action against JHL, Racho Jordanov (CEO of JHL), Rose Lin (General Manager of JHL),

12  Xanthe Lam, Allen Lam, James Quach, and John Chan, asserting claims of federal and state

13  trade secret misappropriation, conspiracy to misappropriate trade secrets, violation of the

14  Computer Fraud Abuse Act ("CFAA"), conspiracy to violate the CFAA, and various state law

15  violations (*id.* ¶¶ 36–38, 247–48, 259–355).[4]

16  The claimed trade secrets generally relate to Genentech's (1) validated analytical

17  methods to test and ensure the stability, potency, purity, identity, and quality of the four

18  biologics; (2) information regarding the development and selection of a formulation for those

19  four biologics and Tecentriq (another Genentech biologic); (3) the compilation of documents

20  Xanthe collected regarding the four biologics; (4) manufacturing and operation protocols,

21  including GMP-compliant procedures; and (5) the compilation of documents Quach

22  downloaded regarding manufacturing and operation protocols (*id.* ¶ 177).[5]

23  Genentech alleges that defendants conspired to steal Genentech's trade secrets related to

24  the four biologics at issue (Pulmozyme, Rituxan, Herceptin, and Avastin) in order to get an

25  unlawful leg up in JHL's "race[] to complete clinical trials and establish GMP-compliant

---

26

27      [4]  The parallel criminal action, *United States v. Lam, et al.*, Case No. 18-cr-00527-WHA, was first
assigned to the undersigned judge.  The instant civil suit was related soon thereafter.

28      [5]  Genentech filed a statement of its trade secrets pursuant to California Code of Civil Procedure
2019.210 concurrently with its motion for preliminary injunction (Dkt. No. 21).

United States District Court

For the Northern District of California

1  manufacturing facilities" in a bid to gain regulatory approval and quickly hit the global market.

2  It asserts that the "astonishing" rate at which JHL — a relatively young biotechnology company

3  with fewer than a hundred employees — has been able to develop its biosimilars is evidence

4  that JHL is using Genentech's trade secrets (Compl. ¶¶ 32, 41).

5     On November 5, 2018 (soon after this action commenced), Genentech moved for

6  provisional relief (Dkt. No. 20).  On January 4, 2019, all defendants moved to dismiss (Dkt.

7  Nos. 57, 59, 62, 66, 67, 69) and to stay the instant action pending resolution of the criminal

8  proceeding (Dkt. Nos. 56, 58, 60, 64).  This order follows full briefing and oral argument.

**ANALYSIS**

10   **1.    JHL'S RULE 12(B)(2) MOTION TO DISMISS FOR
           LACK OF PERSONAL JURISDICTION.**

11     JHL — which operates primarily in Taiwan and China and has no immediate plans to

12  market in the United States — moves to dismiss for lack of personal jurisdiction.

13     California's long-arm statute authorizes the exercise of personal jurisdiction to the

14  extent consistent with due process. CAL. CIV. PROC. CODE § 410.10.  Thus, the inquiry

15  collapses to our court of appeals' test for the exercise of specific jurisdiction over a nonresident

16  defendant:  "(1) the defendant must either 'purposefully direct his activities' toward the forum

17  or 'purposefully avail himself of the privileges of conducting activities in the forum'; (2) 'the

18  claim must be one which arises out of or relates to the defendant's forum-related activities'; and

19  (3) 'the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must

20  be reasonable.' "  *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir.

21  2017) (quoting *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).  "The

22  plaintiff bears the burden of satisfying the first two prongs of the test."  *Ibid.* (quoting

23  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).  Once the

24  plaintiff satisfies that burden, "the burden then shifts to the defendant to 'present a compelling

25  case' that the exercise of jurisdiction would not be reasonable."  *Id.* at 1068–69.

26

27

28

"Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, 'the plaintiff need only make a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss.' " *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (quoting *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011)). While a plaintiff "may not simply rest on the 'bare allegations of the complaint,' " "uncontroverted allegations must be taken as true, and 'conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor.' " *Ibid.* (quoting *Schwarzenegger*, 374 F.3d at 800).

"If personal jurisdiction exists over one claim, but not others, the district court may exercise pendent personal jurisdiction over any remaining claims that arise out of the same 'common nucleus of operative facts' as the claim for which jurisdiction exists." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004)).

This order finds that Genentech has made a *prima facie* showing that JHL, by allegedly conspiring with the Lams, purposefully directed its intentional torts to California such that JHL would be reasonably subject to the personal jurisdiction of this court. The details now follow.[6]

### A.   Purposeful Direction.

"Where, as here, a case sounds in tort, we employ the purposeful direction test." *Axiom Foods*, 874 F.3d at 1069 (citing *Dole Food*, 303 F.3d at 1111). Under this test, the defendant must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Ibid.* (quoting *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 673 (9th Cir. 2012)). The "express aiming" requirement is satisfied by pleading that the defendant "engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Dole Food*, 303 F.3d at 1111 (quoting *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)).

---

[6]   Genentech, in its opposition, does not argue that there is general jurisdiction over JHL. This order therefore only addresses specific jurisdiction.

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

1    Genentech argues that JHL purposely directed its activities to California by

2    "orchestrat[ing] and execut[ing] a scheme to steal trade secrets in California" (Dkt. No. 93 at 6).

3    The thrust of this contention lies in the purported conspiracy involving JHL's recruitment of the

4    Lams to misappropriate Genentech's trade secrets on JHL's behalf (*id*. at 7).  Genentech thus

5    argues that there is personal jurisdiction over JHL (1) because the conduct of the Lams, JHL's

6    alleged agents, may be imputed to JHL, and (2) independently based on its chief officers

7    Jordanov and Lin, who directed their alleged conduct to California.

8    JHL repeatedly contends that Genentech's allegations of JHL's involvement in the

9    misappropriation are conclusory and that Genentech alleges no facts specific to JHL's conduct.

10    This order disagrees.  The totality of the allegations herein is sufficient to support a reasonable

11    inference that Jordanov and Lin recruited the Lams — California residents and, as to Xanthe, a

12    Genentech employee — for the purpose of misappropriating Genentech's trade secrets on JHL's

13    behalf.  This order therefore finds that Genentech has made a *prima facie* showing that JHL

14    purposely directed its activities to California.

15    Notably, JHL does not try to dispute the specific alleged activities by defendants.[7]

16    Rather, it attempts to isolate those activities and attack those allegations individually.  For

17    example, JHL argues that Genentech did not specifically allege that Xanthe misappropriated

18    trade secrets on JHL's behalf while consulting for JHL in Taiwan in December 2013 (Dkt. No.

19    57 at 11–12).  It asserts that the fact that Xanthe "had dinner and exchanged text messages"

20    with Jordanov and Lin is insufficient to tie JHL to Xanthe's conduct (*id*. at 12).  Nor is the fact

21    that Lin and Jordanov knew Xanthe was still employed by Genentech indicative of JHL's

22    involvement in the misappropriation, according to JHL (Dkt. No. 104 at 4).

23    JHL's attacks fall short, however, as they ignore the context of those factual allegations.

24    When properly read in context and taken as true, those facts sufficiently support a reasonable

25    inference of the alleged conspiracy.  For example, before heading to Taiwan, Xanthe allegedly

26

27        [7] Genentech alleges that Xanthe and Quach "admitted to the vast majority of conduct alleged in this
28    complaint during a series of voluntary interviews" (Compl. ¶ 39).  And, the only evidence JHL submitted with
its motion is the Lin declaration stating, *inter alia*, that JHL had no written employment contract with Xanthe
and that its contract with Allen explicitly categorized him as an independent contractor (*see* Dkt. No. 57-1).

United States District Court

For the Northern District of California

downloaded numerous confidential Genentech documents containing trade secrets regarding analytical and formulation methods (Compl. ¶ 28).  She saved those documents in "JHL"-labeled folders, specifically named for each of the four Genentech biologics, onto her Genentech-issued laptop (*id*. ¶¶ 22–25, 29, 129–33).  While in Taiwan, Xanthe worked closely with Jordanov and Lin on formulation strategy for JHL's biosimilars (*id*. ¶ 157).  And, while merely having dinner and exchanging text messages with Lin and Jordanov might seem innocuous enough, Xanthe's cozy relationship with JHL's co-founders — compounded with Allen's JHL founder stock options — increases the plausibility that the Lams agreed to misappropriate Genentech's trade secrets on JHL's behalf.  This inference is further supported by the fact that the Lams have known Lin since at least 2009, when they consulted for Eusol (also while Xanthe was still employed at Genentech), another Taiwanese competitor for whom Lin then served as plant manager.  Xanthe had consulted for Eusol in a similar manner — downloading and saving confidential Genentech documents onto her Genentech-issued laptop into specially-created folders, consulting on-site, and continuing her consulting services back in California (*id*. ¶¶ 214–18).  Lin's prior experience with the Lams at Eusol thus goes to the inference that Lin sought them out to do the same for her own company, JHL.

Moreover, upon returning to the United States, the Lams allegedly continued to assist JHL's biosimilar development efforts from their California residence by siphoning more Genentech trade secrets.  For example, Xanthe discussed confidential Genentech documents with Lin, which was transmitted by Allen, regarding Genentech's analytical methods for Rituxan (*id*. ¶ 175).  Xanthe edited JHL protocols — presumably sent by JHL to Xanthe in California — by inserting specifications from confidential Genentech documents (Compl. ¶¶ 25, 29, 132–37).  She worked closely with Allen, who was "deeply involved" in the biosimilar development efforts, including helping him create "several internal JHL Formulation Development presentations" in 2014 and 2015 (*id*. ¶¶ 54, 141).  She continued to send additional confidential Genentech information to JHL through Allen and Chan, whom Xanthe directly supervised, and allowed Quach to access additional confidential Genentech documents before he started at JHL (*id*. ¶¶ 31, 40, 165, 169).

Jordanov and Lin knew that Xanthe was still employed by Genentech at the time and thus knew that she could access confidential information related to the four biologics at issue. They were also aware that she was consulting for JHL in direct violation of company policy. Jordanov stated he understood Xanthe's apprehension over holding weekly Skype calls with Chan — which she stopped having because she did not "want to get into trouble" because they were "too sensitive" — given her concurrent employment with Genentech (*id*. ¶¶ 173–74).

JHL's current "Core Product Candidates" exactly target the four Genentech biologics at issue (Lin Decl. ¶ 14). Jordanov previously stated that "[c]ountless international pharmaceutical companies have attempted to develop a rituximab biosimilar" (and presumably failed) (Compl. ¶ 186). Thus as a young, small startup entering the biopharmaceutical space, JHL had the incentive to access Genentech's proprietary documents and short circuit the reverse engineering process in order to quickly "develop a product identical in quality, safety, and efficacy to [the Genentech] reference" product (*id*. ¶¶ 17, 186).

Based on the totality of the foregoing allegations, JHL's attempt to deny involvement with the alleged misappropriation strains credulity. This order therefore finds that Genentech has more than plausibly alleged that JHL reached into California based on the purported conspiracy.

JHL's reliance on *Baker Hughes Inc. v. Homa*, No. C H-11-3757, 2013 WL 5775636 (S.D. Tex. Oct. 25, 2013) (Judge Lee Rosenthal), a non-binding decision, is unavailing. There, the Texas-based plaintiff alleged that the Austrian defendants recruited its *Virginia*-based employees for the purpose of stealing the plaintiff's trade secrets. *Id*. at *18. The district court held that the alleged conduct was insufficient to establish the Austrian defendants' minimum contacts with the Texas forum, particularly where it was "too speculative" to infer that the defendants specifically recruited the plaintiff's employees to obtain its trade secrets. *Ibid*. It also found that the Austrian defendants' mere email sent to the plaintiff's Texas-based employee in an *attempt* to recruit that resident failed to show that it had reached into the forum. *Id*. at *19. The district court further held that the Austrian defendants' passive reception of the plaintiff's trade secrets was insufficient contact. *Id*. at *14.

Here, in contrast, Genentech has sufficiently alleged the requisite minimum contacts: JHL successfully recruited California residents specifically to steal and use California trade secrets. As Genentech points out, the instant action is more analogous to *Montana Silversmiths, Inc. v. Taylor Brands, LLC*, 850 F. Supp. 2d 1172 (D. Mont. 2012) (Judge Richard Cebull). There, as here, the nonresident defendant successfully recruited the plaintiff's resident employee for the purpose of obtaining the plaintiff's trade secrets. *Id*. at 1182. This, the district court found, was sufficient contact. And, within our district, *Way.com, Inc. v. Singh*, No. C 18-04819 WHO, 2018 WL 6704464 (N.D. Cal. Dec. 20, 2018) (Judge William Orrick), similarly held that a nonresident defendant purposefully directed its conduct at the forum where the defendant stole the trade secrets of a company "it knew to be based in [the forum], causing harm it knew would be suffered [there]." *Id*. at *8.[8]

JHL's insistence that the aforementioned decisions are distinguishable because, unlike the defendants in *Montana Silversmiths* and *Way.com*, it does not have immediate plans to compete with Genentech in California and thus Genentech suffers no harm in the forum state, is unpersuasive (Dkt. No. 104 at 7). The focus of those holdings centered on the nonresident defendant's forum contacts and the alleged harm within the forum, *not* on direct competition within the forum. And, our court of appeals has "repeatedly held that a corporation incurs economic loss, for jurisdictional purposes, in the forum of its principal place of business." *CollegeSource*, 653 F.3d at 1079. As such, though JHL does not currently compete with Genentech in California, Genentech incurs any economic harm stemming from the trade secret misappropriation in California.

In sum, this order finds that Genentech has sufficiently alleged that JHL purposefully directed its activities to California by targeting Genentech — which JHL knew was

---

[8] For similar reasons, JHL's citations to *Sarkis v. Lajcak*, No. C 08-01911 RMW, 2009 WL 3367069 (N.D. Cal. Oct. 15, 2009) (Judge Ronald Whyte), *aff'd*, 425 F. App'x 557 (9th Cir. 2011), and *Walden v. Fiore*, 571 U.S. 277 (2014), are unavailing because the ties between the defendant and the forum state in those cases were far more tenuous than those alleged here.

11

United States District Court
For the Northern District of California

headquartered in California — when it recruited California residents Xanthe and Allen Lam to misappropriate Genentech's trade secrets, thereby causing harm in California.[9]

### B.    Relation to Forum.

A claim "arises out of" the defendant's local conduct if "but for" the contacts between the defendant and the forum state, the plaintiff's injury would not have occurred. *Doe v. Am. Nat. Red Cross*, 112 F.3d 1048, 1051–52 (9th Cir. 1997). This prong is satisfied. Here, but for JHL's express targeting of Genentech and its California trade secrets, Genentech's alleged injuries would not have occurred. Genentech's claims therefore arise out of JHL's California-related activities.

### C.    Reasonableness.

"If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)). Our court of appeals considers seven factors in determining whether the exercise of jurisdiction over a nonresident defendant is reasonable:

> (1) the extent of the defendant['s] purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Dole Food*, 303 F.3d at 1114. JHL has not met its burden.

*First*, the extent of JHL's purposeful injection, though not as extensive as Genentech contends, is more than minimal. As alleged, JHL specifically recruited California residents — while one was still employed by Genentech — for the purpose of stealing Genentech's trade secrets. Though JHL does not plan to compete with Genentech in California in the immediate future, it has pointedly reached into California to commit the alleged intentional torts. This factor thus weighs in favor of Genentech.

---

[9] Because this order finds that JHL, through Lin and Jordanov, directly reached into California (as alleged in the complaint), it does not reach the issue of whether or not the Lams were JHL's agents.

United States District Court

For the Northern District of California

*Second*, JHL argues that its burden of defending in California is substantial with respect to transporting witnesses and evidence and translating documents (Dkt. No. 57 at 15). Genentech as plaintiff, however, bears the burden of deposing witnesses and collecting relevant evidence in Taiwan.  Document translation also will most likely occur to a certain degree no matter which jurisdiction Genentech brings this suit.  This factor thus weighs only slightly in favor of JHL.

*Third*, JHL does not identify any actual interest by Taiwan in adjudicating this dispute. Moreover, in determining the amount of weight to give the third factor, courts look at the defendant's presence or absence of connections to the United States.  *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1489 (9th Cir. 1993).  Here, JHL's chief officers Jordanov and Lin themselves maintain residences in California.  In email correspondence, they list Rancho Santa Fe, California as JHL's "U.S. Office" (Compl. ¶ 46).  JHL collaborates with other biotechnology companies in San Francisco (*ibid*.).  JHL hired many former Genentech and Amgen employees (*id*. ¶ 45).  JHL's connection to the United States (and California in particular) is strong.  This factor thus holds little weight.

*Fourth*, California — Genentech's principal place of business — has "a strong interest in providing an effective means of redress for its residents tortiously injured."  *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1200 (9th Cir. 1988).  That Genentech also operates outside of California does not negate California's clear interest in adjudicating this dispute.  This factor thus weighs in favor of Genentech.

*Fifth*, the location of evidence and witnesses is "no longer weighed heavily given the modern advances in communication and transportation."  *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998) (citing *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 129 (9th Cir. 1995)).  This factor is thus neutral.

*Sixth*, Genentech clearly has an interest in convenient and effective relief.  This factor favors Genentech.

*Seventh*, "[w]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable."  *CollegeSource*, 653 F.3d at 1080 (quoting *Bauman v.*

13

*DaimlerChrysler Corp.*, 644 F.3d 909, 929 n.19 (9th Cir. 2011)).  This order finds that, on balance, JHL has not shown "a compelling case" that exercise of jurisdiction would be unreasonable under these circumstances.  The existence of an alternative forum is thus irrelevant.

*          *          *

In sum, this order finds that Genentech has made a *prima facie* showing that JHL had minimum contacts with California and that exercise of jurisdiction over JHL would be reasonable.  Accordingly, JHL's motion to dismiss for lack of personal jurisdiction is **DENIED**.

### 2.    DEFENDANTS' RULE 12(B)(6) MOTIONS TO DISMISS.

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility when the party asserting it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When ruling on a motion to dismiss, a court may generally consider only allegations in the pleadings, attached exhibits, and matters properly subject to judicial notice.  The court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030–31 (9th Cir. 2008).  Conclusory allegations or "formulaic recitation of the elements" of a claim, however, are not entitled to the presumption of truth.  *Iqbal*, 556 U.S. at 681.

### A.    The DTSA and CUTSA (Claims 1–2).

#### (i)    Actions Post-DTSA Enactment.

As an initial matter, defendants Jordanov, Lin, Allen Lam, and Chan argue that Genentech failed to state a claim under the DTSA because their alleged conduct occurred before the enactment of the DTSA.

The DTSA, which Congress enacted on May 11, 2016, only applies to conduct occurring "on or after the date of the enactment of this Act."  *See* DEFEND TRADE SECRETS ACT

14

United States District Court

For the Northern District of California

OF 2016, Pub. L. No. 114–153, § 2, 130 Stat. 376 (2016) (codified as amended at 18 U.S.C. § 1836).  The DTSA gives rise to a claim for an "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  "Misappropriation" under the DTSA includes the (1) acquisition, (2) disclosure, or (3) use of a trade secret.  *Id.* § 1839(5).

Here, Genentech failed to specifically allege "some relevant act" made after May 2016 involving misappropriation by Jordanov, Lin, Allen, or Chan.  Instead, Genentech argues that other defendants' actions made post-DTSA enactment — such as JHL's alleged continued use of the misappropriated trade secrets — may be imputed onto each of the moving defendants as participants of the trade secret theft conspiracy.  Defendants contend that Genentech's conspiracy allegations are deficient.

As other courts have found, "[n]othing suggests that the DTSA forecloses a use-based theory simply because the trade secret being used was misappropriated before the DTSA's enactment."  *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. C 15-02177 SI, 2017 WL 1436044, at *4 (N.D. Cal. Apr. 24, 2017) (Judge Susan Illston); *see also Adams Arms, LLC v. Unified Weapon Sys., Inc.*, No. C 16-1503-T-33AEP, 2016 WL 5391394, at *6 (M.D. Fla. Sept. 27, 2016) (Judge Virginia Hernandez Covington)).  The " 'DTSA applies to misappropriations that began prior to the DTSA's enactment if the misappropriation continues to occur after the enactment date,' so long as the defendant took *some relevant act* after that date."  *Sonoma Pharm., Inc. v. Collidion Inc.*, No. C 17-01459 EDL, 2018 WL 3398940, at *5 (N.D. Cal. June 1, 2018) (Magistrate Judge Elizabeth Laporte) (citations omitted) (emphasis added) (quoting *Veronica Foods Co. v. Ecklin*, No. C 16-07223 JCS, 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017) (Magistrate Judge Joseph Spero)).

"The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to the plaintiff from an act or acts done in furtherance of the common design."  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994) (citing *Doctors' Co. v. Superior Court*, 49 Cal. 3d 39, 44 (1989)).  "[T]he major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a

2   direct actor and regardless of the degree of his or her activity." *Ibid*.

3       As discussed at length above in connection with the personal jurisdiction analysis, this

4   order finds that Genentech has pled sufficient facts suggesting (1) an agreement among JHL,

5   Jordanov, Lin, and the Lams to misappropriate Genentech's trade secrets; (2) that those

6   defendants committed misappropriation; and (3) Genentech continues to suffer harm due to

7   JHL's continued use of its trade secrets.

8       Genentech, however, failed to adequately allege an agreement between JHL and Chan.

9   It merely alleges that JHL hired Chan at Xanthe's recommendation and that he, at a later point,

10  used Genentech's trade secret.  The alleged facts center mainly on Chan's relationship with

11  *Xanthe*.  Missing is any specific allegation allowing a reasonable inference as to Chan's

12  agreement with *JHL* to misappropriate trade secrets on its behalf.

13      Based on the foregoing, this order finds that JHL's alleged continued use of the

14  misappropriated trade secrets post-DTSA enactment may be imputed onto Jordanov, Lin, and

15  Allen.  It may *not*, however, be imputed to Chan, as Genentech's allegations regarding his

16  participation in the conspiracy with JHL are insufficient at this stage.

17      Accordingly, Jordanov, Lin, and Allen's motions to dismiss the DTSA claim as to them

18  are **DENIED** and Chan's motion to dismiss is **GRANTED** with **LEAVE TO AMEND**.

19              *(ii)*     ***Adequacy of Pleadings of Misappropriation Under***
                          ***the DTSA and CUTSA as to Individual Defendants.***
20
21      Defendants Jordanov, Lin, and Chan next argue that Genentech failed to adequately

22  plead trade secret misappropriation in violation of CUTSA and DTSA as to them.

23       For the purposes of this motion, the elements of CUTSA and DTSA claims are

24  substantially the same.  *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL

25  2123560, at *7 (N.D. Cal. May 15, 2017).  "To qualify as a trade secret under California Civil

26  Code Section 3426.1, the information at issue must derive economic value from not being

27  generally known to the public and be subject to reasonable measures to maintain its secrecy."

28  *Qiang Wang v. Palo Alto Networks, Inc.*, No. C 12-05579 WHA, 2013 WL 415615, at *2 (N.D.

    Cal. Jan. 31, 2013).

16

The elements for indirect misappropriation (as applicable to Jordanov, Lin, and Chan) are as follows:

> (1) the plaintiff is the owner of a valid trade secret;
>
> (2) the defendant acquired the trade secret from someone other than the plaintiff and
>
>> (a) *knew or had reason to know* before the use or disclosure that the information was a trade secret and knew or had reason to know that the disclosing party had acquired it through improper means or was breaching a duty of confidentiality by disclosing it; or
>>
>> (b) knew or had reason to know it was a trade secret and that the disclosure was a mistake;
>
> (3) the defendant used or disclosed the trade secret without plaintiff's authorization; and
>
> (4) the plaintiff suffered harm as a direct and proximate result of the defendant's use or disclosure of the trade secret, or the defendant benefitted from such use or disclosure.

*Ibid.* (emphasis added).  Moreover, to be personally liable, a "corporate director or officer must have known or had reason to know of the misappropriation and then unreasonably participated in the unlawful conduct." *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1389 (2000), *as modified on denial of reh'g* (Apr. 7, 2000).  A "corporate director or officer's participation in tortious conduct may be shown not solely by direct action but also by knowing consent to or approval of unlawful acts." *Id.* at 1380.

Defendants Jordanov and Lin contend that Genentech's allegations that they knew or should have known of Xanthe's trade secret theft and that they unreasonably participated in the misappropriation are conclusory (Dkt. Nos. 59 at 6–7; 62 at 6–9).  Defendants are wrong.  As discussed above in connection with the personal jurisdiction analysis, the totality of Genentech's allegations support a reasonable inference that Jordanov and Lin recruited Xanthe to misappropriate Genentech's trade secrets.  *See supra* Section 1(A).  As such, Jordanov and Lin's reliance on *AccuImage Diagnostics Corporation v. Terarecon, Inc.*, 260 F. Supp. 2d 941 (N.D. Cal. 2003) (Judge Marilyn Patel), is unavailing.  There, the district court rejected the plaintiff's allegation that the defendants (consisting of a competitor, its CEO, and the plaintiff's former employee) conspired to steal its trade secrets as conclusory.  The plaintiff's only specific

United States District Court

For the Northern District of California

1    allegations supporting its conspiracy theory as to the CEO defendant was the CEO's expressed

2    interest in hiring the plaintiff's then employee, the employee's laptop full of the plaintiff's trade

3    secrets, and the defendant corporation's subsequent release of a competing product.  *Id.* at

4    950–51.  The district court held that this was insufficient to state a claim as to the CEO's trade

5    secret misappropriation.

6         Here, in contrast, much more was alleged to support the inference of Jordanov and Lin's

7    at least knowing consent of the trade secret misappropriation (as discussed above).  Like the

8    district court in *AccuImage* explained in finding a sufficiently pled conspiracy allegation as to

9    another defendant, "[a]n alleged conspirator's 'requisite concurrence and knowledge may be

10   inferred from the nature of the acts done, the relation of the parties, the interests of the alleged

11   conspirators, and other circumstances.' "  *Id.* at 952 (quoting *Wyatt v. Union Mortg. Co.*, 24

12   Cal. 3d 773, 785 (1979)).

13        Lin's additional contention that her communications with Xanthe regarding Genentech's

14   proprietary analytical methods were merely passive reception of a trade secret is similarly

15   misplaced (Dkt. No. 59 at 8).  Unlike in *Silvaco Data Systems v. Intel Corporation*, 184 Cal.

16   App. 4th 210, 223 (2010), *disapproved on other grounds by Kwikset Corporation v. Superior

17   Court*, 51 Cal. 4th 310 (2011), where the defendant "inadvertently [came] into possession of a

18   trade secret," Lin, as alleged, actively sought out and discussed Genentech's trade secrets with

19   Xanthe.  Nor is Jordanov's assertion that he was unaware of Xanthe's concurrent employment

20   at Genentech during her December 2013 consultation plausible under the alleged circumstances,

21   especially given that he is a former longtime Genentech employee.  Again, defendants attempt

22   to isolate each allegation in a vacuum.[10]

23        Jordanov and Lin further argue that Genentech's conspiracy allegations are conclusory

24   particularly in light of the fact that Xanthe's work for JHL in December 2013 related to

25

26   _____

27        [10]  Because this order finds that Genentech sufficiently pled that Lin and Jordanov directly participated
     in the alleged conspiracy that resulted in harm to Genentech, the "agent's immunity rule" does not apply.  *See

28   AccuImage*, 260 F. Supp. 2d at 947 ("[T]he agent's immunity rule does not apply in cases where directors and
     officers of a corporation 'directly order, authorize, or participate in the tortious conduct.' ") (quoting *Wyatt*, 24
     Cal. 3d at 785)).

replicating formulations already publicly disclosed (Dkt. Nos. 62-1 at 8–9; 59 at 7).[11]  This is a red herring.  Of course the formulations of the four biologics are publicly disclosed by Genentech itself.  Rather, the alleged trade secrets at issue relate to "undisclosed proprietary information regarding how Genentech came to decide upon the most suitable formulation for [the biologic], and the relative strengths and weaknesses of various formulations for [the biologic], and the relative strengths and weaknesses of various formulations for [the biologic] that Genentech considered internally" (Dkt. No. 63-1 at 3).  This kind of proprietary information may come in the form of negative know-how, and JHL's own formulation may still have benefitted from such information by avoiding costly research pitfalls.  To repeat, Jordanov and Lin, as alleged, sought out Genentech's trade secrets by hiring the Lams.  That one aspect of the formulation of Genentech's biologics may be publicly known does not by itself destroy this reasonable inference (particularly where these defendants do not specifically dispute the adequacy of Genentech's other claimed trade secrets).  Nor does it compel the conclusion that Xanthe's work only involved non-actionable reverse engineering.[12]

Chan argues that Genentech failed to sufficiently allege that he knew that the information at issue contained alleged trade secrets or that Xanthe acquired it by improper means (Dkt. No. 101 at 4).  CUTSA, however, only requires that Chan *had reason to know* that the information was a trade secret and that he *had reason to know* that it was acquired through improper means.  Here, Chan allegedly received a confidential Genentech Technical Report that was "clearly labeled as 'GENENTECH Pharm R & D Technical Report – CONFIDENTIAL' " and clearly marked "Confidential" and "Internal Only" at the bottom of the cover page (Compl.

---

[11]  Jordanov and Lin request judicial notice of a portion of Genentech's Statement Regarding Trade Secrets Purusuant to California Code of Civil Procedure 2019.210 (Dkt. No. 63).  Genentech does not oppose (Dkt. No. 93 at 16).  A court may judicially notice a fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FRE 201(b).  Accordingly, Jordanov and Lin's request for judicial notice is GRANTED.

[12]  This order rejects Jordanov and Lin's contention that Genentech's claimed "formulation" trade secrets are too vague at the pleading stage, as discussed below.  *See infra* Section 3(A)(ii).  Accordingly, their reliance on *Vendavo, Inc. v. Price f(x) AG*, No. C 17-06930 RS, 2018 WL 1456697, *4 (N.D. Cal. Mar. 23, 2018) (Judge Richard Seeborg), and *Space Data Corp. v. X*, No. 16-CV-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017) (Judge Beth Freeman), where the district courts found the plaintiffs' claimed trade secrets inadequately pled, is unavailing.

United States District Court
For the Northern District of California

¶ 169).  This report concerned the stability and compatibility of Pulmozyme with Stedim bags for storage, shipping, and handling — the exact topic JHL was researching at that time (*id.* ¶ 171).  Chan was also specifically given a hard copy (rather than an e-copy) of the report and was told not to show the document to others.  Based on the foregoing, this order finds that Chan at least had reason to know that the document contained alleged trade secrets, that it was obtained through improper means, and used it.

Accordingly, defendants Jordanov, Lin, and Chan's motions to dismiss the trade secret misappropriation claims for lack of adequate pleading are **DENIED**.

**B.    Conspiracy Liability Under CUTSA, DTSA,
          and CFAA (Claims 3 & 9).**

All defendants argue that claims three and nine involving stand-alone claims of conspiracy to misappropriate trade secrets under the DTSA and CUTSA and conspiracy to violate the CFAA, respectively, fail because (1) Genentech failed to adequately plead the elements of civil conspiracy under California or federal law, and (2) California law and the federal statutes do not provide for an independent, stand-alone civil claim for conspiracy (*e.g.*, Dkt. No. 57 at 20–23).  As to the former point, this order has already found the adequacy of Genentech's conspiracy allegations in connection with the post-DTSA claim.  And, as to the latter point, Genentech in its opposition does not seriously dispute defendants' contention that neither the DTSA nor CUTSA provides for a stand-alone civil conspiracy claim.

"The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design."  *Applied Equip. Corp.*, 7 Cal. 4th at 511 (citing *Doctors' Co.*, 49 Cal. 3d at 44).  At the pleading stage, Genentech is only required to allege facts which "plausibly suggest[] . . . agreement."  *Twombly*, 550 U.S. at 557.

As discussed above, Genentech's conspiracy allegation overreaches as to Chan.  This order also finds that Genentech's conspiracy allegation as to Quach fails for similar reasons.  To repeat, the alleged facts focus mainly on Chan and Quach's relationship with *Xanthe*.  Genentech offers no specific allegation to support a reasonable inference as to Chan and Quach's agreement with *JHL* to steal trade secrets on its behalf.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

To defendants' latter point, under California law, "civil conspiracy is not a separate and distinct cause of action." *AccuImage*, 260 F. Supp. 2d at 947 (citing *Entm't Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1228 (9th Cir.1997)). Instead, civil conspiracy is "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp.*, 7 Cal. 4th at 510–11. As such, it can be considered in the context of other tort claims. *Yulaeva v. Greenpoint Mortg. Funding, Inc.*, No. C S-09-1504 LKK/KJM, 2009 WL 2880393, at *5 (E.D. Cal. Sept. 3, 2009) (Judge Lawrence Karlton).

Defendants are therefore correct that there can be no independent civil conspiracy claim under CUTSA. And, Genentech cites no authority suggesting that Section 1836(b) of the DTSA provides for a stand-alone private action for conspiracy to misappropriate trade secrets (nor does Genentech attempt to make any serious argument for such in its briefing).[13]

Moreover, as discussed in the section above, Genentech failed to adequately plead that JHL and Quach entered into an agreement to misappropriate Genentech's trade secrets. Therefore, even assuming (without deciding) that the CFAA provides for a conspiracy claim, the claim as asserted against JHL is deficient.

Accordingly, defendants' motions to dismiss claim three regarding conspiracy to misappropriate are **GRANTED** and the claim is **DISMISSED WITH PREJUDICE**. JHL's motion to dismiss claim nine is **GRANTED** with **LEAVE TO AMEND**.

### C.   Common Law Claims (Claims 5–7).

JHL, Jordanov, Lin, Allen Lam, Chan, and Quach move to dismiss claims five and seven involving intentional interference with contractual relations and aiding and abetting breach of duty of loyalty, respectively. They argue that those claims are (1) time barred under the two-year statute of limitations, and (2) superseded by CUTSA. Chan further argues that Genentech failed to plead sufficient facts to state these claims as to him. Xanthe moves to dismiss claim six involving breach of duty of loyalty, arguing that (1) it is time barred under the

---

[13] And, *Steves & Sons v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 843 (E.D. Va. 2017) (Judge Robert Payne), has already rejected the proposition that Section 1832(a)(5), which criminalizes conspiracy to violate the DTSA, provides for a private right of action.

United States District Court
For the Northern District of California

1    two-year statute of limitations, (2) she did not owe a fiduciary duty to Genentech, and (3) the

2    claim is superseded by CUTSA (Dkt. No. 67 at 11).

3          The statute of limitations for claims of interference with contractual relations, breach of

4    duty of loyalty, and aiding and abetting breach of duty of loyalty is two years.  *Knoell v.*

5    *Petrovich*, 76 Cal. App. 4th 164, 168 (1999); *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d

6    911, 1001 (C.D. Cal. 2011) (Judge David Carter) (citing CAL. CODE CIV. PROC. § 339(1)).

7          Here, Genentech alleged that it "first received notice of the allegations described herein

8    on or about October 11, 2016, via a tip received from a Genentech employee who was

9    concerned that Xanthe was engaged in improper consulting activities outside of Genentech"

10   (Compl. ¶ 244).  Genentech filed the instant action on October 29, 2018.  Thus, according the

11   defendants, Genentech's common law claims fall just outside the two-year window.

12         Genentech counters that the tip concerned Xanthe's consulting activities with AP

13   Biosciences, Inc. (another Taiwanese competitor), not JHL (*see id.* ¶ 245; Dkt. No. 93 at 28).

14   This alone, Genentech argues, did not give it notice of Xanthe's activities involving JHL and

15   the claims asserted in the instant action.  Rather, Genentech did not have reason to suspect

16   JHL's involvement until mid-November 2016, which Genentech argues is when the clock began

17   to run (Dkt. No. 93 at 29).  This extraneous explanation, however, is found only in Genentech's

18   briefing rather than in the complaint itself.  Without deciding the merits of Genentech's

19   contentions, JHL, Jordanov, Lin, Allen, Chan, and Quach's motions to dismiss claims five and

20   seven involving intentional interference with contractual relations and aiding and abetting

21   breach of duty of loyalty are **GRANTED** with **LEAVE TO AMEND**.[14]

22         On the other hand, Genentech does not attempt to salvage claim six for breach of duty of

23   loyalty.  Nor can it, as claim six covers *all* of Xanthe's consulting activities, including those

24   done for AP Biosciences.  Accordingly, Xanthe's motion to dismiss claim six is **GRANTED** and

25   the claim is **DISMISSED WITH PREJUDICE**.

26

27

28         [14]  Because this order dismisses claims five and seven without prejudice based on the statute of
     limitations, it does not reach defendants' other arguments.

United States District Court

For the Northern District of California

**D.    CDAFA and CFAA (Claims 8 & 10).**

JHL contends that the CFAA and California's Computer Data Access and Fraud Act ("CDAFA") claims as to JHL fail because Genentech failed to adequately plead that Quach was acting as an agent of JHL in the summer of 2017 when he allegedly used Xanthe's log-in credentials to access the confidential JHL documents. As discussed above in Section 2(B), this order agrees. Accordingly, JHL's motion to dismiss claims eight and ten relating to violations under the CFAA and CDADA is **GRANTED** with **LEAVE TO AMEND**.

**3.    PLAINTIFF'S MOTION FOR PROVISIONAL RELIEF.**

To obtain a preliminary injunction, Genentech must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In our circuit, "serious questions going to the merits" and a balance of hardships that tips sharply in Genentech's favor can support issuance of a preliminary injunction so long as Genentech also shows a likelihood of irreparable injury and that the injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

Genentech relies primarily on its trade secret misappropriation claims in seeking provisional relief. JHL contends that the harm alleged is reparable. It further disputes Genentech's showing of a likelihood of success on the merits because (1) "much" of the information at issue does not constitute trade secrets, and (2) JHL "is not currently using" Genentech's trade secrets (Dkt. No. 77 at 5–18). All defendants also take issue with the scope of provisional relief requested by Genentech.[15]

This order concludes that Genentech has established all four *Winter* factors as to its trade secret misappropriation claims and that certain provisional relief is warranted, as detailed below.

---

[15] All other defendants join in JHL's opposition to the instant motion (Dkt. Nos. 70, 71–73, 76, 78). Lin and Jordanov's motions for joinder in JHL's opposition to the motion for preliminary injunction (Dkt. Nos. 76, 78) are **GRANTED**.

### A.   Likelihood of Success on the Merits.

Genentech brings misappropriation claims under the California Uniform Trade Secrets Act and the federal Defend Trade Secrets Act, both of which offer essentially the same definitions for our purposes.  "Misappropriation" means:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (A) Used improper means to acquire knowledge of the trade secret; or
>>
>> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
>>
>>> (i) Derived from or through a person who had utilized improper means to acquire it;
>>>
>>> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>>
>>> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>>
>> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

"Trade secret" means "information, including a . . . compilation" that:

> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

And, "improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage, and excludes reverse engineering or independent derivation.  CAL. CIV. CODE § 3426.1; *see also* 18 U.S.C. § 1839.

The Court has reviewed the motion record submitted by Genentech — which undoubtedly benefits from both internal and FBI investigations — and it is strong.  That is, Genentech has made a compelling showing at this stage that Xanthe (and later Quach)

1   downloaded hundreds of confidential Genentech documents containing trade secrets specifically

2   related to the four biologics at issue — which she used herself in assisting JHL's biosimilar

3   development and further supplied to others at JHL — and that JHL knew or at least should have

4   known of (if not authorized) Xanthe's conduct.

5       JHL disputes whether "much" of the information at issue qualifies as trade secrets,

6   contending that the information was generally known, that it was not subject to reasonable

7   efforts to maintain secrecy, and that Genentech's trade secret descriptions filed herein are so

8   vague that they fail to put JHL on notice (Dkt. No. 77 at 10–11).  It further disputes whether

9   JHL is "currently using" the information contained in the stolen documents (*id*. at 16).

10      That JHL studiously resorts to these qualifiers is telling.  Of course, by asserting that

11  "much" of the information at issue does not constitute trade secrets, JHL implicitly admits that

12  at least *some* of the information qualifies as trade secrets.  And, that JHL may not be *currently*

13  using Genentech's trade secrets says nothing about whether it *previously* used them, *i.e.*,

14  whether JHL used them to derive its current protocols and methods.  Nor does it say anything

15  about Genentech's contention that JHL directly *acquired* its trade secrets by conspiring with the

16  Lams, which is a separate ground for misappropriation.  As Genentech points out, JHL failed to

17  submit any evidence showing that no Genentech document was found at JHL.

18      Rather, the evidence points to the conclusion that JHL did in fact acquire Genentech's

19  trade secrets.  For example, Allen sent an email to Jordanov, Lin, and others at JHL on January

20  7, 2014, in which he "[a]ttached . . . the methyl green activity assay used by the *innovator*,"

21  observed that the innovator's (Genentech) assay was "doable" and was at least "familiar to the

22  FDA/EMEA, and acceptable to them," and stated that the "materials and chemicals required in

23  th[at] assay [were] already ordered" by JHL so that they "c[ould] try out the method"

24  (McCloskey Decl., Exh. 16) (emphasis added).  This evidence clearly links the JHL co-founders

25  to a confidential Genentech document and shows with likely success that the document included

26  Genentech trade secrets, at least by revealing the very assay (all steps and criteria included) that

27  was already validated and accepted by regulators.  Additionally, at oral argument, JHL's

28  counsel conceded that at least one of Genentech's confidential documents had been found at

United States District Court
For the Northern District of California

25

United States District Court

For the Northern District of California

1   JHL (while claiming ignorance as to the actual number of documents found) (Dkt. No. 117 at

2   73:16–25).

3       This order therefore finds that Genentech has established that it is more probable than

4   not that at least some of the information at issue qualifies as trade secrets and that it was

5   acquired and/or used by JHL.  To the extent JHL actually disputes the merits, this order now

6   addresses its most substantive arguments below (and JHL's other arguments not specifically

7   addressed would not alter the outcome of this order).

8                   *(i)    **Independent Economic Value.***

9       It is axiomatic that information in the public domain or that is generally known never

10  qualifies as a trade secret.  *Shapiro v. Hasbro, Inc.*, 653 F. App'x 568, 568–69 (9th Cir. 2016).

11  Here, Genentech claims as trade secrets information related to how it formulates, tests,

12  analyzes, controls, and manufactures its biologics.  The information also relates to "required

13  criteria for key" drug characteristics such as potency, purity, stability, and identity (Dkt. No. 21

14  at 2).

15      JHL contends that "many" of Genentech's alleged trade secrets are generally known.

16  That is, the "trade secret" information, according to JHL, "is the subject of vast disclosures in

17  myriad public sources," such as regulatory requirements, country-issued guidelines, industry

18  standards, patents, and publications by various companies (Dkt. No. 77 at 11).

19      True, some of the information JHL specifically points to within the trove of documents

20  at issue may be publicly disclosed in various patents, publications, and standardized protocols.

21  But pinpointing to certain aspects of the information at issue misses the forest for the trees.

22      For example, Genentech does not only claim particular information contained within the

23  Genentech documents, in isolation, as its trade secrets.  It also claims the *compilations* of that

24  information as trade secrets, *i.e.*, certain individual documents themselves are compilations of

25  proprietary and public information (Dkt. No. 107 at 5).  This order finds that there is a

26  likelihood that such compilations do in fact constitute trade secrets.  For example, biological

27  drug manufacturers often rely on publicly-available standard protocols, such as those provided

28  by the United States Pharmacopeia (Tessier Decl. ¶¶ 244–45).  But those standards offer general

United States District Court

For the Northern District of California

guidance that serve more as jumping off points by providing only "target" quality attributes to aim for in drug development (Balogh Suppl. Decl. ¶ 10).  They do not contain Genentech's specifications or the exacting level of detail needed to reach those benchmarks for its *specific* products (*ibid.*).  These internal specifics (as well as public information), taken comprehensively and conveniently placed in a single coherent document, likely qualify for trade secret protection, as they would provide the "step-by-step" methods and acceptance criteria used to test various aspects of the biologics.  Access to these compilations would therefore allow a competitor to accelerate its biosimilar development and — given that the whole point of the abbreviated approval pathway is to show that the biosimilar candidate is *highly similar* to the reference product — increase the likelihood of receiving regulatory approval (Balogh Decl. ¶ 8; Balogh Suppl. Decl. ¶ 5; Moore Decl. ¶ 7).[16]

### (ii)     *Reasonable Particularity.*

JHL argues that Genentech's Statement Regarding Trade Secrets is deficient.  JHL's main gripe with the statement is that it purportedly fails to distinguish Genentech's trade secrets from public knowledge.  That is, JHL contends that thirty-one of the thirty-six claimed trade secrets are described using broad categories and that additional detail provided through subcategories or citations to example documents insufficiently describe the alleged trade secrets with reasonable particularity (Dkt. No. 77 at 14).  This, JHL asserts, fails to distinguish Genentech's trade secrets, such as allegedly proprietary steps or specifications in a protocol, from matters of general knowledge or special knowledge of persons in the trade.  JHL further contends that the other five claimed trade secrets related to the compilation of documents similarly suffer from a lack of distinction between proprietary and public information.

"Absent a showing that the details alone, without further explanation, are inadequate to permit the defendant to discern the boundaries of the trade secret so as to prepare available defenses, or to permit the court to understand the identification so as to craft discovery, the

---

[16]  This, however, should in no way be construed as the Court's blessing of *all* of Genentech's claimed trade secrets.  For example, JHL points to specific information that is indeed publicly disclosed.  And, the Court is skeptical at this stage of Genentech's claim that compilations created by *Xanthe* and *Quach* — JHL's supposed moles — are *Genentech's* trade secrets.

United States District Court

For the Northern District of California

1    trade secret claimant need not particularize how the alleged secret differs from matters already

2    known to skilled persons in the field."  *Brescia v. Angelin*, 172 Cal. App. 4th 133, 143 (2009).

3    " 'Reasonable particularity' mandated by [S]ection 2019.210 does not mean that the party

4    alleging misappropriation has to define every minute detail of its claimed trade secret at the

5    outset of the litigation.  Nor does it require a discovery referee or trial court to conduct a

6    miniature trial on the merits of a misappropriation claim before discovery may commence.

7    Rather, it means that the plaintiff must make some showing that is reasonable, *i.e.*, fair, proper,

8    just and rational."  *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th

9    826, 835–36 (2005) (citations omitted).  A trade secret identification should be "liberally

10   construed, and reasonable doubts about its sufficiency [should be] resolved in favor of allowing

11   discovery to go forward."  *Brescia*, 172 Cal. App. 4th at 149.

12          Here, Genentech's Statement Regarding Trade Secrets includes the following details for

13   most of its claimed trade secrets.  For each of the four biologics at issue, Genentech lists seven

14   categories of trade secrets:  (1) analytical methods to test and ensure the stability of the

15   biologic; (2) analytical methods to test and ensure the potency of the biologic; (3) analytical

16   methods to test and ensure the purity of the biologic; (4) analytical methods to test and ensure

17   the identity of the biologic; (5) manufacturing processes and analytical methods to test and

18   ensure the quality of the biologic; (6) information regarding development and selection of a

19   formulation for the biologic; and (7) the compilation of documents Xanthe compiled regarding

20   the biologic (*e.g.*, Dkt. No. 13-4 at 3–12).  Genentech further states within each category that

21   (*e.g.*, *id.* at 7):

22          because each step in the biologic manufacturing process becomes the
             foundation for subsequent steps . . . the trade secrets at issue comprise
23          both each individual protocol, procedure, specification, and
             acceptance criterion regarding the [critical quality attribute] of [the
24          biologic], as well as the combination of those protocols, procedures,
             specifications, and acceptance criteria.
25

26   The statement explains that Genentech memorialized the aforementioned material in various

     documents allegedly misappropriated by defendants, including Genentech's Standard Operating
27
     Procedures (SOPs), Test Procedures, Validation Protocols, Validation Reports, Qualification
28
     Protocols, Qualification Reports, and Technical Reports (*e.g.*, *ibid.*).  It then identifies

                                                   28

exemplary documents (which are attached as exhibits) that contain the trade secret information.

For example, Genentech identifies ████████████████████████████████

██████████ as an example document containing trade secret information related to testing

the purity of Pulmozyme (*id*. at 8, Exh. 7). ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

JHL has failed to show why this level of specificity is not reasonable at this stage. It

complains that the statement does not separate Genentech's trade secrets from public

knowledge, but JHL does not sufficiently show *how* that hinders it from crafting a defense or

the Court from crafting discovery. *See Brescia*, 172 Cal. App. 4th at 143. In fact, as Genentech

points out, JHL in its opposition has already defended against numerous documents Genentech

claims as its trade secrets, arguing that it is not "currently using" Genentech's trade secrets.

*John M. Floyd & Associates, Inc. v. First Imperial Credit Union*, No. C 16-1851 DMS (WVG),

2017 WL 4810223, at *4 (S.D. Cal. Oct. 25, 2017) (Judge Dana Sabraw), is thus

distinguishable, as the trade secret identification there only included a broad range of

documents that the defendant argued contained *only* generally known information that was used

in the relevant industry, leaving the defendant clueless as to what constituted the plaintiff's

trade secrets. Here, in contrast, JHL does not contest over half of the exhibits attached to

Genentech's Statement Regarding Trade Secrets (*see* Tessier Decl. ¶ 3; Rudge Decl. ¶ 8). Nor

does JHL contest that the *compilations* of the supposedly public information in the form of a

single document are not readily ascertainable.

Genentech has therefore sufficiently identified the information it claims as its trade

secrets for the purpose of granting provisional relief. JHL, however, is correct that the

*categories* of trade secrets within Genentech's statement risk vagueness at their outer edges.

This point will be addressed in determining the scope of provisional relief, as discussed below.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

### (iii)    *Reasonable Efforts to Maintain Secrecy*.

JHL next contends that Genentech failed to take reasonable measures to protect the information's secrecy.  It does not dispute that Genentech's policy of limiting access to the information, entering into confidentiality agreements with its employees, prohibiting unauthorized disclosure or use of confidential information during employment, and storing information in password-protected repositories constitutes sufficiently reasonable efforts to maintain secrecy (*see* Kirshman Decl. ¶¶ 26–60).  Rather, it argues Genentech lacked reasonable efforts by allowing Xanthe to continue on as normal for eleven months after learning of her consulting work for competitors.  Genentech, for example, did not take any action to curb her access to proprietary information, such as using commercially available monitoring software that identify and block email with certain attachments or to certain addresses (Dkt. No. 77 at 16; Racich Decl. ¶¶ 11, 14).  This order disagrees.  Genentech immediately launched an investigation into Xanthe's conduct but avoided taking any action that might have alerted Xanthe to the FBI investigation because of the government's request.  Once the FBI searched her house, Genentech took immediate action and fired Xanthe soon after (Kirshman Decl. ¶¶ 4, 19).  Under these circumstances, this order finds that Genentech's efforts were reasonable.  Discovery into this story may weaken it, but the present record is more than adequate for the tailored provisional relief that will be granted herein.[17]

### (iv)    *Current Use of Trade Secrets*.

JHL finally argues that Genentech failed to show that JHL is "currently using" the alleged trade secrets (Dkt. No. 77 at 16–17).  It asserts that "many" of JHL's protocols corresponding to Genentech's trade secrets are materially different.  JHL argues, for example, that it cannot be using Genentech's alleged trade secret regarding "the stability and compatibility of Pulmozyme with Stedim bags for storage, shipping, and handling" because

---

[17]  JHL moves to strike the McGavock Declaration and Supplemental Kirshman Declaration submitted with Genentech's reply brief (Dkt. No. 109).  Because this order does not rely on those declarations — as much of the information contained therein can be independently reasonably inferred from the material not objected to and/or is irrelevant for present purposes — JHL's motion to strike is **DENIED AS MOOT**.

1   ████████████████████████████████████████████████████

2   █████████████████ (Tessier Decl. ¶ 75).

3        As discussed above, this argument fails to grapple with the allegation that JHL *acquired*

4   Genentech's trade secrets through the Lams.  It also seemingly concedes — by repeated use of

5   qualifiers such as "many" of JHL's protocols are not "currently" using Genentech's trade

6   secrets — that either at least one of JHL's protocols are currently using trade secrets or that JHL

7   used the trade secrets in the past (or both).  Moreover, that certain JHL protocols differ in

8   material ways from Genentech's corresponding protocols does not foreclose JHL's alleged use

9   of Genentech's negative know-how trade secrets.  Such use would confer JHL the benefit of

10  steering clear of fruitless development pathways, thereby saving precious time and resources.

11       Accordingly, this order finds that Genentech has shown a likelihood of success on the

12  merits of its trade secret misappropriation claims.

13                    **B.    Irreparable Harm.**

14       Both parties debate whether or not a presumption of irreparable harm applies in trade

15  secret cases.  This order need not reach the issue because it concludes Genentech has shown

16  irreparable harm without the benefit of any presumption.

17       Here, Genentech faces the risk of further disclosure of Genentech's trade secrets to third

18  parties.  This harm would be irreparable.  For example, JHL has already entered into a high-

19  profile partnership with multinational pharmaceutical company Sanofi — another Genentech

20  competitor — to develop and market the Rituxan biosimilar.  Partnerships with other third

21  parties are also likely on the horizon.  This, Genentech argues, evidences JHL's "intention to

22  use and disclose Genentech's trade secrets to benefit Genentech's competitors" (Dkt. No. 20 at

23  25).  This order agrees.

24       JHL's reliance on *Faiveley Transport Malmo AB v. Wabtec Corporation*, 559 F.3d 110

25  (2d Cir. 2009), is unpersuasive.  JHL disputes the risk of disclosure asserted by Genentech

26  based on the United States Court of Appeals for the Second Circuit's observation that "once a

27  trade secret is misappropriated, the misappropriator will often have the same incentive as the

28  originator to maintain the confidentiality of the secret in order to profit from the proprietary

United States District Court
For the Northern District of California

31

1    knowledge." *Id*. at 119.  There, the defendant clearly aimed to *only* use the trade secrets

2    "without further dissemination or irreparable impairment of value." *Ibid*.  But the appellate

3    court also observed that, in general, " 'the loss of trade secrets cannot be measured in money

4    damages' where that secret, once lost, is 'lost forever,' " and thus irreparable harm is likely

5    shown "where there is a danger that, unless enjoined, a misappropriator of trade secrets will

6    disseminate those secrets to a wider audience." *Ibid*. (quoting *FMC Corp. v. Taiwan Tainan*

7    *Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)).  While the proposition that a misappropriator

8    would be incentivized to maintain secrecy may be sometimes true, that incentive is chipped

9    away here by various partnerships that might require the sharing of information containing

10   Genentech's trade secrets in the course of dealing.  Thus the risk of further disclosure is a

11   tangible one, and JHL has not persuaded otherwise.

12        Moreover, Xanthe allegedly downloaded and provided to JHL hundreds of confidential

13   Genentech documents filled with proprietary negative know-how.  The use of such information

14   would be "virtually untraceable," thereby making the task of identifying (and enjoining) which

15   of JHL's biosimilars used Genentech's trade secrets, if Genentech were to prevail at trial, a

16   "bone-crushing endeavor." *See Waymo*, 2017 WL 2123560, at *10–11.

17        JHL further contends that the fact that Genentech filed the instant motion two years after

18   learning of Xanthe's alleged misconduct in October 2016 shows that harm to Genentech is not

19   imminent, or is at least exaggerated.  Even if exaggerated, this order finds that the risk of

20   irreparable harm due to dissemination and/or the untraceable use of Genentech's trade secrets

21   nevertheless presently exists.  Moreover, JHL's contention ignores Genentech's cooperation

22   with the government investigation (*see* Peters Suppl. Decl. ¶¶ 4–11).  All district court decisions

23   JHL cites to are therefore distinguishable.

24        JHL also argues that the lack of imminent harm is further shown by the fact that its

25   biosimilars are still undergoing regulatory review and thus there still remains at least two years

26   before commercialization.  This argument, however, is more properly addressed in fashioning

27

28

1  the scope of provisional relief rather than in the outright denial of any relief, as discussed

2  below.[18]

3  **C.    Public Interest.**

4  There is public interest in vindicating intellectual property rights and prohibiting

5  illegitimate competition.  This is particularly true where biosimilar developers must expend

6  huge amounts of time and capital to reverse engineer the innovator's manufacturing process and

7  undergo rigorous regulatory review.  Due to the high barrier to market entry, there remains an

8  acute need to keep the playing field level and tolerate only legitimate competition.  JHL's

9  counter to this point essentially amounts to its contention that Genentech failed to show a

10  likelihood of success on the merits.  This order disagrees with JHL, as discussed above.

11  JHL further argues that the public has an interest in more affordable life-saving

12  medicine and that the requested provisional relief could slow public access to such medicines

13  (Dkt. No. 77 at 25).  The tailored provisional relief provided herein, however, helps ensure that

14  access to these more affordable medicines, if ultimately vindicated, is not unduly delayed.

15  The individual defendants also contend that the public has an interest in fair and even-

16  handed criminal proceedings and that Genentech's requested relief would thwart this interest

17  (*e.g.*, Dkt. No. 71 at 15).  This concern is also addressed in the scope of relief provided below.

18  **D.    Balance of Hardships.**

19  Genentech overreaches in its requested provisional relief, which was lifted from the

20  provisional relief granted by the undersigned in *Waymo LLC v. Uber Technologies, Inc.*, No. C

21  17-00939 WHA, 2017 WL 2123560, at *13–14 (N.D. Cal. May 15, 2017).  Specifically,

22  Genentech seeks to (Dkt. No. 20-1):

23  (1)  enjoin defendants from using or disclosing the claimed trade secrets;

24  (2)  enjoin defendants from selling products developed using
     Genentech's trade secrets;

25

26  (3)  enjoin defendants from utilizing any protocols or methods using
     Genentech's trade secrets;

27

28

---

[18]  The parties also debate the correct characterization of the relevant market at issue.  This issue (and the consequence of loss of market share), however, need not be reached for this order to find irreparable harm.

(4)  enjoin defendants from submitting any filings using Genentech's trade secrets before regulatory bodies;

(5)  require defendants to return to Genentech within fourteen days of a ruling (a) all copies of Genentech documents and information, and (b) all materials (*e.g.*, cell lines, test results, drug substances) containing any or derived from Genentech's trade secrets;

(6)  require JHL, Jordanov, and Lin to conduct an investigation and provide a detailed accounting under oath setting forth each individual and entity to whom defendants disclosed (a) any Genentech documents or other materials, or (b) any of Genentech's trade secret information within thirty days of a ruling; and

(7)  require defendants to provide a log of all oral and written communications wherein Xanthe Lam, Allen Lam, John Chan, or James Quach may have mentioned any Genentech trade secret to anyone connected to JHL.

But the present circumstances differ from those in *Waymo* in terms of degree of imminent harm (as demonstrated by Genentech's one-year gap between the FBI's execution of the search warrant and the commencement of the instant action) and the criminal proceedings against certain individual defendants.  Genentech thus fails to justify the scope of its requested relief.  Upon tailoring said relief as described below, however, this order finds that the balance of hardships favors Genentech.

JHL argues that Genentech's trade secret descriptions are vague and overbroad such that Genentech's requested relief "would inevitably require JHL to refrain from using public and independently derived information to assure compliance" (Dkt. No. 77 at 21).  Nor has Genentech shown, JHL argues, that it is entitled to the drastic relief of effectively halting JHL's biosimilar development (as reflected in Genentech's second and fourth requests).

JHL further contends that the fifth, sixth, and seventh requests "impose disproportionately burdensome affirmative obligations on" it (*id*. at 22).  For example, the fifth request asks that JHL return materials "containing any, or derived from any" Genentech trade secret, thereby potentially forcing JHL to reveal its own proprietary information.  And, JHL argues, the sixth and seventh requests "effectively seek expedited discovery without good cause for doing so," particularly when the alleged harm is not imminent (*id*. at 23).

The individual defendants Jordanov, Lin, Xanthe Lam, Allen Lam, Chan, and Quach join JHL's opposition.  Xanthe Lam, Allen Lam, and Chan further contend that the fifth and

34

seventh requests directly implicate their right against self-incrimination.[19]  As the Supreme

Court of the United States held in *United States v. Hubbell*, 530 U.S. 27, 36–37 (2000),

> "the act of production" itself may implicitly communicate "statements of fact."  By "producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic."  Moreover . . . when the custodian of documents responds to a subpoena, he may be compelled to take the witness stand and answer questions designed to determine whether he has produced everything demanded by the subpoena.  The answers to those questions, as well as the act of production itself, may certainly communicate information about the existence, custody, and authenticity of the documents.

Responding to Genentech's requests to document production, they argue, will amount to

testimony by each defendant that they determined for themselves that they are (or are not) in

possession of Genentech materials and information.  Those defendants further contend that the

fifth request requiring them to return documents in turn requires them "to make extensive use of

the contents of [their] own mind[s]."  *Id*. at 43.

For their part, the Lams have proposed to turn over any responsive materials to their

counsel until the criminal action is resolved and agree to be bound by orders prohibiting them

from using or disclosing any Genentech trade secret ruled legitimate pending resolution of this

action (Dkt. No. 71 at 12).  They specifically oppose the granting of the fifth request as to JHL,

however, because it would allegedly severely prejudice the Lams (as well as Chan and Quach).

This is so, they argue, because the parties in the criminal proceeding lack the power to pursue

criminal discovery against a foreign national located outside of the United States.  JHL's

compelled disclosures under that request, according to defendants, "will provide the

Government with evidence for its criminal prosecution that it could not obtain absent

[Genentech's] seeking such information through civil discovery" (*id*. at 13).

---

[19]  Chan further argues that he should not be bound by *any* form of provisional relief, arguing that Genentech failed to make a substantive showing of its claims against him, and therefore objects to all seven requests for relief as applied to him (Dkt. No. 70).  Genentech, however, points to evidence that Chan likely came to some confidential Genentech documents and that he worked closely with Xanthe as head of Pulmozyme formulation.  This is sufficient to show a likelihood of success of the merits of the CUTSA claim against Chan.  And, any disclosure of the trade secrets by Chan would cause irreparable harm.  In light of the fact that Chan has not shown that he would be overburdened by the tailored provisional relief provided herein, his request to be excluded from any provisional relief provided herein is therefore **DENIED**.

In considering all arguments on both sides as to the scope of provisional relief, this order hereby grants the following relief (to become effective upon the posting by Genentech of a bond or other security in the amount of **50 MILLION DOLLARS**):

(1)  Defendants shall not disclose (including to Sanofi or any other current and/or potential business partner of JHL) or further use, directly or indirectly, any of the sixty-six Genentech documents referenced in (and appended to) Genentech's Statement Regarding Trade Secrets (Dkt. No. 21) or any portion therein;

(2)  Defendants shall not offer to sell, market, commercialize, or sell biologics, therapeutics, drugs, and/or products of any kind that utilize, embody, or were developed, in whole or in part, with the benefit or use of any of the sixty-six Genentech documents referenced in (and appended to) Genentech's Statement Regarding Trade Secrets;

(3)  JHL and any officer, director, employee, agent, supplier, or consultant of JHL shall preserve and return to Genentech (or the Court) within **TWENTY-ONE (21) CALENDAR DAYS** of the date of Genentech's posting of bond all copies, excerpts, and summaries thereof of all Genentech documents (including those not specifically appended to Genentech's Statement Regarding Trade Secrets), whether or not qualifying as a trade secret, and shall identify which officer, director, employee, agent, supplier, or consultant of JHL possessed said documents and/or information.  Counsel of record and their litigation experts may make copies to use in defending this civil action.  Jordanov, Lin, Xanthe Lam, Allen Lam, Chan, and Quach shall preserve and return the aforementioned material to their respective counsel pending resolution of the criminal proceeding, and their counsel shall certify their client's compliance, within **TWENTY-**

36

**ONE (21) CALENDAR DAYS** of the date of Genentech's posting of bond;

(4)  JHL, Jordanov, and Lin (collectively "JHL Defendants"), shall, within **FORTY-TWO (42) CALENDAR DAYS** of the date of Genentech's posting of bond, conduct a thorough investigation and provide a detailed accounting under oath, setting forth each individual and entity to whom or to which defendants and any of them, and their employees or representatives, and all persons acting in concert or participating with them, disclosed any information within any of the sixty-six Genentech documents referenced in (and appended to) Genentech's Statement Regarding Trade Secrets (in paper, electronic, or any other form, including, for example, cell lines, assays, test results, drug substances, or drug products), what they saw or heard, when they saw or heard it, and for what purpose.  This order requires more than querying servers with keyword searches.  For example, the JHL Defendants must interview personnel, particularly focusing on anyone who has communicated with Xanthe Lam, Allen Lam, John Chan, or James Quach;

(5)  JHL Defendants shall, within **FORTY-TWO (42) CALENDAR DAYS** of the date of Genentech's posting of bond, provide a detailed accounting of the extent to which, if any, the protocols, methods, and/or processes adopted by JHL track any information contained within any of the sixty-six Genentech documents referenced in (and appended to) Genentech's Statement Regarding Trade Secrets;

(6)  Defendants shall prepare, within **FORTY-TWO (42) CALENDAR DAYS** of the date of Genentech's posting of bond, a complete and chronologically organized log of all oral and written communications — including, without limitation, conferences, meetings, phone calls,

**United States District Court**
For the Northern District of California

Skype or video-chat sessions, one-on-one conversations, texts, emails, letters, memos, and voicemails — wherein Xanthe Lam, Allen Lam, John Chan, or James Quach may have mentioned any Genentech confidential, proprietary, or trade secret information to any officer, director, employee, agent, supplier, or consultant of the JHL Defendants. The log shall identify for each such communication the time, place (if applicable), mode, all persons involved, and subjects discussed, as well as any and all notes, recordings, invoices, or other records referencing such communication. JHL shall provide this completed log to Genentech's counsel (or the Court) within **FORTY-TWO (42) CALENDAR DAYS** of Genentech's posting of bond. Jordanov, Lin, Xanthe Lam, Allen Lam, Chan, and Quach shall provide this completed log to their respective counsel pending resolution of the criminal proceeding, and their counsel shall certify their client's compliance, within **FORTY-TWO (42) CALENDAR DAYS** of Genentech's posting of bond.

This order allows all work towards regulatory approvals to continue. None of the sixty-six Genentech documents referenced in (and appended to) Genentech's Statement Regarding Trade Secrets or any portion therein, however, may be further disclosed to any regulatory authority, hospital, or any other person or entity involved in the regulatory approval process without JHL's first obtaining the Court's permission. And, defendants are enjoined from any further action going towards commercialization once the regulatory approval process is completed for that biosimilar.

All of the provisional relief granted herein is without prejudice to Genentech taking discovery. For example, if the foregoing provisional relief or Genentech's discovery reveals that any of the protocols adopted by JHL track verbatim, or almost verbatim, any of the sixty-six Genentech documents referenced in (and appended to) Genentech's Statement Regarding

United States District Court

For the Northern District of California

1   Trade Secrets, then the Court would likely expand the provisional relief to enjoin use of that

2   protocol so long as the information at issue qualifies as a Genentech trade secret.

3        Further, he who seeks equity must do equity.  That is, Genentech must also account for

4   those sixty-six Genentech documents referenced in (and appended to) its Statement Regarding

5   Trade Secrets.  Within **THIRTY-FIVE (35) CALENDAR DAYS** of the date of Genentech's posting

6   of bond, Genentech must provide a log to JHL's counsel (or the Court) explaining the extent to

7   which the aforementioned documents have been disclosed by Genentech — including (1) all

8   persons and/or entities (*e.g.*, vendors, regulatory agencies, hospitals) to whom Genentech has

9   disclosed any of the aforementioned documents and whether those persons and/or entities were

10  subject to a non-disclosure agreement, and (2) all articles, presentations, patents, emails, or any

11  other similar publication by Genentech that disclosed to a third party any of the aforementioned

12  documents or any significant portion contained therein.

13                    *              *              *

14       The Court sustained specific personal jurisdiction at the pleading stage with respect the

15  motion to dismiss.  But certain jurisdictional facts were still contested to a degree (though ruled

16  in favor of Genentech at the pleading stage, as this order must), which must be ruled on at the

17  motion for summary judgment or trial stage.  Before granting provisional relief, the Court feels

18  obliged to look beyond the pleadings to assure itself that it has personal jurisdiction over JHL.

19  Having received the evidentiary record submitted on the motion for provisional relief, the Court

20  is more than satisfied that personal jurisdiction over JHL does in fact exist in the instant action

21  and so finds.

22

23       **4.   DEFENDANTS' MOTIONS TO STAY.**

24       The individual defendants intend to assert their Fifth Amendment right against self-

25  incrimination (Swanson Decl. ¶¶ 6–7; Craig Decl. ¶¶ 6–7; Divelbiss Decl. ¶¶ 5–6; Boersch

26  Decl. ¶¶ 7–8; Schwartz Decl. ¶¶ 2–11).  All defendants now move to stay the action pending the

27  resolution of the criminal proceeding, to take effect after the ruling on Genentech's motion for

28  preliminary injunction.

39

"The Constitution does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings." *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1995) (citing *Fed. Sav. & Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 902 (9th Cir. 1989)). "[A] court may decide in its discretion to stay civil proceedings . . . when the interests of justice seem to require such action." *Ibid.* (quoting *Sec. & Exch. Comm'n v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980)) (citations omitted). The decision whether to stay civil proceedings in the face of a parallel criminal proceeding should be made in light of the particular circumstances and competing interests involved in the case. *Ibid.* (quoting *Molinaro*, 889 F.2d at 902). Our court of appeals has held that:

> the decisionmaker should consider "the extent to which the defendant's fifth amendment rights are implicated." In addition, the decisionmaker should generally consider the following factors: (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation.

*Id.* at 324–25 (citation omitted) (quoting *Molinaro*, 889 F.2d at 903).

The gravamen of the individual defendants' arguments centers on the contention that the instant civil action, which substantially overlaps with the parallel criminal action, would put the defendants "in the untenable position of having to choose between exercising [their] constitutional right against self-incrimination and defending [themselves] in the civil action" (*see, e.g.*, Dkt. No. 56-1 at 1). JHL argues that while it has no Fifth Amendment right to invoke, it will nevertheless be inhibited in its ability to defend itself in the instant action since its key witnesses will refuse to testify (Dkt. No. 58 at 1). And, it stresses that while JHL, Jordanov, and Lin have not been named as defendants in the criminal action, they are nevertheless a focal point in that proceeding (*id.* at 2).

For its part, Genentech agrees that a partial stay is warranted as to the indicted defendants Xanthe Lam, Allen Lam, Quach, and Chan and proposes the following as to those defendants: (1) that they be required to answer Genentech's complaint (even if to just invoke

United States District Court
For the Northern District of California

1  the Fifth Amendment in response), and (2) Genentech be permitted to seek "non-testimonial

2  discovery" in the form of requests for document production (Dkt. No. 92 at 2).  Moreover, to

3  purportedly level the playing field, Genentech requests that the indicted defendants be

4  prohibited from participating in discovery in the instant civil action until the stay is lifted

5  (*ibid.*).  Genentech argues, however, that no stay is warranted as to JHL, Jordanov, and Lin.

6              **A.      Plaintiff's Interest and Defendants' Burden.**

7              As discussed above, Genentech has already conceded that the indicted defendants' Fifth

8  Amendment privilege warrants a partial stay.  No valid reason is offered, however, for

9  Genentech's proposal to require indicted defendants to answer the complaint.  Genentech's

10  request to require them to answer is therefore denied.  This order also finds that Genentech's

11  desire to serve indicted defendants requests for document production is outweighed by indicted

12  defendants' risks of adverse inference (if they invoke the Fifth Amendment) and violation of

13  their Sixth Amendment right to counsel.  Further, this order finds that extension of this partial

14  stay as to Jordanov and Lin is proper.  That is, Genentech may not depose or request document

15  production from Lin or Jordanov.  Nor are Lin or Jordanov required to answer Genentech's

16  complaint.  All defendants, however, should still attend depositions still in play.

17              As to JHL, on the other hand, no stay will be granted.  JHL complains that it would be

18  hampered in defending itself in the action because it would not be able to rely on key witnesses,

19  including Jordanov and Lin — JHL's cofounders who are at center stage in the alleged scheme

20  to misappropriate Genentech's trade secrets — because of their Fifth Amendment privileges.

21  But the same would be true for Genentech, who would be similarly unable to build its case

22  without these key witnesses.  Moreover, JHL has not shown that it cannot rely on any other

23  witness of substance, such as other senior officers and/or employees at JHL.

24              Furthermore, the complete stay that JHL seeks would hinder Genentech's ability to

25  perform third-party discovery — third parties who may not necessarily preserve relevant

26  evidence.  Genentech has a legitimate interest in seeking timely discovery from these third

27  parties, particularly in light of the fact that there is a risk that Genentech's trade secrets have

28  *already been* disclosed to others.  This risk cannot be mitigated by provisional relief.

Defendants rightly point to Genentech's two-year delay before filing this action from the time it first learned of Xanthe's alleged wrongdoing. Genentech counters that it refrained from alerting Xanthe of the FBI investigation at the government's request (Peters Suppl. Decl. ¶¶ 4–11). While defendants' point is well-taken, this order finds that, overall, the two-year gap is not fatal to Genentech, as the delay does not necessarily mean that Genentech does not now have a *present* interest in expeditiously litigating this case. This is especially true given that the evidence revealed by the government to Genentech during that time directly supported Genentech's request for provisional relief (*id.* ¶ 10).

Defendants further argue that allowing discovery related to JHL would allow the government to gain a more expansive scope of discovery than it otherwise would be entitled to. They argue that the civil and criminal actions have been coordinated in order to obtain evidence for both proceedings (*see, e.g.*, Tubach Decl. ¶ 3). As alluded to in connection with the scope of provisional relief, this point is not inconsequential. Defendants, however, have not shown any evidence of "bad faith or malicious governmental tactics" that rises to the level of warranting a full stay. *See Lizarraga v. City of Nogales Arizona*, No. C 06-474 TUC DCB, 2007 WL 215616, at *3 (D. Ariz. Jan. 24, 2007) (Judge David Bury) (quoting *Mainelli v. United States*, 611 F. Supp. 606, 615 (D.R.I. 1985)). For example, "[t]his is not a case where the civil Plaintiff is the same litigant as the criminal prosecutor, such as where the government brings a civil enforcement action against a defendant and also criminally prosecutes him." *Ibid.* And, "[e]ven in those instances, a court will utilize the least imposing methods, in lieu of a stay, to protect a defendant's Fifth Amendment rights." *Ibid.*

Here, while there is evidence of coordination between Genentech and the government, it is clear that Genentech has its own independent interest in bringing the instant civil action against defendants — namely, to protect its alleged trade secrets and prevent illegitimate competition. To prevent potential abuse by the government to the extent possible, however, Genentech is ordered not to voluntarily provide to the government any evidence obtained during the course of discovery in the instant civil action. Moreover, while Genentech may request document production from JHL, such production must occur *in Taiwan*. That is,

United States District Court

For the Northern District of California

1    Genentech's counsel must go to Taiwan (or wherever the documents are located overseas) to

2    receive the requested documents and may bring back to the United States only its own notes and

3    summaries of those documents.  Without further order from the Court, the requested documents

4    themselves shall remain in their original location.  Once the criminal action is resolved,

5    Genentech may copy the evidence as needed (without needing the Court's approval).

6         In light of these limitations imposed on civil discovery, JHL's (which, to repeat, does

7    *not* have a Fifth Amendment right) complaint of prejudice is therefore outweighed by

8    Genentech's interest in moving the case forward.[20]  As such, this factor overall (to the extent

9    stated herein) weighs in favor of Genentech.

10                        **B.    Court's Convenience in Managing Its Docket.**

11        Defendants offer that without a stay, defendants' invocations of Fifth Amendment

12   privileges may provoke discovery disputes.  *See Waymo*, 2017 WL 2123560, at *5 (assertion of

13   Fifth Amendment privilege led to proliferation of contentious discovery disputes).  This order

14   agrees that there is a very real risk of discovery disputes absent a stay that would inconvenience

15   the Court.  This factor thus weighs in favor of at least a limited stay.

16                        **C.    Non-Party and Public Interests.**

17        Defendants argue that the public has an interest in a fair criminal trial.  Genentech

18   argues that the public has an interest "in a speedy resolution of the controversy."  *Keating*, 45

19   F.3d at 326.  Neither contention outweighs the other and this factor is therefore neutral.

20                        **D.    Additional Requests Made by Plaintiff.**

21        Genentech also argues that in order to make the partial stay as to the indicted defendants

22   "symmetrical," those defendants should "not participate in discovery in this civil action until the

23   stay is lifted."  Genentech further offers that in the criminal action, those defendants will "have

24   access to whatever information Genentech has produced to the government in response to

25   _____

26        [20]  This order recognizes that the Court has previously observed that "[a]llowing the civil proceedings
     to continue will permit the government to gain access to discovery that it would otherwise not have under the
27   federal rules of criminal procedure, such as documents derived from initial disclosures, defendants' responses to
     interrogatories, pleadings and admissions at any depositions."  *Fed. Ins. Co. v. Laney*, No. C 12-04708 WHA,
28   2013 WL 594267, at *3 (N.D. Cal. Feb. 14, 2013).  The circumstances here, however, are distinguishable
     because the evidence potentially discovered outside the scope of the criminal proceeding are largely directed to
     *non*-indicted parties.

demands for information" (Dkt. No. 92 at 2, 14).  The risk of asymmetrical discovery to Genentech's detriment, however, is largely negated by Genentech's request for drastic provisional relief.  As such, the individual defendants (including Lin and Jordanov) shall not initiate any depositions of or serve document production requests on any officer, director, employee, agent, supplier, or consultant of Genentech.  They may, however, otherwise participate in depositions by others and receive documents produced by others.

*          *          *

On balance, defendants have not shown that a full stay of the instant action is warranted. Defendants' motions to stay are therefore **GRANTED IN PART** and **DENIED IN PART**.  While Genentech may not depose, seek an answer from, serve interrogatories to, or request admissions or document production from any individual defendant (either indicted or unindicted), no stay will be imposed as to JHL.  The extent of the stay granted herein, however, may be revisited after six months of the date of this order.

### CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are **GRANTED** to the extent stated above and **DENIED** in all other respects.  Genentech may seek leave to amend and will have **21 CALENDAR DAYS** from the date of this order to file a motion, noticed on the normal 35-day track, for leave to file an amended pleading to the extent disputed in the instant motions. The motion must include a proposed amended pleading (and a redlined copy) and must explain why the new pleading overcomes all deficiencies, including those this order did not reach.

Plaintiff's motion for provisional relief is **GRANTED** to the extent stated above and **DENIED** in all other respects.

Defendants' motions to stay are **GRANTED** to the extent stated above and **DENIED** in all other respects.

**IT IS SO ORDERED.**

Dated:  March 1, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

44